UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES                  )
                                        )
v.                                       )          Crim. No. 03-10370-DPW
                                        )
FRANK GIGLIO                   )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FRANK GIGLIO'S MOTION TO SUPPRESS EVIDENCE DERIVED FROM ELECTRONIC SURVEILLANCE**

On July 21, 2003, Judge Tauro granted the government's application for authorization to intercept communications of eleven named individuals, including Giglio, relating to various controlled substances and money laundering offenses, occurring over a telephone subscribed to Kurt Walter ("telephone #1"). On August 15, 2003, Judge Saris authorized the interception of communications of the individuals named in the July 21, 2003, order, along with those of a number of additional individuals, over another telephone believed to be used by Walter ("telephone #2"), and over a telephone believed to be used by Douglas Bannerman ("telephone #3").[1] Giglio was intercepted over telephone #3.[2] On September 12, 2003, Judge Zobel authorized the continued

_____

[1]

  The application sought to add an additional 16 named individuals; Judge Saris found probable cause as to only 7 of them. Order, August 15, 2003.

[2]

  The government has not particularized the wiretaps during which Giglio was intercepted. Defendant's review of the line sheets has identified interceptions of Giglio on telephone #3 during this interception period and during the interceptions over telephone #3 pursuant to the November 7, 2003, order. Defendant has asked the government to inform him whether he was intercepted during other interception periods or on telephones other than telephone #3, but has not yet been provided with this information. It is not possible to determine definitively from the line sheets whether or not a particular individual was intercepted over a particular telephone because of the number of unidentified telephone numbers and unidentified participants. In addition, the line sheets seldom contain more than a brief summary of the conversation. Defendant Giglio reserves the right to supplement his motion and memorandum if he receives information after their filing indicating

interception of communications over telephones #1 - #3. On October 10, 2003, Judge Saris extended the authorization to intercept communications occurring over telephones #1 - #3 and also authorized interceptions of communications occurring over another telephone said to be used by Bannerman ("telephone #4"). On November 7, 2003, Judge Tauro extended the authorization to intercept communications occurring over telephones #1 -#4. Giglio was intercepted over telephone #3 during this interception period.

Defendant has moved to suppress all communications intercepted pursuant to the August 15, 2003, order, as well as all evidence derived therefrom, on the grounds that (1) the application/affidavit failed to satisfy the necessity requirement of 18 U.S.C. §2518(1)(c), and (2) that the affidavit failed to demonstrate probable cause to believe that he was committing the target offenses or that he would be intercepted discussing the target offenses over the target telephones. He has further moved to suppress all communications intercepted pursuant to the November 7, 2003, order, as well as all evidence derived therefrom, on the ground that the application/affidavit failed to satisfy the necessity requirement of 18 U.S.C. §2518(1)(c). In addition, he has moved to suppress all communications intercepted pursuant to the orders of September 12, 2003, October 10, 2003, and November 7, 2003, because those interceptions were extensions of the unlawful August 15, 2003,

---

that he was intercepted over telephones other than telephone #3 or during the periods of interception over telephone #3 pursuant to the orders of September 12, 2003, or October 10, 2003.

In addition, defendant has asked that the government inform him whether the individual who recorded conversations which he had with him in 2004, who Giglio believes was one of the named targets of the wiretap applications, began to cooperate with the government at any time before the November 7, 2003, wiretap application. If he did, and the individual is who Giglio believes he is, then the omission of this information from the applications/affidavits would have had a material bearing on the necessity determination. Defendant does not at present, however, have a good faith basis for asserting that there were any intentional or reckless omissions from the affidavits in this regard. *See Franks v. Delaware*, 438 U.S. 154 (1978). Defendant will seek leave to make additional filings related to the electronic surveillance conducted in this case if he learns that this individual, who remains formally unidentified by the government began cooperating with the government prior to November 7, 2003.

order. This memorandum will address each of these issues in turn.

**I.    APPLICATION, AFFIDAVIT, AND ORDER OF AUGUST 15, 2003**

    **A.    Averments of the July 21, 2003, Affidavit.[3]**

        **1.    Probable Cause**

This application, as well as each subsequent application, was supported by an affidavit of DEA Special Agent Brian Tomasetta. In January, 2003, Tomasetta believed, Newell, a named target, drove a truck from the west coast to Massachusetts, in the course of which journey he made calls to a former voicemail box of Bannerman's. 7/12 Aff. at 15. Telephone records indicated that during the same several days, there was telephone contact between Bannerman and telephone #1, a voicemail box believed to be used by Milo, another named target, and telephones subscribed by Giglio's home and business. *Id.* at 16. On January 24, 2003, officers observed Walter meet with Newell and put a duffle bag in Newell's truck; after Walter left, they saw another man place something in the rear of Newell's truck. A subsequent search revealed $218,910 in the rear of the truck; the duffle contained clothing, toilet articles, and $3,000. Marijuana was detected in residue vacuumed from the truck. *Id.* at 17-18. Thirty minutes after the seizure, a call was placed from a pay phone near Newell's hotel to Bannerman's voicemail box. *Id.* at 19. It was Tomasetta's opinion that Newell had driven a load of marijuana belonging to Bannerman to Massachusetts, that Newell called Bannerman en route to keep him abreast of his progress, that Bannerman called other targets to organize the collection of drug money, that Newell had already delivered the marijuana before the seizure, that the seized money was payment for the marijuana, and that Newell called Bannerman to tell him of the seizure. *Id.* at 19.

---

    [3]    A discussion of the averments of the July 21, 2003, affidavit is included because the August 15, 2003, affidavit relative to Bannerman's telephone incorporates it by reference.

**CI-1** stated that it "knew, based on direct knowledge, that Walter had been a marijuana trafficker for a number of years." *Id.* at 20. CI-1 did not have a personal relationship with Walter but was, according to Tomasetta, able to identify Walter and "other associates." CI-1 identified Bannerman as a close friend of Walter who, it had learned from another target, bought and sold marijuana and cocaine. *Id.* at 21.

**CW-1** came to the attention of law enforcement officers here as a result of an Oregon investigation which led to the execution of a search warrant at CW-1's home in Massachusetts on May 13, 2003. According to CW-1, she supplied Walter with 25-50 pounds of marijuana on approximately nine occasions in 2001-02. *Id.* at 24-25. In February, 2003, Walter fronted CW-1 60 pounds of marijuana and again supplied her with marijuana in April, 2003. CW-1 was to pay off the monies she owed Walter for the February marijuana in increments from the proceeds of the marijuana with which Walter continued to supply her. *Id.* at 26-27. At the behest of law enforcement, CW-1 had a number of telephone conversations with Walter in which they discussed the monies CW-1 owed to Walter and CW-1's need for marijuana from Walter. Law enforcement surveiled several meetings between CW-1 and Walter in May-June, 2003, during which CW-1 paid Walter portions of the money she owed him and Walter supplied her with marijuana. *Id.* at 28-46.

**CW-2** agreed to cooperate with law enforcement after he was intercepted engaging in drug-related conversations with Moreno-Fernandez, a named target whom the affidavit described as "a Mexican national who is a high-level distributor of controlled substances including cocaine and marijuana," *id.* at 7-8, during San Diego wiretaps in 2001-02. According to CW-2, in 2000, he and another individual drove 150 pounds of marijuana to San Diego for Bannerman, which Bannerman rejected because of its poor quality, although he referred Clark, another target, as a potential buyer. *Id.* at 48. Further according to CW-2, he brokered six large purchases (ranging from 495 - 1200

pounds) of marijuana by Bannerman and/or Milo from Moreno-Fernandez in 2001-02. *Id.* at 48-49.[4]

### 2.    Necessity.

#### a.    cooperating witnesses and confidential informants.

According to Tomasetta, **CW-1**'s usefulness was limited because she did not know Walter's true name or where he lived or his current or past drug suppliers or his current drug customers. Because Walter would not tell CW-1 the true name of the person he had enlisted to collect the monies owed by a customer of CW-1's, Tomasetta opined that Walter would be unwilling to share other information regarding his drug-dealing activities with CW-1. *Id.* at 59-60.

