UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA      )
                              )    No. 03-10370-DPW
        v.                    )
                              )
9. FRANK GIGLIO,              )
                              )
            Defendant.        )
```

**GOVERNMENT'S OPPOSITION TO FRANK GILGIO'S MOTION
TO SUPPRESS THE WIRETAP**

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorney Rachel E. Hershfang, hereby opposes Frank Giglio's ("Giglio") motion to suppress the wiretaps in this case.

The final phase of this investigation employed a series of wiretaps on phones used by defendants Douglas Bannerman ("Bannerman") and Kurt Walter ("Walter"). Beginning on July 17, 2003, Special Agent Brian Tomasetta ("Agent Tomasetta") of the Drug Enforcement Administration ("DEA") sought judicial authorization to intercept wire communications, first for a telephone used by Walter ("Target Telephone 1"), then for additional phones used by Walter and Bannerman (Target Telephones 2-4). Each of the follow-on affidavits built on the July 17 Affidavit's foundation, adding information gleaned from the ongoing investigation. Each requested interception was duly authorized by a District Judge of this district.

Giglio asks the Court to suppress his communications -- of which the parties have identified two -- captured on the Title III intercepts, on various grounds.  First, with respect to the August 15, 2003 Order [the second order in the case, and the first relating to Target Telephone 3, on which Giglio was intercepted], Giglio argues that the necessity requirement of 18 U.S.C. §2518(1)(c) was not met, and that there was no showing of probable cause with respect to Giglio.  He further argues that all subsequent interceptions should be suppressed as the fruit of the poisonous tree.  He makes the necessity argument again with respect to communications intercepted pursuant to the [final] November 7, 2003 Order.

These arguments must be rejected.  As described in the August 15 Affidavit, the investigative advances during the first period of interception did not obviate the need for the interception of various phones, and Judge Saris' August 15 Order so found.[1]  Giglio's argument that there was a failure to establish probable cause with respect to him, individually, is groundless -- no such legal requirement exists.  And, finally, the November 7 Affidavit, like the August 15 Affidavit, amply

---

[1]To the extent that the necessity argument focuses on alleged inadequacy of the July 17 Affidavit (incorporated in the August 15 Affidavit), that matter was addressed in the government's opposition to the suppression motion filed by Douglas Bannerman docket no. 186 ("Gov't Opp.").  The argument is hereby incorporated by reference.

demonstrated the need for a wiretap.  These claims should be rejected, as discussed below.

## I.   Giglio's Necessity Arguments Misunderstand the Applicable Legal Standards.

There is the unmistakable air of a Monday-morning quarterback in Giglio's motion.  He criticizes what he characterizes as DEA's failure to contact both known and unknown cooperating witnesses and sources of information with respect to Bannerman.  See Memorandum of Law In Support of Defendant Frank Giglio's Motion to Suppress [...] ("Def. Memo.") 20-22.  He finds insufficient DEA's efforts to introduce an undercover agent, as well as Agent Tomasetta's explanations in this regard.  Def. Memo. 22-24.  Giglio criticizes DEA's surveillance efforts which, in Giglio's view, were both insufficiently diligent and overly cautious, Def. Memo. 24-26, second-guesses the failure to use the Grand Jury, Def. Memo. 26-27, and opines that the limitations expressed by Agent Tomasetta with respect to both search warrants and pen/toll analysis insufficiently distinguish this investigation from any other.  Def. Memo. 27.