**CW-2** had, according to Tomasetta, no "direct evidence" of Bannerman's source of drugs or his customers or his means of transporting and storing drugs or what he did with his drug proceeds. Calls CW-2 made to Bannerman's voicemail box in October, 2002, and January, 2003, were not returned, and Moreno-Fernandez had cut off contact with CW-2, leading Tomasetta to believe that either the targets had decided not to utilize CW-2's services any longer or they suspected him of cooperating with law enforcement.[5]

**CW-4** had provided historical information only about Milo. Having CW-4 make contact

---

[4]

    **CW-3** was cooperating with the DEA after being arrested on federal firearms and drug-trafficking charges. CW-3 identified Clark as one of his marijuana customers and as an alternative source of supply. *Id.* at 51. According to CW-3, he supplied Clark with large quantities of marijuana on a number of occasions from the late 1990s through 2001.

    **CW-4** was cooperating with the DEA after his arrest on marijuana charges. According to CW-4, in 2001-02, he delivered 6-10 loads of marijuana, of 40-200 pounds each, from Milo to a customer in Massachusetts.

[5]

    CW-2 contacted Bannerman's voicemail box in April, 2003, without DEA approval, and left Bannerman a message which Tomasetta interpreted as either an effort by CW-2 to do "damage control" with Bannerman in the event that Bannerman thought that he was cooperating or a warning to Bannerman that he was cooperating. *Id.* at 61-62.

with Milo was being contemplated, but prospects for success were, Tomasetta believed, unclear, given the possibility that Milo knew of CW-4's arrest. Even were the contact successful, it would not, Tomasetta stated, fulfill the goals of the investigation, because even when CW-4 was buying marijuana from Milo, he did not know Milo's source of supply or his other customers. *Id.* at 62-63.[6]

### b. undercover agents.

The DEA was unaware of anyone who might be able to introduce an undercover agent to Walter other than CW-1. Because of measures taken by members of the conspiracy to avoid detection by law enforcement, Tomasetta believed it unlikely that an undercover agent "would be permitted to infiltrate sufficiently the organization to achieve the goals of the investigation." *Id.* at 66. As examples, Tomasetta pointed to Walter's unwillingness to give CI-2 his telephone number, Bannerman's declining use of his voicemail box after the January, 2003, seizure, and Clark's declining use of his own voicemail box after learning of CW-3's arrest. *Id.* at 66-67.

### c. grand jury.

Tomasetta included the standard recitations regarding why "subpoenaing persons believed to be involved in this conspiracy and their associates before a federal grand jury would not be completely successful in achieving the stated goals of this investigation." *Id.* at 67. Any such persons

---

[6] Because of his incarceration, **CW-3** could, Tomasetta said, provide only historical information about Clark, and Clark's awareness of CW-3's arrest would compromise CW-3's ability to have further drug-related conversations or meetings with Clark or any of the other targets. *Id.* at 62.

**CI-1** was unwilling to testify and had only limited, non-drug-related, contact with one of the targets. *Id.* at 5. **CI-2** had proven unreliable in the past and had no knowledge of any of the targets. *Id.* at 62 & n.11. Walter's unwillingness to give CI-2 his telephone number, Tomasetta opined, "illustrates the difficulty that any one cooperating witness, confidential informant, undercover agent or third party who is not already involved in the target's drug trafficking operation would encounter if attempts were made to infiltrate the operation." *Id.* at 64.

called to testify would likely invoke their Fifth Amendment privileges, and the government would not be willing to confer immunity on them, as such immunity could foreclose prosecution of "the most culpable members of the conspiracy." *Id.* at 67. Nor would a grant of immunity ensure truthful testimony. *Id.* Finally, Tomasetta said, service of grand jury subpoenas would alert the targets to the existence of the investigation. *Id.*

### d.     physical surveillance.

Although Tomasetta had no current information regarding where Walter lived, Walter had been surveiled on "numerous occasions," including his January, 2003, encounter with Newell, his April, 2003, Marathon party, and his meetings with CW-1. *Id.* at 68. Sustained surveillance at any of the addresses associated with Walter was, according to Tomasetta, "not practical," and could lead to the detection of surveillance, as those addresses were all in residential neighborhoods.  Agents had visited secluded property, largely surrounded by a tall fence, owned by Bannerman on about a dozen occasions; they saw no one entering or leaving and could not see into the property. *Id.* at 69. Bannerman also had an apartment on Boylston Street in Boston, which Tomasetta had surveiled. *Id.* Surveillance was conducted at these locations approximately 20 times between November, 2002, and February, 2003, but neither Bannerman nor his vehicles were observed.[7]

Tomasetta went on to opine that regular physical surveillance, in the absence of electronic surveillance, would be unlikely to develop sufficient evidence regarding when, how, and by whom marijuana was being transported to Massachusetts, the source of the marijuana and its intended recipients, the state of mind, knowledge, and roles of those observed, or the disposition of proceeds.

---

[7]     Surveillance of Clark was conducted in May and December, 2002, and on January 22, 2003; on the first of these occasions, Clark engaged in what Tomasetta believed were countersurveillance driving techniques. Law enforcement surveiled Giglio's place of business on January 22, 2003, and his home and business on April 17-18, 2003. *Id.* at 71-72.

*Id.* at 73. Sustained surveillance would be difficult, Tomasetta said, because of the nature of the areas in which many of the addresses were located, and prolonged surveillance risked alerting the targets to the investigation. *Id.* at 74. The targets would be likely to notice prolonged surveillance, "given the extreme countersurveillance measures engaged in by members of this long-standing conspiracy, including the use of pay phones, pre-paid calling cards, wireless telephones and voicemail boxes to avoid identification of the telephones they are using in furtherance of their drug trafficking, using telephones subscribed in third parties' names, false or fictitious names and addresses or false or fictitious business names, rotating rental vehicles, and suspected use of electronic counter-surveillance devices and counter-surveillance techniques." *Id.* at 75. The amount of information which could be obtained through physical surveillance was, Tomasetta continued, limited.

     **e.**  **interviews of subjects or associates.**

  This section, too, is standard fare for wiretap affidavits. Interviews would, according to Tomasetta, not provide sufficient information, would produce untruthful responses, and would alert the targets to the investigation. *Id.* at 76.

     **f.**  **search warrants.**

  Law enforcement did not have sufficient information, Tomasetta stated, to target any particular location for search, nor did it know the current residences of many of the targets. *Id.* at 77. Tomasetta also explained why trash searches were either not feasible or would not provide sufficient information to fulfill the goals of the investigation, although, where feasible, they could lead to valuable financial information. *Id.* at 78.[8] Execution of search warrants would not, Tomasetta said, "reveal the total scope of the criminal operation and the identities of the coconspirators," nor

---

[8]

  Search warrants had been executed in April, 2003, and again in June, 2003, on Bannerman's former voicemail box. *Id.* at 78-79.

would it produce sufficient information to prosecute all of the culpable individuals. It would, moreover, Tomasetta further said, alert the targets to the investigation. *Id.* at 79-80.