In two respects, these criticisms profoundly misunderstand the applicable legal standards.  First, the question before a court reviewing the sufficiency of a wiretap application and affidavit is not, as Giglio seems to presume, whether there might have been another, or a different, way of conducting the investigation.  Instead, a reviewing court is to consider

3

whether, on the face of the affidavit, "the facts set forth in the application were *minimally adequate* to support the determination that was made." United States v. Villarman-Oviedo, 325 F.3d 1, 9 (emphasis added) (quoting United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989)).  That is, the reviewing court determines whether the original decision to issue the order was reasonable.  See United States v. Lopez, 300 F.3d 46, 53 (1st Cir. 2002).  And, contrary to what Giglio supposes, a wiretap is not justified only when law enforcement has been completely stymied in its investigation -- though this case might meet even that standard -- but when "the government has made 'a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to'" a wiretap.  Villarman-Oviedo, 325 F.3d at 9 (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)).  What is required is not absolute exhaustion, nor complete lack of success, but difficulties in pursuing a case through conventional means, "to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir.) (citing cases), cert. denied, 477 U.S. 908 (1986); accord Villarman-Oviedo, 325 F.3d at 9.[2]

---

[2]See also United States v. David, 940 F.2d 722, 729 (1st Cir. 1991) ("An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley.  It is enough that reasonable efforts to succeed without such assistance have been

Giglio's second misapprehension pertains to what might be
termed a "uniqueness" requirement.  He repeatedly complains that
the affidavits do not show how this drug investigation is
different from others.  <u>See, e.g.</u>, Def. Memo. 8 (description of
limitations of conducting interviews is "standard fare for
wiretap affidavits"); <u>id.</u> 25 (examples of limitations of
surveillance are "fairly standard" and "do not explain why *this*
drug conspiracy is different from any other"); <u>id</u>. 27 (deriding
description of limitations of using search warrants as doing
"nothing to differentiate this drug investigation from any
other"); <u>id</u>. (discussion of pen and toll information "do[es] no
more than address the inherent limitations of these investigative
tools").

Title III requires that an applicant show probable cause to
believe that the target offense is being committed, that
communications concerning the offense will be intercepted over
the identified phone, and that normal investigative procedures
have been attempted, have not yet succeeded, and appear unlikely
to succeed, or dangerous.  <u>See</u> 18 U.S.C. §2518(1)-(3).  There is
no statutory or common-law "uniqueness" requirement.  Instead, as
courts have recognized, there is often a sameness (or, in
Giglio's view, a "dreary similarity") to requests for wiretaps in

_____

tried and failed, and that electronic surveillance seems a
suitable next step in a plausible progression.")

drug cases. Cf. Def. Memo. 16. This is neither remarkable, nor particularly problematic. See United States v. Velazquez-Feliciano, 107 F.Supp.2d 134, 136 (D. P.R. 2000) ("use of unoriginal language in" wiretap applications "does not constitute a wrong," especially where accompanied by investigation-specific facts).

With the applicable legal standards in mind, a review of Giglio's arguments makes plain that suppression is not warranted in this case.

## II. The Facts Set Out in the August 15 Affidavit Support Judge Saris' Issuance of the Order.

The averments of Agent Tomasetta's initial (July 17) affidavit were incorporated by reference in the August 15 Affidavit. Those averments have been treated extensively in the government's opposition to Bannerman's motion to suppress (at 12-21) and are not repeated here. Instead, this response will focus on the sections of the August 15 Affidavit that reflect changes in, or discoveries as a result of, the investigation, and on the continued necessity for wiretaps on both Target Telephone 2 (Walter) and Target Telephone 3 (Bannerman) in light of those changes.

### A. The August 15 Affidavit Provided the Court with the Information Required to Make a Reasoned Assessment of "Necessity."

As noted above, a reviewing court examines a Title III

affidavit to determine whether "the facts set forth in the application were *minimally adequate* to support the determination that was made." <u>Villarman-Oviedo</u>, 325 F.3d at 9.  In so doing, a court assesses the reasonableness of the issuing court's authorization of the interceptions.  <u>Lopez</u>, 300 F.3d at 53.