### g.    pen registers and telephone toll records.

Tomasetta set forth the inherent limitations of pen registers and telephone toll analysis. *Id.* at 80-81. Trap and trace information had, however, Tomasetta noted, led to the identification of Newell as a suspected marijuana/money courier and to the January, 2003, surveillance of him and seizure of more than $220,000, although it had not permitted law enforcement to locate Newell before he had delivered the marijuana which Tomasetta believed that he had brought to Massachusetts. *Id.* at 80-81.

### B.    The Necessity Averments of the August 15, 2003, Affidavit.[9]

### 1.    Cooperating witnesses and confidential informants.

**CW-1** had provided further assistance through her meeting with Walter on July 25, 2003, and would, Tomasetta said, continue to assist in the investigation. Her ability to assist was, however, Tomasetta continued, limited, as she knew Walter only by the name "Cort," did not know where Walter lived, and contacted him only by cell phone. In his conversations with CW-1, Walter had not given CW-1 any information regarding his other customers, his source of supply, where he stored his drugs or drug proceeds, or how he disposed of the proceeds. CW-1's assistance would not,

---

[9]

Telephone #1 called telephone #3 53 times, and telephone #3 called telephone #1 76 times in April-August, 2003. 8/15 Aff. at 44. On July 23, 2003, Bannerman and Walter had a conversation in which they agreed to meet on July 26, 2003, and in which Bannerman made a statement which Tomasetta interpreted as drug-related. *Id.* at 36-38. Law enforcement surveiled a meeting between Walter and Bannerman on July 26, 2003, which Bannerman left carrying a plastic bag which Tomasetta described as "the size and general shape of a large amount of currency." *Id.* at 39-41.

On August 3, 2003, Bannerman and Walter had a conversation which Tomasetta interpreted as arranging a meeting at which Walter would either pick up marijuana from, or deliver money to, Bannerman. On August 5, 2003, the two had a conversation in which, according to Tomasetta, Walter referred to having drug proceeds for Bannerman. *Id.* at 38-39.

therefore, Tomasetta said, alone suffice to meet the goals of the investigation.  *Id.* at 52.

**CW-4** told Tomasetta about an individual he knew as "Doug," to whom he had been introduced by Milo, who Tomasetta believed to be Bannerman. During a chance meeting with Bannerman, CW-4 told Tomasetta, he asked Bannerman to ask Milo if he had any "work," which Tomasetta interpreted to mean marijuana. In a subsequent meeting, Bannerman told CW-4 that he had talked to Milo and that Milo had agreed to give him money to assist him in regard to the charges pending against CW-4. Bannerman would not take CW-4's telephone number to pass on to Milo, and CW-4 had not yet heard from Milo, leading Tomasetta to suggest that Bannerman may not have spoken to Milo about CW-4. While CW-4 and Bannerman apparently frequented the same bar/restaurant in Boston, and CW-4 had occasional contact with him, CW-4 did not otherwise know how to reach Bannerman.[10] Assistance from CW-4 would not alone suffice to meet the goals of the investigation, Tomasetta concluded, because he had never purchased marijuana from Bannerman, did not know how to reach him, was not currently dealing with Milo, lacked information regarding Bannerman, and had not provided information regarding other targets of the investigation. *Id.* at 51-53.

### 2. Undercover agents.

Much of this section is a repeat of the corresponding section of the July 21, 2003, affidavit. *See* page 6, *supra.* Tomasetta added Bannerman's unwillingness to take CW-4's telephone number as another example of measures taken by the targets to avoid detection by law enforcement. Tomasetta was of the opinion that it would be even more difficult to introduce an undercover agent

---

[10]

Pen register data for a telephone associated with CW-4 showed that that telephone had contacted Bannerman's former voicemail box 29 times between August 16, 2002, and September 19, 2002; a prepaid calling card believed to have been used by Bannerman contacted a telephone associated with CW-4 in May, 2003.

to Bannerman than to Walter, citing the surveillance-consciousness he believed Bannerman exhibited on July 26, 2003, his unwillingness to give CW-4's telephone number to Milo, his "careful use of communication devices," evidenced, Tomasetta said, by the drop-off in use of his former voicemail box after the January, 2003, seizure, the fact that he lived and operated on both the east and west coasts, and his keeping a low profile, exemplified by his secluded Duxbury residence. Finally, Tomasetta stated, he did not know of any confidential source who could introduce an undercover agent to Bannerman. *Id.* at 54-55.

### 3.    Grand jury.

This section is a verbatim repetition of the recitations in the corresponding section of the July 21, 2003, affidavit. *See* pages 6-7, *supra.*

### 4.    Physical surveillance.

The first paragraph of this section, ¶121, is essentially a repeat of information contained in the corresponding section of the July 21, 2003, affidavit, as are ¶125-27. *See* pages 7-8, *supra.* Since the interceptions began on Walter's telephones, and in conjunction with those interceptions, physical surveillance had been conducted on a number of occasions, predominantly of Walter meeting with persons Tomasetta believed to be his marijuana customers. *See* 8/15 Aff. at 19-35. Physical surveillance, Tomasetta opined, would not advance the goals of the investigation, even when conducted in conjunction with electronic surveillance. This "became clear," Tomasetta said, from Walter's "sharp turns and rapid acceleration" on July 26, 2003, which Tomasetta described as consistent with countersurveillance moves, and from Bannerman's "tak[ing] note"of a surveiling vehicle as it passed him. The surveillance on that date had been successful, Tomasetta noted, to the extent that law enforcement had been able to observe Bannerman leaving Walter's address carrying a bag consistent in appearance with money inside; it had not, however, confirmed either the purpose of the meeting or the contents of the bag or provided evidence of the state of mind of the two men.

Moreover, Tomasetta continued, because surveillance had had to pull back to avoid detection, law enforcement had not been able to observe whether Walter had brought the bag he gave to Bannerman from another location or had the money stashed at that address. *Id.* at 57-58.[11]

### 5.     Interviews of subjects or associates.

This section is a verbatim repeat of the information set forth in the corresponding section of the July 21, 2003, affidavit. *See* page 8, *supra.*

### 6.     Search warrants.

Much of the information set forth in this section duplicates what was previously set forth in the corresponding section of the July 21, 2003, affidavit. *See* pages 8-9, *supra.*[12] Law enforcement had determined which of the addresses associated with Walter was his primary residence, although it remained unclear, Tomasetta said, whether he used his residence as a drug distribution point or to stash marijuana or proceeds. Even were he doing so, Tomasetta continued, execution of a search warrant at Walter's residence would be "premature." Law enforcement had been unable to follow Bannerman on July 26, 2003, "to his own residence or stash house." Although law enforcement had received information that Clark was receiving packages consistent in appearance with packaged marijuana at a storage facility, it had no information that there was currently marijuana stored at that location. *Id.* at 63-64. Paragraph 135, regarding the April, 2003, and June, 2003, searches of Bannerman's former voicemail box is almost entirely a verbatim repetition of information contained in the July 21, 2003, affidavit, as are paragraphs 136-137. *See* pages 8-9, *supra.*

---

[11]     Tomasetta further noted that McCarthy, a named target, had appeared to be watching the surveillance officers during an August 5, 2003, surveillance, which led the surveillance officers to pull back, limiting the observations they were able to make. *Id.* at 58 n.10.

[12]Tomasetta rejected the idea of trash searches at either Bannerman's Duxbury property or his Copley Square apartment for reasons similar to those which led him to reject trash searches at the addresses associated with Walter. *Id.* at 64-65.

### 7. Pen registers and telephone toll records.

This section is almost entirely a verbatim repetition of the corresponding section of the July 21, 2003, affidavit. *See* page 9, *supra.*

### C. The Application And Affidavit Failed To Satisfy The Necessity Requirement of 18 U.S.C. §2518(1)(c) With Respect To The Interceptions Over Telephone #3.