Here, Judge Saris' issuance of the August 15 Order was based on more than minimally adequate facts.  Agent Tomasetta carefully described the advances made in the past 25 days of the investigation, and explained how those advances did not obviate the need for interceptions on Target Telephones 2 and 3.  He then reiterated the goals of the investigation, analyzing the extent to which the ongoing investigation and the wiretap on Target Telephone 1 had advanced those goals.  As had the first affidavit, the August 15 Affidavit explained in great, case-specific detail why previously-used normal investigative procedures were unlikely to achieve success, were likely to fail, or to prove too dangerous.  August 15 Aff. ¶¶105-145.  These explanations were at the very least minimally adequate to support Judge Saris' determination that the Order should issue.  By issuing the Order, Judge Saris indicated her agreement with Agent Tomasetta's assessment and decided that electronic surveillance was "a suitable next step in a plausible progression" of investigative steps.  <u>David</u>, <u>supra</u>, 940 F.2d at 729.

The relevant facts are outlined briefly below.

1.    **Cooperating witnesses and confidential informants**.

Giglio criticizes what he characterizes as the affidavit's failure to address the efforts -- if any -- made to target Bannerman by using cooperating witnesses ("CWs") or confidential informants ("CIs"). Def. Memo. 20-21. Giglio focuses on information provided in the July 15 Affidavit about both CWs and CIs, hypothesizing that CI-1, CW-2, or CW-4 might have been productive avenues for reaching Bannerman. See id.

Giglio seems to suggest a requirement that, throughout the course of a wiretap investigation, the investigators re-plow old ground in advance of every request for authorization to intercept. Here, the July 15 Affidavit detailed the limitations of using CWs and CIs. Focusing on CW-2, there were substantive limitations with respect to CW-2's knowledge of Bannerman's Boston-based drug activities, as CW-2 had previously been involved in providing marijuana to Bannerman in California. More importantly, though, DEA feared that CW-2 might no longer be cooperating in good faith, based on a telephone call CW-2 made to Bannerman's voicemail box during the period of CW-2's cooperation. See July 15 Aff.; Gov't Opp. 19.

CI-1's limitations as a source of information on Bannerman were also explained. CI-1's knowledge was about Walter, not Bannerman; CI-1 recognized Bannerman as a friend of Walter's, but had only second-hand knowledge ("through CI-1's association with

another Target") of Bannerman's drug-related activities.  July 15 Aff. ¶¶70-73.  Plainly, there was no basis to presume that CI-1 could be an effective conduit to Bannerman's drug-dealing activities.

With respect to CW-4, the August 15 Affidavit described advances since the July 17 Affidavit, including the information that CW-4 knew someone identified as "Doug," whom CW-4 met through target Gary Milo.  Contrary to Giglio's perception that CW-4 could effectively target Bannerman, the August 15 Affidavit showed Bannerman's reluctance to engage CW-4 in discussing the marijuana business.  As Agent Tomasetta carefully explained, although Bannerman did not flee at CW-4's coded mention of marijuana, neither did Bannerman take any verifiable step either to advance CW-4's drug-dealing with Milo or to enter into the drug business with CW-4 himself.  See August 15 Aff. ¶116. Bannerman's skittishness toward CW-4 effectively eliminated using CW-4 as an effective investigative tool against Bannerman.

In short, except with respect to CW-4, the limited utility of the CWs and CIs was unchanged since July 15.  To meet the "necessity" threshold, it was not necessary for DEA to try again what had already proved fruitless.

2.  **Undercover Agents.**  Giglio suggests that DEA improperly assessed the likely success of introducing undercover agents, and argues that DEA's lack of success in producing drug-dealing

9

relationships between CI-2 and Walter, and CW-4 and Bannerman, to show that such infiltration would not likely be successful. Def. Memo. 22-24. In contrast, the August 15 Affidavit carefully explains how DEA made efforts with <u>both</u> Bannerman and Walter to introduce these individuals; sets out the limitations of those efforts; and describes incidents in which Bannerman exhibited his attentiveness to surveillance. August 15 Aff. ¶118. Given DEA's frustrated attempts to use a known person to introduce an undercover, it is difficult to imagine how Giglio would have liked DEA to proceed. Simply introducing an unknown person, without an intermediary, is an investigative technique that DEA usually eschews, for good reason. The options for introducing an undercover agent would therefore appear to be severely limited.[3] Again, Giglio's criticism goes less to the establishment of "necessity" than to a wish that DEA had used different means to pursue its investigation. Such discontent does not warrant suppression.