#### 1. The necessity requirement in general.

Every application for electronic surveillance must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c). The August 15, 2003, application fails to comply with this central – and crucially important – provision of Title III. The purpose of the necessity requirement is to ensure that a device so inimical to personal privacy as electronic surveillance "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Rivera-Rosario*, 300 F.3d 1, 19 (1st Cir. 2002), *quoting United States v. Kahn,* 415 U.S. 143, 153 n.12 (1974). *See, e.g., United States v. Giordano*, 416 U.S. 505, 515 (1974)("Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications"); *United States v. Hoffman,* 832 F.2d 1299, 1307 (1st Cir. 1987)("in a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception – not the rule"); *United States v. Lilla*, 699 F.2d 99, 104 n.7 (2nd Cir. 1983)(even though it might be more efficient to wiretap, "the statutory requirement that other investigative procedures be exhausted before wiretapping reflects a congressional judgment that the cost of such efficiency in terms of privacy is too high").

No electronic surveillance order may issue unless the court determines that "normal

investigative procedures have been tried and have failed or reasonably appear to be unlikely to

succeed if tried or to be too dangerous." 18 U.S.C. §2518(3)(c).

> Before granting a wiretap authorization, the issuing court "must satisfy itself that the
> government has used normal techniques but it has encountered difficulties in penetrating a
> criminal enterprise or in gathering evidence – to the point where (given the statutory
> preference for less intrusive techniques) wiretapping becomes reasonable.

*United States v. Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003), *quoting United States v. Abou-*

*Saada*, 785 F.2d 1, 11 (1st Cir.1986). While the government is not required to demonstrate that it

has exhausted all traditional investigative techniques, *United States v. Lopez*, 300 F.3d 46, 52 (1st

Cir. 2002), it must nonetheless "demonstrate that [it] has made a reasonable, good faith effort to run

the gamut of normal investigative procedures before resorting to means so intrusive as electronic

interception of telephone calls.'" *United States v. Santana*, 342 F.3d 60, 65 (1st Cir. 2003), *quoting*

*United States v. London,* 66 F.3d 1227, 1237 (1st Cir. 1995). *See, e.g., United States v. Ashley*, 876

F.2d 1069, 1072 (1st Cir. 1989); *Abou-Saada,* 785 F.2d at 11. In determining the facial sufficiency

of the application/affidavit to demonstrate necessity, the reviewing court "must decide by looking

to the affidavit on its face, whether the facts are reasonably adequate to support the issuing judge's

implicit determination that other procedures reasonably appear unlikely to succeed." *Ashley*, 876

F.2d 1074.

The decision whether wiretapping is necessary and reasonable in a particular case is

committed to the independent judgment of the judicial officer to whom the application is made.

> The independent determination by a judicial officer – rather than by a law enforcement
> officer – of the necessity of electronic surveillance undergirds the very constitutionality of
> Title III. Indeed, it is this independent judicial assessment that ensures that electronic
> surveillance is consistent with the dictates of the Fourth Amendment.

*In re Application for Interception of Wire Communications*, 2 F.Supp.2d 177, 179 (D.Mass. 1998).

*See, e.g., United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997)("before issuing a

wiretap order, the district judge must independently determine that the requested wiretap is

necessary"), *overruled on other grounds sub nom. United States v. Ramirez-Encarnacion*, 291 F.3d

1219 (10th Cir. 2002); *United States v. Kalustian,* 529 F.2d 585, 588-89 (9th Cir. 1975)("The . . .

judge, not the agents, must determine whether the command of Congress has been obeyed");*United*

*States v. Salemme*, 978 F.Supp. 343, 348 (D. Mass. 1997)("It is important that the government

satisfy the requirement of §2518(1)(c) because the constitutionality of Title III relies in meaningful

measure on the process it provides for an independent judicial officer, rather than a law enforcement

officer engaged in the competitive business of fighting crime, to decide that electronic surveillance

is necessary, and therefore reasonable in a particular case").

### 2.    Failure to provide a full and complete statement.

To enable the judicial officer to make the required independent determination regarding the

necessity of the requested wiretap, the application/affidavit must describe the entirety of the

traditional investigative techniques which have been employed prior to the application, so that the

judicial officer may make a fully informed determination regarding the actual necessity for

electronic surveillance. To that end, Congress chose to make the §2518(1)(c) requirement

"absolute." *Salemme*, 978 F.Supp. at 348.

> In contrast to the requirements concerning probable cause and prior applications . . . the
> government's obligation to make a "full and complete statement" concerning the powerful
> but intrusive weapon that electronic surveillance constitutes is unqualified; the government
> is obligated to inform the court of *all* of its information on this issue.

*Id.*[13] *See Castillo-Garcia*, 117 F.3d at 1187 ("To obtain an electronic surveillance order, the

---

[13]

As to probable cause, the applicant need include only "a full and complete statement of the
facts and circumstances *relied upon by the applicant . . . .*" 18 U.S.C. §2518(1)(b)(emphasis added).
As to prior applications for electronic surveillance, the applicant must make "a full and complete
statement of the facts concerning all previous applications *known to the individual authorizing and
making the application . . . .*" §2518(1)(e)(emphasis added). Subsection 2518(1)(c), in marked
contrast, contains no such qualifiers.

government must *explain fully* in its application what investigative techniques have been tried against the target of the wiretap" (emphasis added)); James G. Carr, *The Law of Electronic Surveillance*, §4:39 at 4-79 (2004)(hereinafter "Carr")("a specific and detailed explanation about the disutility of conventional methods in the particular case is a prerequisite to an informed and independent judicial assessment of investigatory diligence and the prospective merits of alternatives"). How much of the investigation to disclose in the affidavit is not, therefore, a matter of the affiant's discretion: it is a congressional command.

> The government is not permitted to disclose only the information that it wishes to rely on. Rather, the government is obligated to inform the court of all the relevant information that agents participating in the investigation possess concerning necessity.

*United States v. Salemme*, 91  F.Supp.2d 141, 369 (D.Mass. 1999), *rev'd in part on other grounds*, 225 F.3d 78 (1st Cir. 2000).

Tomasetta plainly did not provide the court with a "full and complete statement" regarding the traditional investigative techniques employed throughout the course of the investigation, which in July-August, 2003, had been ongoing for almost two years. Indeed, he admitted as much:

> Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are needed to establish the necessary foundation for an order authorizing the interception of wire communications over Target Telephone 2 and Target Telephone 3.

8/15 Aff. at 6-7. *See* 7/21 Aff. at 5 (making essentially the same statement). The judicial officer to whom the application is presented cannot make an *independent* assessment of whether resort to wiretapping is truly necessary if the judge has before him only what the affiant has chosen to tell him regarding the investigation to date.  The necessity averments of Title III affidavits have a dreary similarity, and Tomasetta's are by and large  no exception – in the opinions of the affiants, physical surveillance is always inadequate, informants are always unavailable or inadequate, insertion of undercover operatives is always impracticable, and search warrants, grand jury subpoenas, and

witness interviews are always inadvisable. All of these may be true in any given case, but the judicial officer can only know that they are true in the particular case before him if he is presented with all the facts concerning the investigation conducted to that point. If a "full and complete statement" is not set forth in the affidavit, then the affiant will effectively control the necessity determination rather than the judge, in whom the statutory responsibility lies.