    **3.** <u>**Physical Surveillance**</u>. Giglio takes issue with the regularity and persistence of DEA's surveillance of the targets

---

[3]In arguing that the undercover angle was under-utilized, Giglio notes that Bannerman "had an apartment in busy Copley Square and was known to frequent at least one Boston bar/restaurant." Def. Memo. 23-24. These observations' relevance to the argument is somewhat opaque; does Giglio mean to imply that, because Bannerman could be found in public, he was particularly susceptible to the unsolicited advances of an undercover agent?

in the investigation, Def. Memo. 24-26, finding it lacking as
compared to what he has seen in other Title III affidavits.
Giglio also criticizes the affidavit's description of the
limitations of surveillance as simply setting forth the
limitations of surveillance, generally, and as insufficiently
distinguishing this investigation from others.  Def. Memo. 25.

Again, Giglio's complaints do not correlate with the
applicable legal standards.  In the August 15 Affidavit, Agent
Tomasetta carefully detailed the surveillance that had been done
in support of the ongoing wiretap, and then explained the
limitations of even perfect physical surveillance.  Some of the
investigative goals, including identifying the importation of
marijuana to Massachusetts and the people doing it; following the
distribution of the marijuana within the District; and learning
the identities of the people involved, required more than just
surveillance.  August 15 Aff. ¶¶121-128.  In so doing, the August
15 Affidavit adequately explained the limitations of
surveillance, and provided information relevant to Judge Saris'
determination that "the government has used normal techniques but
it has encountered difficulties in penetrating a criminal
enterprise or in gathering evidence -- to the point where (given
the statutory preference for less intrusive techniques)
wiretapping becomes reasonable."  Abou-Saada, 785 F.2d at 11
(citing cases); accord Villarman-Oviedo, 325 F.3d at 9.

4.     **Grand Jury Practice, Interviews, Search Warrants,**
**Pen/Toll Information.**  Giglio's primary plaint is the lack of
originality in the August 15 Affidavit's explanation of the
limitations of these investigative tools.  Def. Memo. 26-27.
This lack of uniqueness is neither surprising nor fatal.  In most
drug investigations, the means to the end are the same.  And, in
most drug investigations, the roadblocks look familiar -- grand
jury subpoenas and witness interviews have a limited chance of
significant success, and run the risk of tipping off one or more
targets; premature searching before all relevant locations are
identified runs the same risks and, in the absence of information
provided by wiretaps and contemporaneous surveillance, is likely
to yield nothing; pen and toll information, while useful, can get
an investigator only to a certain point.  These general concerns,
as well as particularized explanations of the possible use of
these investigative techniques in this investigation, were amply
explored in the August 15 Affidavit.  See ¶¶129-145.

For example, Agent Tomasetta explained that, with respect to
surveillance of many named targets, their roles in the conspiracy
had not yet been determined, and that physical surveillance would
therefore not be fruitful.  August 15 Aff. ¶¶121, 123.
Surveillance in support of the wiretap had run into practical
problems related to the targets' skittishness.  Id. ¶122.  And,
notwithstanding Giglio's view of which neighborhoods are

12

difficult for surveillance, Agent Tomasetta explained that there was increased sensitivity to law enforcement presence in the area of Walter's (Brookline) home.  Id. ¶126.