This investigation had been ongoing for almost two years and involved not only the Boston office of the DEA and other DEA offices as well but also the Massachusetts State Police, the Bureau of Immigration and Customs Enforcement, the IRS, 7/21 Aff. at 14, and the Quincy Police Department. 8/15 Aff. at 16. Clearly, there was much information regarding use of traditional investigative techniques prior to the wiretap application with which the issuing judge was not provided. The investigation had apparently led Tomasetta to conclude that all 11 named targets were currently members of a single conspiracy[14] and to conclude that there was probable cause to believe that all 11 would be intercepted over telephone #1. The July 21, 2003, affidavit, however, describes a number of disjointed drug-related activities by various individuals over a number of years but, if Tomasetta had information which linked all the disparate players mentioned into a single conspiracy, that linking information does not appear in the affidavits. This was, as Tomasetta noted, a multi-district investigation, 7/21 Aff. at 14, which, among other things, involved an intensive investigation in San Diego which included Title III wiretaps in 2001-02. *See* 7/21 Aff. at 8, 48, 64-65, yet neither the July 21 nor the August 15 affidavit provides more than passing mention of the results of the

---

[14] *See* 7/21 Aff. at 8 (describing Moreno-Fernandez as a member of "the conspiracy"); *id.* at 9 (describing Newell as a member of "the conspiracy"); *id.* at 11 (describing Milo as a member of "the conspiracy"); *id.* at 58 ("the investigation has not revealed the nature of the current relationships between the targets in terms of their respective roles in the drug trafficking conspiracy"); *id.* at 72 ("the investigation to date has not revealed . . .[the] current roles [of Baldini, Graham, and Wright] in the conspiracy").

traditional investigative techniques employed in that investigation, other than the information obtained from CW-2. *See* 7/21 Aff. at 48-50. A full and complete statement requires that all information relevant to the existence of necessity for the requested wiretap possessed by all agencies participating in the investigation must be disclosed in the affidavit. *See*, *e.g., United States v. Aviles*, 170 F.3d 863, 867 (9th Cir. 1998); *United States v. Mastroianni*, 749 F.2d 900, 909-10 (1st Cir. 1984); *Salemme*, 91 F.Supp.2d at 371; *In re Application*, 2 F.Supp.2d at 178. While the July 21 affidavit does state that the San Diego investigation produced no *direct* evidence against any of the targets of this investigation, 7/21 Aff. at 65, it is otherwise silent regarding what information regarding the targets of this interception was developed and what was done to investigate it. There was also a Massachusetts State Police investigation in 2001, which included wiretaps, of which Clark and CW-3 were targets, *see* 7/21 Aff. at 9-10, 51, but, once again, the affidavit says little about the fruits of this investigation and what was done to investigate the information obtained as a result of it, other than the information obtained from CW-3. *See* 7/21 Aff. at 51-52. In addition, the affidavits are silent as to what traditional investigative techniques led law enforcement to believe that Newell was transporting marijuana to Massachusetts in January, 2003, *see* 7/21 Aff. at 15-20; analysis of pen register data apparently told law enforcement where to look for Newell on the morning of January 24, 2003, but there likely was additional information the source of which was not disclosed which pointed to a drug transaction in the offing. A component of this investigation was being conducted in California, where Bannerman, according to Tomasetta, spent a substantial amount of time, 8/15 Aff. at 55, and from where, according to several of the confidential sources, marijuana was transported to Massachusetts, yet the affidavits are virtually silent about the ongoing west coast facet of the investigation.[15] Clearly, there was much about the antecedent investigation

---

[15]    In addition, the affidavit provides no information regarding the 2000 investigation in an

and the results which had already been obtained to which the issuing judge was not made privy.

### 3.    Failure to demonstrate necessity.

Even though authorization to tap Bannerman's telephone was sought in the same application/affidavit as was authorization to tap an additional telephone of Walter's, the necessity showing for *each* target telephone must be scrutinized separately, as if separate applications had been filed for each telephone. *See United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988). Moreover, even had the July 21, 2003, application established necessity for the interception of communications occurring over Walter's telephone #1, that alone would not suffice to establish the necessity for electronic surveillance of Bannerman's telephone. "The fact that the government adequately exhausted traditional investigative techniques before seeking an order to tap the first suspect's phone is irrelevant."*Id*. at 1180-81. The government may not simply "move swiftly from wiretap to wiretap." *Castillo-Garcia*, 117 F.3d at 1196. "Rather, under Title III, it must always pause to consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each successive wiretap." *Id*.  at 1196.

> [T]he government is obligated under the strict confines of §§2518(1)(c) and (3)(c) to establish necessity every time it seeks a wiretap and the fact that the government adequately exhausted traditional investigative techniques before seeking an order to tap [the first suspect's] telephone is irrelevant. . . . It is inadequate to simply carry over statements from prior applications as to other suspects without making further investigative attempts.

*United States v. Blackmon,* 273 F.3d 1204, 1209 (9th Cir. 2001) (internal quotation marks omitted).

*See, e.g., United States v. Santora*, 600 F.2d 1317, 1321 (9th Cir. 1979)("Less intrusive investigative procedures may succeed with one putative participant while they may not succeed with another");

*United States v. Abascal*, 564 F.2d 821, 826 (9th Cir. 1977)(It is "not enough that the agents believe

---

undisclosed jurisdiction which led to Bannerman's arrest and conviction for possession of marijuana with intent to distribute. Bannerman was convicted in November, 2000, after he and another individual were observed, as the result of a wiretap, transporting 610 pounds of marijuana. *Id.* at 7.

that the telephone subscribers they wish to tap are all part of one conspiracy"); *see also* Carr, §4:39 at 4-84. The application/affidavit failed to demonstrate necessity for the interception of communications occurring over telephone #3.

### a.     cooperating witnesses and confidential informants.

Tomasetta began this portion of his necessity discussion with the assertion that use of cooperating witnesses and confidential informants alone would not suffice to meet the goals of the investigation. 8/15 Aff. at 51; *see also id.* at 52, 54. The test is not, however, whether a single type of investigative technique – or the use of a single confidential source – would fulfill all law enforcement needs. That a particular traditional investigative technique would not by itself suffice does not mean that a number of traditional investigative techniques, used synergistically, would be similarly insufficient. As to cooperating witnesses/confidential informants, the August 15, 2003, affidavit is silent as to what, if any, efforts had been made to utilize existing cooperating witnesses or confidential informants to investigate Bannerman. This is particularly striking in light of the fact that both CI-1 and CW-2 were sources of information regarding Bannerman in the July 21, 2003, affidavit. CI-1 knew Bannerman well enough to be able to identify his photograph and provided some information about Bannerman, 7/21 Aff. at 21.[16] It does not appear that law enforcement even contacted CW-2, who Tomasetta believed had a substantial drug dealing history with Bannerman. *See* pages 4-5, *supra*.[17] Moreno-Fernandez's failure to return calls made by CW-2 in 2002 does not mean that Bannerman would not have returned calls made at the behest of law enforcement.[18]

---

[16]      That CW-1 did not wish to testify is of no moment. The government has at its disposal any number of means through which to secure testimony from unwilling witnesses.

[17]In addition, CW-2 had been to Bannerman's California residence and knew that he had an apartment overlooking Copley Square. 7/21 Aff. at 70.

[18]      Tomasetta does state that calls made to Bannerman's former voicemail box by CW-2 on

Indeed, CW-2 may even have been in contact with Bannerman; Tomasetta intentionally chose not to find out. *See* 7/21 Aff. at 62. If CW-2 had had telephonic or personal contact with Bannerman, this presented a substantial opportunity to investigate using traditional investigative techniques which law enforcement chose not to utilize. CW-4 also represented unexplored potential. CW-4 and Bannerman had apparently been in frequent contact in August-September, 2002, and Bannerman had called CW-4 as recently as May, 2003. Bannerman may have declined to pass CW-4's telephone number on to Milo, but, whatever the source of that unwillingness, it did not prevent Bannerman from having conversations of an implicitly inculpatory nature with CW-4, nor, apparently, did it cause him to avoid CW-4 when they ran into each other, which they apparently did with some frequency, as they both frequented the same unnamed bar/restaurant in Boston. *See* 8/15 Aff. at 53. It does not appear from the affidavit that Bannerman is as inaccessible, at least where CW-4 is concerned, as Tomasetta would have it.