Agent Tomasetta's explication of the limitations of search warrants as an investigative tool was similarly fact-specific. At the time of writing, he noted, "there [wa]s no clear evidence as to where any of the Targets' stash houses or storage facilities [we]re located."  Id. ¶132.  Even were the Targets' homes searched, Agent Tomasetta explained, he did not expect that marijuana would be found there, as drug traffickers usually keep the odorous substance far from home.[4]  Id.  Furthermore, at that point in the investigation, there were still targets and locations to be identified (including particular storage units at the EZ Mini-Storage facility in Natick, and the location where Walter kept his cash).  Id. ¶133.  Trash searches, another popular search technique, were impractical with respect to both

_____

[4]Giglio takes issue with Agent Tomasetta's conclusion that a search warrant at Walter's home would have been premature, citing "the activities observed at that address" as being, in Giglio's view, sufficient to support the issuance of a warrant.  Def. Memo. 27 & n.24.  Without citation to specific "activities," or to the applicable timeframe, it is not possible to respond to this broadside.  Eventually (in November, 2003), a court did indeed find probable cause to search Walter's home.  Of course, this followed the continuous, combined, electronic and physical surveillance of Walter and others over the preceding four-month period.  Presumably Giglio does not mean that simply seeing Walter walking in and out of his house, without the information from the intercepted calls, would have sufficed to support the issuance of a warrant.

13

Walter and Bannerman, who lived in multi-unit apartment buildings, and for Bannerman's isolated home in Duxbury.  <u>Id</u>. ¶134.  Notably, Agent Tomasetta did describe the successful searches of Bannerman's voicemail box, and included the results of those searches in his affidavit.  <u>Id</u>. ¶135.

The investigation's similarity to other drug investigations is neither surprising nor troubling.  The use of "standard" language to describe the investigations and its limitations is similarly unremarkable.  <u>See</u> <u>Velazquez-Feliciano</u>, 107 F.Supp.2d at 136. By their very nature, "drug investigations suffer from common investigatory problems." <u>United States v. Milton</u>, 153 F.3d 891, 895 (8th Cir. 1998).  Thus, the mere fact that the reasons offered in a particular affidavit regarding the ineffectiveness of traditional investigative techniques are also common to most drug investigations, does not preclude a finding of necessity.  <u>United States v. Thompson</u>, 210 F.3d 855, 859 (8th Cir. 2000).  Accordingly, the First Circuit has recognized that in drug investigations there is a need to be flexible and view the totality of the circumstances before constricting the tools of an investigation.  <u>United States v. David</u>, 940 F.2d at 722, 728.

The August 15 Affidavit amply demonstrated the necessity for electronic interceptions, as required by Title III, and the resulting order was therefore properly issued by Judge Saris.

Because the issuance of the August 15 Order was supported by the
law and the facts, there is no "fruit of the poisonous tree"
requirement to suppress additional wiretaps in the case.

> **B.    An Affiant Need Not Lay Out Every Single Fact About An
>         Investigation to Show Necessity.**

Giglio argues that Agent Tomasetta's description, in the
August 15 Affidavit, of DEA's investigative efforts to date, fell
short of the statutory requirement of a "full and complete
statement" as to the investigative efforts.  Def. Memo. 15-19.
Giglio seems to imply that nothing short of production of the
entire investigative file will suffice to meet this requirement,
which he characterizes as "absolute."  Def. Memo. 15 (<u>citing</u>
<u>United States v. Salemme</u>, 978 F.Supp. 343, 348 (D. Mass. 1997)).[5]

"Full and complete" does not mean "absolute."  As the First
Circuit has recognized in reviewing the sufficiency of wiretap
affidavits, even when articulable facts have been omitted,
wiretap affidavits may still satisfy the necessity requirement of
Title III. <u>Compare, e.g.</u>, <u>Villarman-Oviedo</u>, 325 F.3d at 6-7, 9-10

---

[5]Giglio hypothesizes the existence of additional, material
information that was not disclosed in the August 15 Affidavit.
For example, he notes that "the affidavits are silent as to what
traditional investigative techniques" led the agents to Gary
Newell in January, 2003, and concludes, "there likely was
additional information the source of which was not disclosed."
Def. Memo. 18.  Having received thousands of pages of discovery,
including reports pertaining to the identification, stop and
search of Newell, however, Giglio failed to identify any
particular information that should have been, but was not,
included in the Affidavit.