While the July 21, 2003, affidavit describes additional persons who had come to the attention of law enforcement but who Tomasetta believed would be of little or no usefulness in the investigation, 7/21 Aff. at 65-66,[19] the August 15, 2003, affidavit says nothing about any efforts to

---

October 17, 2002, and in February, 2003, were not returned. 7/21 Aff. at 61. The most likely reason that Bannerman did not return the October, 2002, call, which was apparently before any arrests were made in the San Diego investigation, was that Bannerman, according to the affidavit, was dealing directly with Moreno-Fernandez. *See* 7/21 Aff. at 49. Moreno-Fernandez continued to speak freely on the telephone at least through late October, 2002. *See id.* at 49. As to the February, 2002, the affidavit notes at a number of points that Bannerman's use of his former voicemail box decreased precipitately after the January, 2003, seizure.

[19]

     Tomasetta stated in his July 21, 2003, affidavit that he "[was] unaware of any other informants or cooperating witnesses who have information regarding any other Targets of this investigation." 7/21 Aff. at 66. What Tomasetta knew is not the test – what matters is what was known to all law enforcement officers and agencies participating in the investigation. *See* page 18, *supra*. The August 15, 2003, affidavit contains no corresponding statement even as to the state of Tomasetta's knowledge.

develop additional witnesses or informants who could provide information about, or assistance with respect to the investigation of, Bannerman or most of the other individuals whom the government anticipated would be intercepted over telephone #3.[20]

### b. undercover agents.

Tomasetta essentially rejected out of hand any effort to attempt infiltration through the use of an undercover agent. That the DEA knew of no one other than CW-1 who could attempt to introduce an undercover agent to Walter, 7/21 Aff. at 66, does not wholly answer the relevant inquiry – the question is whether *any* of the law enforcement officers or *any* of the agencies participating in the investigation knew of such an individual. As to this question, the affidavit is silent. The July 21 affidavit also does not adequately explain why CW-1 could not attempt to introduce an undercover agent to Walter. That Walter would not take CI-2's telephone number at the Marathon party does not appear to have been a [measure[]] taken . . . to avoid detection by law enforcement." 7/21 Aff. at 66. Instead, it far more likely represented Walter's complete disinterest in having CI-2 treat him to a limousine ride; if Walter wanted to ride in a limousine with his girlfriend, it is clear from the affidavit that he was in no need of a freebie. Moreover, CI-2 was a complete stranger who crashed Walter's Marathon party.

The August 15 affidavit describes Bannerman as "very surveillance-conscious," 8/15 Aff. at 54, but the only example of this given is Bannerman's having driven in a manner which Tomasetta described as countersurveillance – "abrupt turns and sharp acceleration" after leaving Walter's residence, 8/15 Aff. at 41 – and his having "appeared to take note" of a surveillance officer when

---

20

    The government intercepted conversations of a number of additional who Tomasetta opined were drug customers of Walter and physically surveiled meetings of those individuals with Walter, *see id.* at 19-29, yet it does not appear that any efforts were made to elicit the cooperation of any of these individuals. That this can be a fruitful technique is illustrated by the fact that CW-2 apparently began cooperating as the result of his interception during the San Diego wiretaps.

the officer passed him when he was on his way to Walter's. *Id.* at 57. The former is also entirely consistent with the manner in which all too many people in the Boston area drive as a matter of course, and, as to the latter, it is hardly unusual that a driver might "take note" of a car that was passing him. The fact of the matter is that law enforcement had only surveiled Bannerman on this single occasion and had, therefore, no means of evaluating his normal driving techniques.

Tomasetta also stated that Bannerman was "very careful in his use of communication devices," but the only example given by Tomasetta was Bannerman's decreased use of his former voicemail box after the January, 2003, seizure. *Id.* at 54-55. This says little or nothing about the potential of introducing an undercover agent to him. More importantly, Bannerman appears from the affidavit to have been considerably *less* careful in his use of communication devices than is often the case in drug investigations; he had been using telephone #3 for some time,[21] and there is no indication that his use diminished after the January, 2003, seizure. In addition, the affidavits make frequent reference to prepaid calling cards used by Bannerman, which law enforcement apparently had no difficulty connecting to him, at least insofar as appears in the affidavits. Bannerman's declination to take CW-4's telephone number to pass it to Milo suggests nothing more than his lack of interest in being involved with whatever passed between CW-4 and Milo; Bannerman had, as previously noted, called CW-4 as frequently as May, 2003, and continued to interact with him when they ran into each other.

That Bannerman may have "live[d] and operate[d]" in both Massachusetts and California, 8/15 Aff. at 55, would appear to increase, rather than decrease, the potential that an undercover agent could be introduced. The affidavit is largely silent as to the California component of the investigation. Moreover, Bannerman may have owned a "secluded" property in Duxbury, but he also

---

[21]Telephone #3 was activated in August, 2000, three years earlier. 8/15 Aff. at 2.

had an apartment in busy Copley Square and was known to frequent at least one Boston bar/restaurant. The lack of information regarding Bannerman appears to reflect more a failure of law enforcement to fully investigate what they knew about Bannerman than it does elusiveness on Bannerman's part. The affidavits failed to provide an adequate explanation of why an attempt to insert an undercover agent would be doomed to failure, either with respect to Bannerman or any of the other targets.

c.    <strong>physical surveillance.</strong>

While law enforcement had, by the time of the August 15, 2003, affidavit, conducted numerous surveillances of Walter and persons Tomasetta believed to be his marijuana customers, it had not, with the exception of July 26, 2003, even attempted surveillance of Bannerman for more than five months. *See* 7/21 Aff. at 70. No surveillance of Clark had been attempted for seven months. *Id.* at 71. Law enforcement surveiled Giglio without difficulty in January, 2003, and April, 2003, *id.* at 71-72, but had made no further efforts for four months. Law enforcement had obtained an address for Milo on July 6, 2003, but no effort had been made to physically surveil him; law enforcement had not even gone to his address. 7/21 Aff. at 72. No effort had been made to surveil Ringham (other than observing him at Walter's April, 2003, Marathon party), even though law enforcement knew both where he lived and where he worked. *See* 7/21 Aff. at 12; 8/15 Aff. at 56. Law enforcement had not attempted to surveil Newell since the January, 2003, seizure; physical surveillance was not precluded simply because Newell lived in Oregon. *See* 7/21 Aff. at 72; 8/15 Aff. at 56. These are all individuals whom the government designated as targets of the wiretap and expected to intercept over telephone #3. 8/15 Aff. at 13.