(affirming District Court's decision not to suppress wiretap, despite defendant's claim that the government failed to disclose existence of a relevant confidential informant; prior sworn testimony of two DEA agents about targets; and all information related to out-of-district wiretaps).   Most often, the cases explain the requirement of a "full and complete statement" as a requirement "that the sovereign should make a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls."  David, 940 F.2d at 727-28, quoting Hoffman, 832 F.2d at 1299, 1306-07.

Giglio's effort is an attempted end-run around the Franks requirements.  If he discovered what he believes to be a material omission in Agent Tomasetta's August 15 Affidavit, he should have identified it and moved for a Franks hearing.  See, e.g., United States v. Cole, 807 F.2d 262, 267 (1st Cir. ) (defendant claimed that affidavit's omission of fact that a codefendant was having an affair with an investigating officer violated requirements of "full and complete statement"; after Franks hearing, court determined that omission was not "material").  Because Giglio has identified no omission at all, and certainly no "material" omission, in Agent Tomasetta's August 15 Affidavit, this argument should be rejected.

**C.    There is No Requirement of an Individualized Showing of Probable Cause as to Each Interceptee.**

16

Giglio argues that, even were the wiretap kosher with respect to Bannerman, the affidavit "entirely failed to demonstrate that Giglio was involved in that criminal activity or that he would be intercepted communicating regarding the target offenses," and that, therefore, Giglio "should not [...]have been named as a potential interceptee." Def. Mem. 28.

There is no legal relevance to this argument. The Title III requirements go to the offense that is being committed (with respect to which probable cause must be shown) and the necessity for interception. See 18 U.S.C.§2518(1)-(3). There is no requirement that all possible interceptees be named in an affidavit or order, nor that there be probable cause with respect to each interceptee. Instead, an order is properly issued when, among other factors, the reviewing court determines that "there is probable cause for belief that an individual is committing, has committed, or is about to commit" an enumerated offense, and "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception." 18 U.S.C. §2518(3)(a)-(b). "*[I]f known*," the identity of the person "committing the offense and whose communications are to be intercepted" should be included in the application. 18 U.S.C. §2518(b)(emphasis added). Cf. United States v. Kahn, 415 U.S. 143, 152 &n.12 (1974) (rejecting argument that omission of defendant's name from the wiretap order

17

was relevant; noting that "Section 2518(4)(a) requires that the order specify 'the identity of the person, if known, whose communications are to be intercepted'" and concluding that, "it can hardly be inferred that this statutory language imposes any broader requirement than the identification provisions of §2518(1)(b)(iv).")[6]

Because probable cause need not be shown with respect to each likely interceptee, or each eventual defendant, this argument should be rejected.

## II. The Final, November 7 Affidavit Adequately Established the Necessity of Ongoing Wiretaps, As Judge Tauro Rightly Found.

Giglio also attacks the final, November 7 Affidavit, on the same grounds as the August 15 Affidavit -- an alleged failure to meet the necessity requirement of Title III.  Def. Memo. 30-33.  Giglio's complaint with the November 7 Affidavit appears to be two-fold: first, he criticizes what he perceives as inadequate

---

[6]The *dictum* in the Santana decision, cited by Giglio, is difficult to reconcile with the statutory requirements.  That decision states, "The government may record conversations only between the target telephone and identified interceptees." United States v. Santana, 342 F.3d 60, 64 &n.1.  If this were the law, it would bar (for example) interception of a conversation between a known target and that person's drug source, even if identifying the source had been one of the enumerated goals of the wiretap investigation. The government's ability to investigate would be limited to investigating the people who had already been identified through the (admittedly insufficient) conventional investigative means.  In contrast, the statutory provision calls for "the identity of the person, if known...," strongly indicating that such information is not essential to the interception of the communications.

investigation by DEA during the wiretap.  See, e.g., Def. Memo.