Tomasetta attempted to explain the lack of physical surveillance effort directed at telephone #3 targets by describing the location of many of the addresses as "residential areas or mixed neighborhoods with numerous businesses and residential buildings, [with] a lot of pedestrian and

24

motor vehicle traffic in [the] area. 8/15 Aff. at 60. The example on which he relied was the location of Walter's Brookline apartment, *id.*, but it is clear from the portion of the affidavit relating to surveillance of persons Tomasetta believed to be Walter's marijuana customers that law enforcement encountered little difficulty observing as people came and went from that address or from any other address connected with Walter. The far more typical complaints found in Title III affidavits regarding the difficulty of conducting physical surveillance are descriptions of areas with little traffic, making it more likely that surveillance would be spotted; many of the locations involved here – including, notably, Bannerman's Copley Square apartment – would seem to be prime candidates for physical surveillance.[22] Tomasetta refers to what he describes as "extreme countersurveillance measures engaged in by members of this long-standing conspiracy," 8/15 Aff. at 60, but his labeling them "extreme" does not make them so. The examples provided by Tomasetta, *id.* at 60-61, are, in fact, fairly standard for alleged members of drug conspiracies and do not explain why *this* drug conspiracy is different from any other. *See, e.g., Blackmon*, 273 F.3d at 1210 (statements in affidavit regarding informants would be true of most or all drug conspiracy investigations and the general limitations on the usefulness of informants); *Kalustian*, 529 F.2d at 589 ("The affidavit does not enlighten us as to why this gambling case presented any investigative problems which were distinguishable in nature or degree from any other gambling case").

The remainder of the physical surveillance sections of the affidavits describes nothing more than the inherent limitations of physical surveillance.

[T]he government must strictly adhere to the requirements of §2518. That pen registers do

---

[22]

As to Bannerman's purported countersurveillance driving techniques on July 26, 2003, 8/15 Aff. at 57-58, *see* page 11, *supra.* Law enforcement had placed a GPS tracking device on Walter's vehicle on August 5, 2003, 8/15 Aff. at 59-60 n.12, but the affidavit fails to explain why the use of such a device was not attempted with respect to a vehicle which had been identified as one Bannerman drove. *See id.* at 40.

> not reveal the identity of callers; that drug dealers know it is in their best interests to reveal as little as possible; that witnesses cannot lead to the prosecution of an entire drug organization; and that traditional investigative methods do not reveal all are generic problems of police investigation.

*Blackmon*, 273 F.3d at 1211. Moreover, such inherent limitations of particular traditional investigative techniques do not justify wiretapping, no matter how broadly the government has stated its investigative goals.

> Their generic nature does not dissipate simply because the government claims a vast investigative purpose. Wiretaps themselves could little achieve the investigative goal stated in the government's application.

*Id.* "The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances." *Id.*

### d.    grand jury/interviews of subjects or associates.

These sections of Tomasetta's necessity discussions – identical in both affidavits – are nothing more than the standard recitation which appears with monotonous regularity in all Title III affidavits. They reflect nothing more than the inherent limitations of these techniques and the risks associated with their use which are present any time their use is contemplated before the end of the investigation. As has been previously addressed, it does not matter for purposes of necessity analysis that use of a grand jury *alone* would not be "completely successful in achieving the stated goals of the investigation." 8/15 Aff. at 55. Nor is it dispositive that witness interviews *alone* "would fail to produce the evidence needed to accomplish the stated goals of this investigation." *Id.* at 62. This investigation had been ongoing for almost two years, and the government already had a good idea who the "most culpable members of the conspiracy," *id.*, were and could potentially obtain valuable information from others without jeopardizing its ability to prosecute its primary targets. The government has many means at its disposal to obtain truthful testimony about criminal activity from those involved in it, and to convince witnesses that it is in their interests to cooperate with the

26

government, yet, when it comes to Title III affidavits, it almost uniformly cloaks itself in a mantle of powerlessness.[23]

### e.    Search warrants.

The inadvisability of executing search warrants before law enforcement was ready to terminate the investigation is also a standard attribute of Title III affidavits and does nothing to differentiate this drug investigation from any other.[24]

### f.    Pen registers and telephone toll records.

These portions of the necessity discussion are essentially the same in both affidavits and do no more than address the inherent limitations of these investigative tools. *See* page 9, *supra.*

### 4.    All communications intercepted over telephone #3, and all derivative fruits thereof, must be suppressed.

The August 15, 2003, affidavit failed to demonstrate the necessity for resort to wiretapping over telephone #3. The necessity requirement is a central and vitally important requirement of all statutory wiretapping schemes, and when it has been violated suppression is mandated.

> Congress intended to require suppression where there is failure to satisfy any of the statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

*Giordano,* 416 U.S. at 527. *See* 18 U.S.C. §2515. The necessity requirement is clearly such a

---

[23]    Tomasetta assertions regarding the inefficacy or inadvisability of these techniques is somewhat belied by the agreements of CW-1, CW-2, CW-3, and CW-4 to cooperate with the government and the government's approaches to various other individuals who they hoped had been involved with the targets.

[24]    Tomasetta protested that law enforcement had insufficient information to target Walter's residence for the execution of a search warrant, yet given the activities observed at that address, it appears likely, based upon First Circuit precedent, that a judicial officer asked to find probable cause to search Walter's residence would have done so. *See, e.g., United States v. Feliz,* 182 F.3d 82 (1st Cir. 1999).

provision. *See, e.g., United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002); *United States v. Mondragon,* 52 F.3d 291, 294 (10th Cir. 1995); *Salemme,* 91 F.Supp.2d at 380; *United States v. Aileman*, 986 F.Supp. 1228, 1231 (N.D.Cal. 1997). All communications intercepted over telephone #3 pursuant to the August 15, 2003, order should be suppressed, along with all derivative fruits thereof. *See* Carr, §4:39 at 4-85-86.

### D. The Application/Affidavit Failed To Demonstrate Probable Cause to Intercept Communications of Giglio.

Even assuming that the affidavit demonstrated probable cause to believe that Bannerman was committing drug crimes and that drug-related communications would be intercepted over telephone #3, the affidavit entirely failed to demonstrate that Giglio was involved in that criminal activity or that he would be intercepted communicating regarding the target offenses. Giglio should not, therefore, have been named as a potential interceptee. "Probable cause exists when the affidavit demonstrates in some trustworthy fashion that an offense has been or is being committed." *United States v. Santana*, 342 F.3d 60, 65 (1st Cir. 2003), *citing United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999). This the affidavit does not demonstrate as to Giglio.

The only information set forth in the affidavits regarding Giglio was that (1) he had a 1994 conspiracy to distribute marijuana conviction in the District of Massachusetts, a 26 year old conviction for simple possession of cocaine and a 36 year old conviction for selling an unspecified drug, 7/21 Aff. at 11-12; (2) in the four days before the January, 2003, seizure, *see* page 3, *supra*, there were "multiple contacts between pre-paid calling cards associated with Bannerman and various telephones subscribed to Giglio or to Giglio's business," *id.* at 16; (3) law enforcement surveiled Giglio's place of business on January 22, 2003, and his home and business on April 17-18, 2003, *id.* at 71-72; (4) a telephone subscribed by Giglio called telephone #3 7 times between April 22, 2003, and July 20, 2003, *id.* at 45, and that telephone called Bannerman's current voicemail box 16

times between June 4, 2003, and July 20, 2003, *id.* at 45-46. While Tomasetta opined that Bannerman was calling Giglio in the days prior to the January, 2003, seizure "to organize the collection of . . . money" to pay for the marijuana which Tomasetta believed that Newell had driven to Massachusetts, 7/21 Aff. at 19, Tomasetta provided no support for his supposition where Giglio was concerned. Other averments in the affidavit linked both Milo and Walter, with whose telephones Bannerman was also said to have been in contact prior just prior to January 24, 2003, to marijuana dealing with Bannerman, but the affidavit did not similarly link Giglio. If anything, the affidavit provides inferential support for the fact that Giglio was *not* historically known to have had marijuana dealings with Bannerman. In describing the offense underlying Giglio's 1994 marijuana conviction, Tomasetta stated that "[i]nformation developed during that investigation revealed that Giglio was a member of a marijuana distribution organization operating in Massachusetts, California, Florida, Arizona, and North Carolina." *Id.* at 11-12. What that investigation apparently did *not* reveal was any drug-related connection with Bannerman or any of the other targets. *None* of the confidential informants or cooperating witnesses even so much as suggested that Giglio may have been involved in Bannerman's drug-related activities at any time. Physical surveillance and other investigation of Giglio revealed nothing except that he had an established residence and a legitimate business. While it appears that there were calls made from a telephone associated with Giglio to telephone #3 and Bannerman's voicemail box during the almost four months prior to the August 15, 2003, application, nothing in the affidavit suggests a drug-related purpose for these calls; notably, there is no indication that Bannerman ever returned these calls, either on telephone #3 or using a prepaid calling card.[25]

The affidavit failed to demonstrate probable cause to intercept communications of Giglio,

---

[25]    Tomasetta stated in his September 12, 2003, affidavit that "the nature of Bannerman and Giglio's current business together is not yet known." 9/12 Aff. at 25-26.

and all such communications, as well as all derivative fruits thereof, must be suppressed.