31 ("While Bannerman was surveiled on a number of occasions
[citations omitted], the vast majority of the surveillance
conducted related to meetings between Walter and persons believed
by Tomasetta to be his marijuana customers"; "Despite the
plethora of persons identified by Tomasetta as being involved in
marijuana dealings with either Walter or Bannerman, the
affidavits are ... essentially silent as to any efforts to enlist
the cooperation or assistance of any of these individuals...");
id. 32 (citing new information relevant to the issuance of search
warrants; stating that affidavit "fails to adequately explain why
the search opportunities which presented themselves were not
used").  Second, Giglio complains that sections of the affidavit
are "essentially unchanged" or "boilerplate carried over from
prior affidavits."  Def. Memo. 31.

    Nothing in these sparely presented claims disturbs the
conclusion that the investigative efforts set forth in the
November 7 Affidavit, and the careful descriptions of the
limitations thereof, are at least "minimally adequate" to support
Judge Tauro's decision that the Order should issue.  The November
7 Affidavit carefully described many of the relevant intercepted
calls, interpreting their meaning where necessary, and leaving
the reader with a clear window into the targeted drug conspiracy.
November 7 Aff. ¶¶54-81.  Among other salient facts, Agent

19

Tomasetta informed Judge Tauro that a long-awaited load of marijuana was apparently expected in mid-November, id. ¶¶55, 60, and that Walter and his customers were in contact both about the anticipated load, id. ¶¶56, 70, and about current marijuana dealings. Id. ¶¶57-59, 69. The affidavit also described Walter's and Bannerman's ongoing contact, including Walter's payments to Bannerman and their mutual anticipation that Bannerman's source would provide the marijuana load in November. Id. ¶¶61-64. The affidavit also described further (DEA-directed) contact between CW-1 and Walter, in which Walter rebuffed CW-1's efforts to purchase marijuana from him. Id. ¶65.

Agent Tomasetta's explanation of the goals of the investigation remains the same, and he explained the extent to which the interceptions had advanced those goals, while still leaving ample territory open to exploration only through renewed electronic surveillance. Id. ¶¶85-88. For each of the four Target Telephones, Agent Tomasetta carefully explained the categories of information that were necessary advance the stated investigative goals, and were available only through continued interception. Id.

The limited utility of cooperating witnesses, confidential informants, interviews, search warrants, physical surveillance, and pen/trap and trace information is not mitigated to any significant degree by the ongoing wiretap interceptions. With

the exception of physical surveillance, which can be established
in support of a wiretap when there is one, there is no inherent
advantage afforded investigators with respect to any of these
traditional methods just by virtue of ongoing wiretaps.  The
language remains the same, or similar, because the constraints
remain the same.  Where the investigation had assisted -- as with
the recorded conversations and the supporting surveillances --
those advances were described.

In short, the November 7 Affidavit, like the affidavits
before it, was at least "minimally adequate" to support the
reviewing judge's decision to issue an Order.  The suppression
motion should be denied.

## III. Conclusion.

In a series of lengthy and careful affidavits, Agent
Tomasetta set out the fruits of an investigation that he had
pursued for 22 months before asking a court to authorize a
wiretap.  For those months, DEA investigated the case in Boston
and in California; recruited four cooperating witnesses and two
confidential informants; attempted physical surveillance and
infiltration; and painstakingly unraveled a tangled web of
telecommunications involving pre-paid calling cards, leading to a
lucky seizure of almost a quarter of a million dollars.  After
the first wire intercept was authorized, Agent Tomasetta
continued carefully apprising each reviewing court of both the

successes and the limitations of the investigation to date, describing advances and explaining why, despite the progress, a wiretap was still needed to meet the investigation's goals.  Each of the four judges who reviewed the affidavits in the case agreed.

This is not a close case.  For the reasons set forth above, and any adduced at hearing (if there is to be one), the government respectfully submits that Giglio's motion should be denied.  The government submits that there is no need for a hearing on this motion, and asks that it be decided on the papers.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Rachel E. Hershfang
RACHEL E. HERSHFANG
Assistant U.S. Attorney

Dated: June 6, 2005