## II.    APPLICATIONS/AFFIDAVITS OF SEPTEMBER 12 AND OCTOBER 10, 2003.

The continued interception of conversations occurring over telephone #3 was unlawful because the initial authorization of interception of conversations occurring over telephone #3 was unlawful for all the reasons discussed in Section I(C), *supra.* These extensions of that authorization were, therefore, also unlawful. *See, e.g., United States v. Giordano*, 416 U.S. at 531-32; *Carneiro*, 861 F.2d at 1182; *United States v. Wac*, 498 F.2d 1227, 1231 (6th Cir. 1974); *United States v. Vastola*, 670 F.Supp. 1244, 1276 (D.N.J. 1987).

## III.   THE APPLICATION/AFFIDAVIT OF NOVEMBER 7, 2003, FAILED TO SATISFY THE NECESSITY REQUIREMENT OF 18 U.S.C. §2518(1)(3) AS TO THE INTERCEPTIONS OVER TELEPHONE #3.[26]

Section 2518(5) provides: "Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this subsection." Thus, an extension application/affidavit must make the same "full and complete statement" required in the initial application, and the court must "make the same findings for an extension order as . . . for an original order." *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986). *See, e.g.*, *United States v. Aviles*, 170 F.3d 863, 868 (9th Cir. 1998). "Each wiretap affidavit, standing alone,  must satisfy the necessity requirement." *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988); *see United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995); §2518(1)("Each application shall include . . . .").

For all that appears in the affidavits,[27] law enforcement did little for several months except

---

[26]

All communications intercepted pursuant to the November 7, 2003, order, and all evidence derived therefrom, must also be suppressed for the reasons stated in Section II, *supra*, as this order was an extension of the prior unlawful interceptions over telephone #3.

[27]

Tomasetta's November 7, 2003, affidavit attached as exhibits his September 12 and October

listen to private conversations, conduct surveillance when an intercepted conversation suggested that a meeting was to take place, and speak with some of its preexisting informants. While Bannerman was surveiled on a number of occasions, *see* 9/12 Aff. at 50, 52, 64-65; 10/10 Aff. at 20, 22, 23, 45, 46-48, 49-50, 61-62; 11/7 Aff. at 23-25, 37, the vast majority of the surveillance conducted related to meetings between Walter and persons believed by Tomasetta to be his marijuana customers. *See* 9/12 Aff. at 31, 35, 38, 39-40, 41, 43, 46, 53-54, 57-58, 60-62, 63; 10/10 Aff. at 12, 29-31, 36, 37, 40, 41, 51-52, 55-56; 11/7 Aff. at 18, 19-20. Despite the plethora of persons identified by Tomasetta as being involved in marijuana dealings with either Walter or Bannerman, the affidavits are, with very limited exception, *see* 11/7 Aff. at 44, essentially silent as to any efforts to enlist the cooperation or assistance of any of these individuals or of any other persons. With the exception of certain updated information regarding CW-4, *see* 9/12 Aff. at 75; 10/10 Aff. at 83-84; 11/7 Aff. at 45, the sections of the necessity discussions relating to the potential use of undercover agents are essentially unchanged from the August 15, 2003, affidavit. *See* pages 11-12, *supra.* The sections relating to use of the grand jury, interviews of subjects or associates, and pen registers and telephone toll records are simply verbatim word-processor boilerplate carried over from prior affidavits. *See* 9/12 Aff. at 77, 83-84, 89-91; 10/10 Aff. at 84, 90-91, 96-98; 11/7 Aff. at 45-46, 49-50, 55-57; pages 26-27, *supra.*

The physical surveillance sections of the affidavits are also almost entirely repeats of information which appeared in the prior affidavits. *See* 9/12 Aff. at 78-83; 10/10 Aff. at 85-90; 11/7 Aff. at 46-49. These sections are particularly noteworthy for their continued repetition of the same outdated averments as appeared in the July 21 and August 15, 2003, affidavits regarding the

---

10, 2003, affidavits. Tomasetta neither attached nor incorporated by reference his July 21 or August 15 or August 19, 2003, affidavits. The necessity showing in the November 7, 2003, affidavit must, therefore, be assessed based only upon the information which appears within it and the two prior affidavits which were incorporated.

inefficacy of physical surveillance, *see* pages 7-8, 11-12, *supra*, without acknowledgment of the very great success law enforcement had enjoyed in conducting physical surveillance and the virtually complete absence of difficulty they encountered in doing so. The only difficulties encountered in conducting physical surveillance because of what Tomasetta deemed to be countersurveillance efforts on the part of the surveiled targets described in these affidavits date from July-August, 2003, months earlier. *See* pages 11-12, *supra*. It is clear from the affidavits that, far from laboring under the limitations described in the three affidavits, law enforcement was able to surveil the targets at will. A GPS tracking device had been installed on Bannerman's vehicle on September 15, 2003, 10/10 Aff. at 87-88 n.13, which gave law enforcement the ability to know where Bannerman was whenever he used his car, yet it appears that law enforcement made only limited use of the information which this device would have made available to it. *See* 10/10 Aff. at 47-48. Law enforcement also made no effort to conduct physical surveillance of any of the individuals, other than Walter, who it believed were involved with Bannerman in marijuana dealing and whom it expected to intercept over telephone #3 except when those individuals were meeting with Bannerman.

With respect to the execution of search warrants, *see* 9/12 Aff. at 89; 10/10 Aff. at 91-96; 11/7 Aff. at 50-55, much of that discussion is simply verbatim repetition of the inherent limitations of, and risks to the investigation attendant upon, the execution of search warrants. It is clear that law enforcement had developed information regarding several likely fruitful search venues – including Walter's mother's home, the opportunity to search which was soon to be lost – and that, were this any context other than a Title III application, the government would be arguing that there was ample probable cause to support a search. The affidavit fails to adequately explain why the search opportunities which presented themselves were not used.

The failure to satisfy the necessity requirement requires suppression of all communications

intercepted pursuant to the November 7, 2003, order, as well as all evidence derived therefrom.

## CONCLUSION

For all the foregoing reasons, this Court should suppress as evidence against Giglio at the trial of this case all communications intercepted pursuant to the orders of August 15, 2003, September 12, 2003, October 10, 2003, and November 7, 2003, as well as any and all evidence derived therefrom.

Respectfully submitted,
By his attorney,


*/s/ Martin G. Weinberg*
Martin G. Weinberg
Mass. Bar. No. 519480
20 Park Plaza, Suite 905
Boston MA 02116
May 16, 2005                                    (617) 227-3700