UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
    )    No. 03-10370-DPW
    v.    )
    )
9. FRANK GIGLIO,    )
    )
    Defendant.    )

**<ins>GOVERNMENT'S OPPOSITION TO FRANK GIGLIO'S MOTION
FOR REMEDIAL MEASURES REGARDING JURY SELECTION</ins>**

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorneys Rachel E. Hershfang and Peter K. Levitt, hereby opposes Frank Giglio's ("Giglio") motion regarding jury selection.

Giglio asks this Court to impose "remedial measures" in selecting a jury, basing his request on an opinion issued by Hon. Nancy Gertner in <ins>United States v. Darryl Green</ins>, No. 02-10301-NG. Specifically, Giglio has asked this Court to provide a jury composed by using a supplemental jury summons procedure (the "<ins>Green</ins> fix") that Judge Gertner has crafted for her case. Judge Gertner issued this opinion in draft form on August 23 and in final form on September 2 (hereinafter "<ins>Green</ins>"). On September 2, the government moved to stay the imposition of the <ins>Green</ins> fix to allow for Solicitor General review, with an eye toward a possible request for mandamus. As of this writing, Judge Gertner has not yet ruled on the motion for a stay. The import of Judge

1

Gertner's order is to make a "Green-fixed" panel available on the day the Green trial is set to begin.  That trial is currently scheduled for September 19, subject to the granting of any motion to stay.  This Court is considering adjusting the date set for this trial to a date on which a Green-fixed jury pool would be available.

The government opposes this request.  Judge Gertner's proposed solution (1) assumes a violation of the law, contrary to governing First Circuit precedent; (2) creates new problems by effectively eviscerating the randomness of jury selection; and (3) itself violates the Jury Selection and Service Act, 28 U.S.C. §§1861 et seq. ("Jury Act,"), as well as the district court's Plan for Random Selection of Jurors (as revised in November, 2000) ("the Plan").  These positions, and the bases therefor, are developed in the government's briefs in Green, which are attached hereto and incorporated herein by reference.  (The two most recent filings are most directly on point; the earlier briefing sets out the government's position with respect to statistical analysis and expert opinion.)

This Court, like Judge Gertner, is now faced with a question that knocks at the foundation of jury selection in this District: does the Plan adequately allow for a jury "selected at random from a fair cross section of the community," as required by law? See 28 U.S.C. §1861.  If, after review of the record in the Green

2

case, this Court determines that there is a fatal flaw in the Plan -- that is, a substantial likelihood that a jury selected pursuant to the Plan will be unlawfully selected, the remedy is not to proceed with a _Green_-fixed jury pool, but rather to wait until there is a systematic solution to what is (if it exists) a system-wide problem.

I.    **The _Green_ Case and Frank Giglio.**

Judge Gertner issued the opinion in a case in which two black defendants are to stand trial for violent crimes, and in which the death penalty may be implicated.  As the court's opinion in that case makes clear, issues of racial and economic disparity in the jury pool were of paramount concern to the court.  As he admits, Giglio is white; he is 58 years old; and he is charged not with violent "street crime," but with membership in a marijuana-trafficking conspiracy.  Unlike the defendants in _Green_, Giglio's case is not a Suffolk County case.  He works in Middlesex County (Cambridge); until recently, he lived there as well (Somerville); and the recorded meeting between him and the cooperating witness took place in Essex County (Peabody).  To the extent that the _Green_ decision is informed by the defendants' race, alleged crime, and county, there is a different set of operative facts here.[1]

---

[1]This is not meant to call into question whether Giglio lacks standing to bring his challenge by virtue of his race; he does not.  See 28 U.S.C. §1861 ("all litigants . . . entitled to

## II.  The <u>Green</u> Fix Violates the Jury Act and Results in Flawed Jury Selection.

The <u>Green</u> fix suffers from both procedural and substantive flaws.  By replacing the Plan's one-shot summons process[2] with a targeted, iterative process, the proposed "solution" effectively un-randomizes the jury selection plan.  This violates the government's right, as a litigant, to a jury "selected at random from a fair cross section of the community."  28 U.S.C. §1861.

Here is how it is supposed to work: The selection process begins with local resident lists submitted annually to the Massachusetts Jury Commissioner.  Plan §5.  From those lists, names are randomly selected to be placed in the Master Jury Wheel for each division of the District Court, "so that each county shall be represented in proportion to the number of names on its resident lists."  Plan §6(b); <u>see also</u> Plan §7(a) (allowing for alternate methods to select names for the Master Jury Wheel; reiterating that "[s]uch random selections of names from the source list for inclusion in the master wheel by data computer personnel must insure that each county within the jury division

_____

trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community...");  <u>see also</u> <u>Peters v. Kiff</u>, 407 U.S. 493, 504 (1972) ("[W]hatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby deprives him due process of law.")

[2]<u>See</u> the Plan, Sections 9(a), (b), and (c).

is substantially proportionally represented in the master jury wheel in accordance with 28 U.S.C. §1963(b)(3).").

The Master Jury Wheel serves as the source of names for jury panels needed by the three divisions (Western, Central, and Eastern) of the District Court.  <u>Id</u>.  Names are drawn from the Master Jury Wheel "at random," in a number determined by "the anticipated juror demands by the Court."  "The number of names, plus additional names sufficient to compensate for the estimated number of prospective jurors who will be unavailable or ineligible, shall be determined by the Court."  Plan §9(a).  Each person whose name is drawn is then sent "a one step juror summons/qualification form" with instructions.  Plan §9(b).

Here is how the <u>Green</u> fix works: After the process set out above, there are to be additional rounds of summonses sent out.  These summonses are to be targeted, in the first instance, to people in zip codes in which there were "undeliverable" summonses in the first round.  <u>Green</u> 91-92.  These replacement summonses are drawn from the same Master Jury Wheel as the first set of summonses, but only from the zip codes in which there were undeliverable summonses in the first instance.  The court has also directed for a two-step follow-up procedure for so-called "nonresponsive" summonses:  first, try again; then, treat them as undeliverable.  <u>Green</u> 92.

The effect of the <u>Green</u> fix is most acutely apparent in the

context of these "nonresponses" -- that is, the people who are presumed to have received their summonses, because the summonses were not returned as undeliverable, but did not return the survey.  By ultimately treating them the same as the "undeliverable" category, and sending out an additional summons to the zip code based on their lack of response, the <u>Green</u> fix demonstrably interferes with the Plan's random design.

This procedure creates a jury pool that is not randomly selected, and therefore does not constitute a "fair cross-section of the community."  Take the following (very simplified) example: In round one, 100 jury summonses are mailed to 5 zip codes, 20 summonses per zip code.  For three zip codes, there is a perfect response rate, yielding 60 completed responses.  For a fourth, only 50% of those summoned respond.  For the fifth, a paltry 25% respond.  Under the <u>Green</u> fix, another 10 summonses go out to zip code number four, and another 15 to zip code number five. Presumably, if the response rates are equally dismal in the second round, additional rounds of summonses will be sent.

The yield of a <u>Green</u>-fixed summons is not a "random" sampling, but rather a sampling with a finger on the scale: zip codes one through three have received 20 summonses each.  Zip code four has received 30 (or more) summonses.  Zip code five has received 35 summonses, and so on.  The result of this process cannot be said to be a "randomly selected," "fair cross-section"

6

of the community.  It is, instead, a carefully selected, targeted
group.  The question is not whether that group may, ultimately,
be more representative of the residents of the Eastern Division,
but whether the selection process comports with the Jury Act and
the district's Plan.  The government respectfully submits that it
does not.

The First Circuit has repeatedly reviewed the Plan and found
it to be adequate to meet the demands of the Jury Act.  See,
e.g., United States v. Royal, 174 F.3d 1 (1st Cir. 1999) (no
constitutional violation where defendant showed absolute
disparity of 2.97% between number of blacks in the Eastern
Division and number of prospective jurors on the Master Jury
Wheel; use of resident lists to compile Master Jury Wheel is not
a "substantial failure to comply with" the Jury Act; failure to
follow up on unreturned summonses also not a substantial
violation where no fair cross-section violation shown); United
States v. Pion, 25 F.3d 18 (1st Cir. 1994) (no showing of
Hispanic under-representation on Master Jury Wheel).  The
government submits that it is so.  However, if the Court, after
review of the Green record, concurs with Judge Gertner that there
has been a "substantial violation" of the Jury Act, contrary to
the holding in Royal, supra, then the remedy is a wholesale
revision of the Plan to address that defect (see, e.g., Royal at
12, suggesting "sending follow-up postcards to prospective jurors

7

who do not return their qualification forms").  The <u>Green</u> fix is not the answer.


                                        Respectfully submitted,
                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                                   By:  <u>/s/ Rachel E. Hershfang</u>
                                        RACHEL E. HERSHFANG
                                        Assistant U.S. Attorney

Dated: September 6, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA       )
                               )
          v.                   )       Criminal No. 02-10301-NG
                               )
DARRYL GREEN, et al.,          )
                               )
          Defendants.          )

### GOVERNMENT'S MOTION FOR STAY

The United States hereby moves the Court for a stay of its Order Re: Defendants' Challenge to the Composition of the Jury Venire, scheduled to be issued today [Electronic Clerk's Notes, 8/31/05], until the Court's order is reviewed by the First Circuit or, at the least, until Friday, September 9, 2005. Specifically, the government seeks a stay of that portion of the order that relates exclusively to the case at bar, the court's "short-term remedy."

As previously argued, the government maintains that the District Court's Plan for Random Selection of Jurors (as revised November 2000) (the "Plan") does not violate the Jury Selection and Service Act, 28 U.S.C. §1§861 et seq. (the "Act") and it objects to the remedy proposed in the Court's order - namely, the supplementation of summonses as set forth in the order - because, inter alia, the Court's order violates the randomness requirement of the Act and the Plan, creates a purported authority to "supplement" the array of names drawn from the Master Wheel that simply does not exist, and amends the Plan without power to do

so.  The government further submits that the supplementation of summonses as contemplated by the Court's "short-term remedy" constitutes a modification of the Plan, without approval by a reviewing panel, and is beyond the authority of a single session within the District of Massachusetts.  In the government's view, if a district court finds that the District's Plan substantially violates the Act, it must stay the criminal case and await the Plan's consideration and possible revision by the appropriate reviewing panel:  it cannot effectively create a new plan and thereby cause inconsistencies in the District's jury selection process.[1]

The Court's order – including its fashioning of an individualized remedy – raises issues that are of obvious importance to litigants in this courthouse and that will very likely now be raised in other sessions.  As a consequence, the government believes that it is a prudent course to seek Solicitor General review of the Court's order and consideration of whether the government should file a petition for a writ of mandamus so that the Court of Appeals may review the Court's order.  None of this can occur in a meaningful fashion overnight.  The government requests that the Court stay its short-term remedy until review by the circuit court (if sought) can be obtained or, at the

---

[1] Thus, contrary to footnote 73 of the Court's Order, the government does oppose the district court's proposed supplementation.

2

least, until Friday, September 9, 2005. The latter date will at
least allow the Solicitor General's office time to consider the
government's options.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney


                         By:  /s/ Lori J. Holik
                              THEODORE B. HEINRICH
                              LORI J. HOLIK
                              Assistant U.S. Attorneys


                    CERTIFICATE OF SERVICE

     I hereby certify that on September 2, 2005, I caused a copy
of the above to be served on counsel of record by causing same to
be electronically filed with the Court.


                              /s/ Lori J. Holik
                              Lori J. Holik
                              Assistant U.S. Attorney


                                   3

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
            v.           )    CRIMINAL NO. 02-10301-NG
                         )
DARRYL GREEN,            )
JONATHAN HART,           )
EDWARD WASHINGTON,       )
BRANDEN MORRIS, and      )
TORRANCE GREEN,          )
                         )
      Defendants.        )


GOVERNMENT'S OPPOSITION TO THE REMEDY PROPOSED BY THE COURT IN
ITS AUGUST 23, 2005 DRAFT DECISION ON DEFENDANT'S MOTION
TO DISMISS ON ACCOUNT OF THE RACIAL COMPOSITION
OF THE MASTER JURY WHEEL, OR ALTERNATIVELY,
TO SUPPLEMENT THE MASTER JURY WHEEL

The government submits this memorandum in partial opposition
to the remedy proposed by the Court in its August 23, 2005 draft
decision on defendant Branden Morris's motion attacking the jury
selection system in the Eastern Division of the District of
Massachusetts.[1]  The government hereby requests additional time
to prepare and submit a more extensive opposition memorandum that
addresses the Court's 95 page draft decision in more detail.

The draft decision includes the following two proposed

---

[1]  The government's focus herein on the Court's proposed
remedy should not be read as accepting either the Court's finding
of a statutory violation or the defendant's statistical showing,
which the Court has adopted in its draft decision.  As the
government has previously argued in hearings and briefs
(specifically, with respect to its objections to the defendant's
statistical showing, filings dated March 21 and 22, 2005), it
does not.

orders:

1. For all summonses returned to the Court as "undeliverable," the same number of new summonses should be mailed to residents who live in the same zip code area as the undeliverable summonses. Replacement summonses will be selected from a supplemental array, merged with the existing array and randomized.

2. For all summonses for which there is no response (nonresponses) after a second mailing, the same number of new summonses should be mailed to residents who live in the same zip code area as the nonrespondents. Replacement summonses will be selected from a supplemental array, merged with the existing array and randomized.

The Court's proposed second targeted mailing to additional residents within select zip codes is beyond the power of this session of the district court, and violates both the Jury Selection and Service Act, 28 U.S.C. §§1861 et seq. (the "Act") and the district court's Plan for Random Selection of Jurors (as revised November 2000) (the "Plan"). As discussed below in more detail, the Court's proposed order violates the randomness requirement of the Act and the Plan, creates a purported authority to "supplement" the array of names drawn from the Master Wheel from 28 U.S.C. §1863(b)(2) that simply does not exist, and amends the Plan without power to do so. Moreover, without discussion, the Court's draft decision ignores the conclusions of the court-appointed expert, Professor Jeffrey B. Abramson, who rejected the very sort of remedy this Court intends to impose.

2

**1.    Randomness**

This Court's proposed order is no different in substance, and no less a violation of the Act and the Plan, than the "weighted mailing" remedy proposed by Dr. Beveridge.  Dr. Beveridge proposed, among other possible remedies, using census data from the zip code areas of Eastern Massachusetts ("ZCTA's") and increasing or decreasing the number of summonses mailed into each ZCTA based upon a comparison between the numbers of names on his census-based "Ideal Master Jury Wheel" and the number of names on the "Actual Master Wheel."  Dr. Beveridge's remedy proposed using his calculated over and underrepresentation numbers to adjust the number of summons sent to persons within each ZCTA.  The result of Dr. Beveridge's proposed remedy would be that summonses would not be mailed on a random basis within the Eastern Division, which is the geographical unit against which randomness must be measured.  See 28 U.S.C. §1861 ("It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."[2] (emphasis added)); 28 U.S.C. §1863(b)(3) ("these

---

[2]<u>Webster's New Collegiate Dictionary</u> (1979) defines "random" in pertinent part as follows: "being or relating to a set or to an element of a set each of whose elements has equal probability of occurrence <a ~ sample>; also: characterized by procedures designed to obtain such sets or elements < ~ sampling>."

procedures shall be designed to ensure the random selection of a
fair cross section of the persons residing in the community in
the district or division wherein the court convenes."). Dr.
Beveridge's adjustments would change the probability of a person
on the Master Wheel being sent a juror summons from a probability
that is equal to that of all others on the Master Wheel, and
therefore fully random within the Eastern Division and in
compliance with the Act, to a probability that is equal only for
members of the Master Wheel within the same ZCTA, and that
differs from the probability of every person on the Master Wheel
not within the same ZCTA, in violation of Act's randomness
requirement. This Court, in refusing to implement Dr.
Beveridge's proposed remedy, apparently agrees with the
government that to do so would violate the randomness requirement
of the Act (and the Plan). What this Court fails to realize is
that its supplemental array approach is not functionally
different than Dr. Beveridge's "weighted summonsing" approach.[3]
The only difference between the two is that Dr. Beveridge's

---

[3]It is also worth noting that the Court's proposed remedy is
also the functional equivalent of the "under yield" approach
which this Court apparently believes can be considered only by
the district court as a whole. Draft Decision, pp. 92-93. The
under yield approach, see Draft Decision, p. 74, adjusts original
mailings based on historical response rates. This Court's
proposed approach uses a second mailing to adjust the number of
summonses mailed based on actual response rates. There is no
substantive difference in the timing of the adjustment. This
Court's approach is as far beyond the power of this Court as the
under yield approach.

proposal would have violated the Act in one step, at the time the initial summons were mailed according to his underrepresentation/ overrepresentation adjustments, while this Court's plan would violate the Act only at the second of its two proposed mailings, when an additional targeted mailing would be sent in order to compensate for undeliverables and nonresponses within the various ZCTA's of Eastern Massachusetts.[4]

This Court's proposed remedy is based on the assumption that undeliverables and nonresponses within the Eastern Division differ markedly based on overlapping factors such as race, income, and geographical area (i.e. urban versus suburban). It follows that the second mailing would only nominally increase the number of summonses mailed to affluent, "whiter" areas, and would dramatically increase the number of summonses mailed to poorer, more urban, less "white" areas. If the original mailings are selected, as no one disputes, on a random basis within the Eastern Division, than a supplemental mailing that is not random within the same geographical area, but merely random within particular ZCTA's, will destroy the randomness within the

---

[4]The Court itself calls its proposed remedy "a targeted second mailing of summonses." Draft Decision, p. 91. The government hardly needs to go further; the Court itself has defined its remedy in terms that are incompatible with the statutory requirement that names of potential jurors be selected randomly from within the Eastern Division.

Division as a whole.[5]

The result of this Court's proposed order is as much a violation of the Act (and the Plan) as Dr. Beveridge's proposed remedy. The selection of names from the Master Wheel would no longer be random. Some names, in particular, those in less affluent, less white areas within the Eastern Division, would be more likely to be picked, due to the supplemental mailing, than those in more affluent, whiter areas. Regardless of the merits of the Court's plan as social policy, it violates both the Act and the Plan.

The Plan in particular specifically prohibits this Court's proposed remedy. It requires: "The selection of names from the source list and the master wheel must also insure that the mathematical odds of any single name being picked are substantially equal." Plan, ¶7(a). If the first mailing is random (which it is), complying with the Plan's requirement that "the mathematical odds of any single name being picked [from the

---

[5]The Court's proposed remedy is somewhat like a dog chasing its tail. Presumably, the second mailing would produce undeliverables and nonresponses in the same proportion as the original mailing, with those undeliverables and nonresponses far more prevalent in the areas from which this Court wishes to increase representation. Thus, although a second mailing would increase the number of persons responding to summonses in certain urban areas, it would not eliminate the discrepancy between responses between those ZCTA's with high response rates and those with low response rates. Only multiple "supplemental" mailings would eventually reduce the discrepancy to an insignificant difference.

master wheel] are substantially equal," the second mailing will
distort the "mathematical odds of any single name being picked"
based on small subdivisions (i.e. ZCTA's) of the Eastern
Division.  The chance of a person's name being picked in ZCTA's
with high numbers of undeliverables and nonresponses will
increase dramatically because a greater than random number of
mailings will be sent in the combined mailings into those
particular ZCTA's.

The Court's mere use of the word "randomized" in its
proposed remedy does not make it so.  And the order's use of the
word "array" and the order to merge "arrays" only confuses things
more, as those are not terms the Court identifies in its account
of the steps of the jury selection process in this district.
Draft Decision, pp. 13-25.[6]

The Court makes two fundamental errors in arriving at its
proposed remedy.  First, the Court ignores the Act's mandate that
randomness must be measured within the Eastern Division as a
whole, and not within political or other subdivisions (i.e.,
ZCTA's) of the Division.  The Act requires every district court
to devise and place into effect a written plan for juror
selection that shall specify procedures "designed to ensure the

_____

[6]Although the government stands to be corrected, it believes
that "Step Five" of the Court's account of the "steps" of jury
selection process in this district, Draft Decision, p. 22, does
not occur as described.

7

random selection of a fair cross section of the persons residing
in the community in the district or division wherein the court
convenes." 28 U.S.C. §1863(b)(3). This district's juror
selection plan follows the Act's mandate. See Plan, ¶5(c) ("the
names of persons to be considered for service as grand or petit
jurors, . . . shall be selected at random from the numbered local
resident lists within the relevant division . . ."); Plan, ¶7(a)
("The selections of names from the source list and the master
wheel must also insure that the mathematical odds of any single
name being picked are substantially equal."). The Court's
proposed remedy violates the Act and the Plan because it would
distort the randomness within the Eastern Division as a whole,
and it is no less a violation even if randomness is maintained
within each ZCTA.

Second, the Court fails to recognize that the Act and the
Plan measure randomness at the time of initial selection of names
from the source list and the Master Wheel. The Plan specifically
defines randomness in terms of names being picked from the Master
Wheel. Plan, ¶7(a). The Court, however, focuses not on the
selection of names, but on a person's chances of "getting on a
federal jury." Draft Decision, p. 71. The Court is simply wrong
in its assertion that the mathematical odds of any given name
being picked under the current Plan are not substantially equal,
apparently suggesting that if the current system fails to comply

8

with the Plan, then the Court's proposed remedy is somehow
acceptable because it does nothing more than continue a violation
of the Plan.  The Court may be right that a citizen's chances of
getting on a federal jury will vary within the Eastern Division,
but that is irrelevant to the required randomness of the
selection process.  Randomness is measured at the time names are
selected from the Master Wheel, and not at the time of, or based
upon, the appearance of persons in response to summonses.  Thus,
the Court is wrong is suggesting that the current Plan fails to
follow the randomness requirement of Paragraph 7(a), and the
government is correct in asserting that the Court's proposed
remedy would violate that provision.

### 2.    Supplemental Mailing

The Court is also wrong in suggesting that the Plan permits
the sort of supplemental mailing, or supplemental jury array,
that the Court's proposed remedy contemplates.  Draft Decision,
p. 84.  The Court claims that the "Plan allows a court to direct
the Clerk to draw a supplemental jury array from the master jury
wheel to be added to the regular array as necessary when
additional names are 'needed.'"  Draft Decision, p. 84.  The
Court overstates the availability of supplemental arrays.  The
actual Plan provision, when examined in full, demonstrates that
the purpose sought to be served by the Court's proposed remedy is
not a permitted use of a supplemental array.  Paragraph 11(d)

9

states: "A 'supplemental array' shall mean a small list of prospective jurors which may be added to a regular array as necessary when a regular array needs additional names <u>because of excused or increased jury requirements</u>." (Emphasis added). This case does not present a need for additional names because of excusals or because of increased jury requirements.[7] Therefore, Paragraph 11(d) does not support the Court's contemplated action. In fact, by limiting the use of supplemental arrays to two specific scenarios (neither of which exist in this case), the Plan prohibits the use of supplemental arrays for other reasons.

This Court has also read the Act to create a "duty to supplement" that does not exist. Again the Court takes language out of context. The Court cites 28 U.S.C. §1863(b)(2) for its assertion: "The JSSA requires that district court plans supplement district source lists 'where necessary to foster the policy and protect the rights' of litigants to a jury that

---

[7]It is also obvious that the second targeted mailings do not constitute a supplemental array under any definition of that term. A supplemental array drawn from the Master Wheel is subject to the same randomness requirement as the selection of an original array. <u>See</u>, Plan, ¶7(a). Here, this Court's order would not select additional names from the Master Wheel in a random fashion and add them to the original array established from the first mailing. Rather, it would limit the selection of names to particular ZCTA's and dictate the number of such names by counting the number of undeliverables and nonresponses from those ZCTA's. Thus, the supplemental array would be a targeted array, as this Court itself admits, and not randomly drawn from the Master Wheel as a whole, as Paragraph 7(a) requires for all names drawn from the Master Wheel.

10

reflects a fair cross-section of their community." Draft
Decision, p. 76. Section 1863(b)(2) does no such thing. First,
the word "supplement" does not appear in the statutory language.
Second, §1863(b)(2) merely guides a district court in its initial
selection of a source list for its jury selection plan. It
provides what is essentially a default source for the names of
prospective jurors: voter registration lists or lists of actual
voters. The provision then states: "The plan shall prescribe
some other source or sources of names in addition to voter lists
where necessary to foster the policy and protect the rights
secured by sections 1861 and 1862 of this title." This Court
takes the statute's authorization for a juror selection plan to
use other sources of names where necessary to foster the policies
underlying the Act, and creates out of whole cloth a duty to
supplement arrays drawn from the Master Wheel whenever it
determines such a supplement would foster those policies.
Section 1863(b)(2) is not a general remedy provision that permits
this Court to rewrite the Act and select jurors in any manner it
wishes upon a determination that it is "necessary to foster the
policy" of the Act. Congress chose not to provide district
courts such latitude in implementing the Act, and this Court is
without power to usurp such authority on its own. Section
1862(b)(2) only permits a district to use other or additional

11

sources of names for the creation of its Master Wheel.[8]  It deals
only with the source of names for prospective jurors; it does not
deal with manner of selecting names from the Master Wheel.  The
Court's proposed order does not "prescribe some other source or
sources of names in addition to voter lists."  This Court's
proposed order does not even supplement the source list of
potential jurors; it supplements an array from the Plan's
designated source of names of potential jurors.  The Court's
order has nothing to do with the source of names of prospective
jurors.  The order does not use a source of names other than the
resident lists from which the Master Wheel is derived.  The
Court's order deals with an entirely different matter, far
outside the scope of §1863(b)(2): the way names are drawn from
the Master Wheel.

     Even if §1863(b)(2) were applicable, it gives this Court no
power to act on its own.  The section permits a "plan" to
prescribe some other source or sources of names.  This Court
cannot, as it recognizes, amend the district court's Plan. Draft

---

        [8]Although not an issue necessary to be decided in this case,
a very good argument exists that the only permissible alternative
sources of names in addition to voter lists are those that are
specifically endorsed in the remainder of §1863(b)(2), including
this district's use of Massachusetts resident lists.  If
§1863(b)(3) gave carte blanche to a district to select any source
of names "where necessary to foster the policy" of the Act, it
would not have been necessary for Congress to amend §1863(b)(2)
to specifically authorize this district's use of an alternative
source of names.

Decision, p. 72, n. 62 (28 U.S.C. §1863(a) requires that the Plan for Random Selection be approved by a "reviewing panel consisting of the members of the judicial council of the circuit and either the chief judge of the district . . . or such other district judge . . . as the chief judge may designate.").

**3.    Substantial Violation of the Act**

This Court, in its Draft Decision, finds the "failure to supplement the resident lists" to be a substantial violation of the Act. Draft Decision, p. 87.  The Court's loose use of the word "supplement" cannot hide the error of its ruling.  As discussed above, the Court's reliance on §1863(b)(2) is misplaced.  Section 1863(b)(2) authorizes the selection of a source or sources of names of potential jurors by a district for its jury selection plan, but this Court's proposed remedy does not add a new source of names to the Master Wheel (nor could it permissibly do so).  Section 1863(b)(2) simply does not authorize the supplementation of arrays drawn from the designated source list, and particularly does not authorize the non-random additional selection of names.

Although the Court tries to suggest that its proposed remedy merely requires the Jury Administrator to "supplement deficient resident lists," it does no such thing.  The resident lists that would be used by the Jury Administrator to create the Court's targeted supplemental array are the same source lists used for

13

the original mailing.  The resident lists are not being supplemented by the Court's order, the array is being supplemented.[9]  The Court's mixing of apples (i.e. source lists from which the Master Wheel is created) and oranges (i.e. drawing names from the Master Wheel) cannot be supported by §1863(2)(b), or for that matter, by any other provision of the Act or the Plan.

The government is also at a loss to understand how this Court could find that the use of Massachusetts resident lists (which it calls deficient) is a substantial violation of the Act without even citing, let alone trying to distinguish, the First Circuit's on-point holding in United States v. Royal, 174 F.3d 1 (1st Cir. 1999).  Therein, the court held: "The use of the resident lists cannot be such a substantial failure to comply with the Act; Congress specifically endorsed the use of resident lists for Massachusetts."  The Court's holding in Royal is the law in this circuit, and this Court is not free to disregard the on-point holding of a superior court.

4.    **Supervisory Powers**

This Court's reliance on its supervisory powers stretches that limited doctrine beyond its breaking point.  This Court

---

[9]By array, the government refers to the list of names, randomly drawn from the Master Wheel, to whom questionnaires and summonses are mailed for a particular sitting of the district court (or grand jury).

noted in its Draft Decision that the Supreme Court has carefully
restricted the scope of supervisory powers.  It even quoted
cautioning language: "[E]ven a sensible and efficient use of the
supervisory power . . . is invalid if it conflicts with
constitutional or statutory provisions." Bank of Nova Scotia v.
United States, 487 U.S. 250, 254 (1988).  However, where this
Court see "no such obstacles here," Draft Decision, p. 89, the
government does.  As discussed above, the Court's proposed remedy
violates both the Act and the Plan, and is beyond the power of a
single session of the district court to implement.

   **5.  Professor Abramson's Conclusion**

   The court appointed expert, Professor Jeffrey Abramson,
issued his report on April 21, 2005.  Although Professor
Abramson's observations and statements are referenced with
approval throughout the Draft Decision, the Court completely
ignores Professor Abramson's ultimate conclusion in which he
squarely rejects the proposal that a single session of the
District Court should implement a remedy that is functionally the
same as the remedy now proposed by this Court.

   Supported by no fewer than seven "compelling" reasons, six
of which are applicable here,[10] Professor Abramson concluded that
the Court should refuse to use its supervisory powers to enact a

---

   [10]  One, the necessity of "fine tuning" Dr. Beveridge's
calculations, is not applicable because the Court is proposing a
different avenue by which to make the same adjustments.

15

remedy like the one the Court, in its Draft Decision, is now proposing.  The reasons cited by Professor Abramson include:

1. a failed, similar "experiment" in the District of Connecticut, as to which Professor Abramson noted "[t]here is, after all, no guarantee that sending out more summonses to a zip code will increase the yield of *African American* residents summoned from that zip code;"

2. constitutional qualms about a summonsing process that arguably gives preference to prospective jurors on the basis of their race;

3. recognition that the remedy proposed is substantial enough that it should be considered by the District as a whole rather than in one case by a single judge in a multi-judge district with a standing jury plan, citing United States v. Levasseur, 704 F.Supp. 1158, 1164, n.10 (D.Mass. 1989);

4. recognition that only the District as a whole should address proposed changes that alter the mathematics of randomness mandated by the Plan;

5. recognition that the proposed "weighted random selection" may violate the Act as well as the Plan;

6. recognition that the proposed remedy is not "especially designed to correct for the inevitable fall-off from

16

proportional representation that undeliverable mail and

nonresponse to jury summonses will still bring about"

if the Court implements a remedy like that which is

proposed in its Draft Decision.

Report of Professor Jeffrey Abramson, April 21, 2005, pp. 60-62.

Consistent with Professor Abramson's conclusions, the

government opposes the remedy proposed by the Court in its August

23, 2005 Draft Decision and requests additional time within which

to prepare a more extensive opposition memorandum that addresses

the Court's draft in more detail.


                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:  /s/ Timothy Q. Feeley
                              THEODORE B. HEINRICH
                              TIMOTHY Q. FEELEY
                              LORI J. HOLIK
                              Assistant U.S. Attorneys

August 30, 2005


                    CERTIFICATE OF SERVICE

    I hereby certify that on August 30, 2005, I caused a copy of
the above memorandum to be served by causing same to be
electronically filed with the Court.

                              /s/ Lori J. Holik
                              LORI J. HOLIK
                              Assistant U.S. Attorney


                              17

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
          V.             )     CRIMINAL NO. 02-10301-NG
                         )
BRANDEN MORRIS           )

GOVERNMENT'S OBJECTIONS TO HEARING EXHIBITS
IN FURTHER OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS ON ACCOUNT OF THE RACIAL COMPOSITION
OF THE MASTER JURY WHEEL, OR ALTERNATIVELY,
TO SUPPLEMENT THE MASTER JURY WHEEL

In addition to any objections raised at the January 11 and 26, 2005 hearings in this matter, the government objects to the tables and charts prepared by Dr. Beveridge as follows:

1.   Amended Table 3: The table shows that in 2003 only 149 jurors were actually seated in this courthouse.  That number of jurors would fill only 10 to 11 twelve person juries, with the usual two alternates per trial. The government does not believe it possible that only 10 or 11 juries were seated in this courthouse over the course of a full year.

2.   Amended Tables 7-10, Table 11: The government objects to the category entitled "Available Master Wheel" and to all disparities and risks calculated using that number.  Available master wheel only includes those persons who returned questionnaires/summonses with race reported, which is less than two-thirds of the number of persons from the actual master wheel to whom

questionnaires/summonses mailed out. Thus, the percentage of blacks in the available master wheel does not accurately reflect the percentage of blacks in the actual master wheel, which is both unknown and unknowable. Because it appears that blacks would be over-represented in at least the undeliverables and no response categories for whom no race information is known, the disparities and risks calculated using the available master wheel overstate any under-representation of blacks in the actual master wheel. Thus, the disparities and risks calculated by Dr. Beveridge lack a proper foundation and are irrelevant to the fair cross-section claim before this Court.

3. Amended Tables 7-10, Table 11: The definitions at the bottom of each chart are irrelevant to the charts, and differ, without explanation, from the definitions on the original tables.

4. Amended Tables 12-16: The government objects to all disparity of risk calculations because they are based on an "available master wheel" that does not accurately reflect the percentage of blacks in the actual master wheel. As noted above, it appears that blacks would be over-represented in at least the undeliverables and no response categories for which no race information is

2

known, which would cause the percentage of blacks in
the available master wheel to be less than the
percentage of blacks in the actual master wheel.  The
government also objects to disparity of risk
calculations because they focus on the composition of
juries and the requirement of a fair cross-section does
not guarantee that juries be "of any particular
composition" . . . or that "venires . . . [be] a
substantially true mirror of the community."  United
States v. Royal, 174 F.3d 1, 6 (1st Cir. 1999) (quoting
Taylor v. Louisiana, 419 U.S. 522, 538 (1975) and
Barber v. Ponte, 772 F.2d 982, 997 (1st Cir. 1985)).
Disparity of risk calculations also suffer from the
same defect as comparative disparity calculations in
that they tend to exaggerate the results when focused
on groups that constitute a small proportion of the
entire population.  Disparity of risk calculations are
also irrelevant because there is no accepted measure of
what is an acceptable versus an unacceptable level of
such risk in the context of a fair cross-section claim.

5.   Amended Table 17: Comparing the make-up of the actual
master jury wheel to Dr. Beveridge's ideal master wheel
(based on census data) by counties is irrelevant for
purposes of a fair cross section or proportionality

challenge.  According to 28 U.S.C. § 1863, the fair cross section requirement is based on the district or division in which the court resides, and not some subdivision thereof.  According to the same statutory provision, proportionality by county is limited to ensuring that each county is proportionally represented in the master jury wheel based on the source lists used, in this case the c. 234A resident lists.  Thus, comparing the master jury wheel by county against census data is irrelevant to both a fair cross-section challenge and to a proportionality claim.

6.    Amended Table 19: Comparing the make-up of the actual master jury wheel to Dr. Beveridge's ideal master wheel (based on census data) by ZCTA's is irrelevant for purposes of a fair cross section or proportionality challenge.  According to 28 U.S.C. § 1863, the fair cross section requirement is based on the district or division in which the court resides, and not some subdivision thereof.  According to the same statutory provision, proportionality is measured by political subdivisons such as counties or parishes, and ZCTA's are not political subdivisions.  Moreover, proportionality by county or other political subdivision is limited to ensuring that each such

4

subdivision is proportionally represented in the master jury wheel based on the source lists used, in this case the c. 234A resident lists.  Thus, comparing the master jury wheel by ZCTA against census data is irrelevant to both a fair cross-section and a proportionality challenge.

7.   Amended Table 21: Comparing the make-up of the actual master jury wheel to Dr. Beveridge's ideal master wheel (based on census data) by town/city is irrelevant for purposes of a fair cross section or proportionality challenge.  According to 28 U.S.C. § 1863, the fair cross section requirement is based on the district or division in which the court resides, and not some subdivision thereof.  According to the same statutory provision, proportionality by county or other political subdivision is limited to ensuring that each such subdivision is proportionally represented in the master jury wheel based on the source lists used, in this case the c. 234A resident lists.  Thus, comparing the master jury wheel by town/city against census data is irrelevant to both a fair cross-section challenge and to a proportionality claim.

8.   Amended Exhibit 22:  Comparing the make-up of the actual master jury wheel to Dr. Beveridge's ideal

5

master wheel (based on census data) by ZCTA's is
irrelevant for purposes of a fair cross section or
proportionality challenge.  According to 28 U.S.C. §
1863, the fair cross section requirement is based on
the district or division in which the court resides,
and not some subdivision thereof.   According to the
same statutory provision, proportionality is measured
by political subdivisions such as counties or parishes,
and ZCTA's are not political subdivisions.  Moreover,
proportionality by county or other political
subdivision is limited to ensuring that each such
subdivision is proportionally represented in the master
jury wheel based on the source lists used, in this case
the c. 234A resident lists.  Thus, comparing the master
jury wheel by ZCTA against census data is irrelevant to
both a fair cross-section and a proportionality
challenge.

9.    Amended Table 22:  Comparing the make-up of the actual
master jury wheel to Dr. Beveridge's ideal master wheel
(based on census data) by ZCTA's is irrelevant for
purposes of a fair cross section or proportionality
challenge.  According to 28 U.S.C. § 1863, the fair
cross section requirement is based on the district or
division in which the court resides, and not some

subdivision thereof.  According to the same statutory
provision, proportionality is measured by political
subdivisions such as counties or parishes, and ZCTA's
are not political subdivisions.  Moreover,
proportionality by county or other political
subdivision is limited to ensuring that each such
subdivision is proportionally represented in the master
jury wheel based on the source lists used, in this case
the c. 234A resident lists.  Thus, comparing the master
jury wheel by ZCTA against census data is irrelevant to
both a fair cross-section and a proportionality
challenge.

10.  Amended Table 23: Determining deviations of the
combined jury pools 2001-2003 based on the number of
African Americans in any given zip code area is
irrelevant for purposes of a fair cross section or
proportionality challenge.  According to 28 U.S.C. §
1863, the fair cross section requirement is based on
the district or division in which the court resides,
and not some subdivision thereof.  According to the
same statutory provision, proportionality is measured
by political subdivisions such as counties or parishes,
and ZCTA's are not political subdivisions.  Moreover,
proportionality by county or other political

subdivision is limited to ensuring that each such
subdivision is proportionally represented in the master
jury wheel based on the source lists used, in this case
the c. 234A resident lists.  Thus, calculations based
on ZCTA's are irrelevant to both a fair cross-section
and a proportionality challenge.

11. Exhibit 4, Attachments to Affidavit of Amanda
Vanderhorst: Even accepting the defendant's absolute
disparity calculation, no fair cross-section violation
can be found.  Given that, the procedures followed by
the towns and cities of Massachusetts in compiling
their c. 234A resident lists are irrelevant to this
case, as their compliance with obligations imposed by

the Commonwealth of Massachusetts, and not by any
federal authority, are not subject to the power of this
Court.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Timothy Q. Feeley
THEODORE B. HEINRICH
LORI J. HOLIK
TIMOTHY Q. FEELEY
Assistant U.S. Attorneys

March 22, 2005

CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2005, I caused a copy of
the above memorandum to be served by causing same to be
electronically filed with the Court.

/s/ Timothy Q. Feeley
TIMOTHY Q. FEELEY
Assistant U.S. Attorney

9

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                        )
         V.           )     CRIMINAL NO. 02-10301-NG
                        )
BRANDEN MORRIS        )

GOVERNMENT'S ADDITIONAL OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS ON ACCOUNT OF THE RACIAL COMPOSITION
OF THE MASTER JURY WHEEL, OR ALTERNATIVELY,
<u>TO SUPPLEMENT THE MASTER JURY WHEEL</u>

     The government hereby submits this memorandum in further opposition to the pending motion of defendant Branden Morris ("Morris"), in which he challenges the master jury wheel from which jurors are selected in the Eastern Division of the District of Massachusetts.  This memorandum will focus on Morris's continued assertion that there are less than half the number of blacks in the jury wheel than would be present if the jury wheel exactly reflected the percentage of blacks in the over 18 population of the Eastern Division.  Additionally, this memorandum will briefly address Morris's argument that the master jury wheel violates the "inclusion of all citizens" requirement of this district's jury selection plan (the "Plan").

    1.    Morris's Claimed Absolute Disparity Overstates The Actual Absolute Disparity Of Blacks In The Master Jury Wheel

Using census figures, Morris asserts that blacks make up 6.96% of the over 18 population in the Eastern Division as of July 1, 2003.  He then asserts that blacks make up only 3.17% of the "available" jury wheel, leaving an absolute disparity of 3.79%.  His figures may be accurate, but any suggestion that those figures compare the percentage of blacks in the population to the percentage of blacks in the master jury wheel is not.

We do not know, because we cannot know, the percentage of blacks in the master jury wheel.  We can only determine the percentage of blacks among those persons who returned jury questionnaires and identified their race.  If all persons who were sent questionnaire returned them and identified their race, we could fairly determine the percentage of blacks in the master jury wheel.  But that is not the case and it is important to recognize the significant proportion of the persons in the master jury wheel for whom race is not known.

Morris provided the following numbers for 2003:

22,197    Questionnaires/summonses mailed

-2,564    (11.6%)  Returned as undeliverable

```
-2,468    (11.1%)  No response

17,165    (77.3%)  Returned questionnaires

-2,861    Did not identify race

14,304    (64.4%)[1]
```

Thus, to treat Morris's claimed absolute disparity numbers as fairly reflective of the actual absolute disparity of blacks in the master jury wheel, one must assume that blacks constitute the same proportion of the undeliverables, no responses, and no race identifiers, which as a whole constitutes more than one-third of the master jury wheel, as they do in the over 18 population as a whole. Obviously, to the degree that blacks are over-represented in the unmeasured categories, the absolute disparity figure proposed by Morris is overstated.  If they were under-represented, the opposite would be true.

The government knows of no way to measure or reasonably infer the percentage of blacks among those who did not

---

[1]  We know the race of less than two-thirds of those persons to whom questionnaires/summonses were mailed. Questionnaires were sent to about two-thirds of the entire master jury wheel, which Morris states generally has a total of approximately 33,000 names.  However, because persons selected to receive questionnaires are selected randomly, it seems fair to infer, based on the selection of two-thirds of the entire master jury wheel, that we know the race of about 64.4% of the entire master jury wheel.

identify race.  However, Morris provides figures from which
it can be said with near, if not absolute, certainty that
blacks are over-represented in the categories of
undeliverables and no responses.

In footnote 19 in Morris's most recent memorandum
(filed on or about March 1, 2005), he compares the
percentage of undeliverables and no-responses in towns and
cities with large populations, but small numbers of blacks,
to towns and cities with large populations and larger
numbers of blacks.  [See also Table 32, included as part of
Attachment A to the Fourth Declaration of Andrew Beveridge].
The figures are compelling, but for a purpose different than
proposed by Morris.

The large towns and cities with a small black
population have a combined undeliverable/no response rate of
13.4%, compared to 35.3% for those cities and towns with a
larger numbers of blacks.  Thus, it follows that blacks are
almost certainly over-represented in the unmeasured
categories of non-deliverables and no responses for which
race is not known.  Accordingly, Morris's "available" master
wheel, on which he bases his absolute disparity calculation
understates the actual percentage of blacks in the master
jury wheel to the same extent that blacks are over-

4

represented in the unmeasured categories of undeliverables and no responses.

Amended Table 17 (3rd page), included as part of Amended Exhibit 3, makes the same point, but limited only to the no response category that is not measured in Morris's "available" mater jury wheel.  On page 11 of his March 1, 2005 memorandum, Morris claims that for 2001-2003, 12.2% of all questionnaires/summonses mailed resulted in no responses (excluding undeliverables).[2]  In Amended Table 17, also presented at page 12 of his March 1, 2005 memorandum, he shows the percentage of no responses, broken down by county.[3]  As noted by Morris in his memorandum, "excluding Dukes and Nantucket Counties . . ., Suffolk County has more than twice the percentage of non-respondents than any other county."

---

[2] Although the differences are not material, it appears that Morris lifted the wrong figure from Table 3 to the January 4, 2005 Declaration of Andrew Beveridge.  That table shows 12.2% as the percentage of undeliverables, as opposed to no responses.  It shows the percentage of no responses to be 11.9%.

[3] It again appears that Morris made an inadvertent error in Amended Table 17.  Although the table clearly represents only the numbers and percentages of no responses (according to the text in the memorandum) the table incorrectly identifies the numbers for each county to represent both no responses and undeliverables.

Morris also provides figures for the percentage of blacks over 18 in towns and cities with large black populations, including Boston, which comprises a substantial part of Suffolk County.  According to Table 18 to the January 4, 2005 Declaration of Andrew Beveridge, Boston has a black population over 18 of 23.61% of its total over 18 population.  Thus, in Boston, where undeliverables and no responses occur far more frequently than in communities with small black populations, blacks constitute a percentage of the city's population that is more than three times the percentage of blacks in the population of the Eastern Division as a whole.

Again we reach the same result.  Two unmeasured categories which constitute a significant percentage of the master jury wheel (22.7% of questionnaires sent for trial jury duty in 2003), but are not included in Morris's "available" master jury wheel, almost certainly, if not certainly, contain an over-representation of blacks (as compared to the 6.96% of blacks in the 2003 over 18 population of the Eastern Division).  It follows that Morris's claimed absolute disparity is greater that the actual absolute disparity in the master jury wheel.

2.    Inclusion Policy Merely Requires The Opportunity
      To Serve As Jurors And Does Not Require All
      Citizens To Be In The Master Jury Wheel

Morris is also wrong in his claim that the use of c.
234A resident lists violates the Plan's stated policy that
"all citizens of this district shall have the opportunity to
be considered for service on grand and petit juries."  Plan,
¶5(a).  Simply put, the fact that the resident lists might
not include all citizens of this district does not mean that
all citizens do not have the opportunity to be included on
the lists from which jurors are summonsed.[4]  In the same
vein, the fact that a particular distinctive group, here,
blacks, is over-represented in the undeliverables and no
responses, does not mean that they do not have the
opportunity to be included on the lists from which jurors
are summonsed.

The Plan does not require that all citizens be
considered for service as jurors, but only that they have

_____

[4]   The plan includes a finding by the district court that
      c. 234A resident lists "includes all registered voters,
      supplemented by all residents not registered to vote."
      Plan, ¶5(b).  Whether that finding is correct or not, a
      violation of the Plan cannot be based on an incorrect
      finding.  The Plan does not require that c. 234A
      resident lists include all residents not registered to
      vote.  Nor could it.  Morris "agrees that this Court
      cannot order the Commonwealth of Massachusetts to
      compile more accurate resident lists." [Footnote 37 to
      March 1, 2005 memorandum].

the opportunity to do so.  If any persons within the district fail to take reasonable steps that would ensure their inclusion on c. 234A resident lists and accordingly their inclusion within the master jury wheel, or fail to take steps to ensure receipt of federal jury summonses, or voluntarily decline to serve as jurors by failing to respond to summonses, the inclusion policy of the Plan is not violated.

First, although the specific practices of the towns and cities may vary, it appears that all towns and cities in Massachusetts start their c. 234A resident lists with voter registration lists.  Thus, any registered voter will be on a resident list provided to federal court for jury selection purposes.  All citizens over the age of 18 in this district have the opportunity to register to vote, and thereby be included on the c. 234A resident lists.

Second, and similarly, those persons who fail to complete and return annual census forms provided by their cities and towns have been given the opportunity to be included on the c. 234A resident lists.

Third, those persons who fail to provide the Post Office, or their towns and cities, with updated and current forwarding addresses, and thus fall within the

undeliverables, had the opportunity to receive summonses for federal jury duty. Fourth, and in a related vein, those persons who received summonses and failed to return them to federal court, for whatever reason, had the opportunity to serve as jurors in this district.

It follows that the use of c. 234A resident lists and the procedures followed for the selection of jurors in the Eastern Division do not violate the Plan's policy "that all citizens shall have the opportunity to be considered for service on grand and petit juries."

<div style="margin-left:40%">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Timothy Q. Feeley
THEODORE B. HEINRICH
LORI J. HOLIK
TIMOTHY Q. FEELEY
Assistant U.S. Attorneys

</div>

March 21, 2005

<div align="center">

CERTIFICATE OF SERVICE

</div>

I hereby certify that on March 21, 2005, I caused a copy of the above memorandum to be served by causing same to be electronically filed with the Court.

<div style="margin-left:40%">

/s/ Timothy Q. Feeley
TIMOTHY Q. FEELEY
Assistant U.S. Attorney

</div>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA )
                         )
          V.             )    CRIMINAL NO. 02-10301-NG
                         )
BRANDEN MORRIS           )
```

GOVERNMENT'S FURTHER OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS ON ACCOUNT OF THE RACIAL COMPOSITION
OF THE MASTER JURY WHEEL, OR ALTERNATIVELY,
<u>TO SUPPLEMENT THE MASTER JURY WHEEL</u>

The government hereby submits this memorandum, pursuant to this Court's January 26, 2005 scheduling order, in further opposition to defendant Branden Morris' ("Morris") motion to dismiss the superseding indictment in this case on account of the racial composition of the master jury wheel, or alternatively, to supplement the master jury wheel.  In an earlier written opposition, filed January 19, 2005, the government argued:

   1)   Morris failed to establish a constitutional or
        statutory violation of the fair cross section
        requirement;

   2)   Morris failed to establish a statutory violation
        of the substantial proportional representation
        requirement; and

   3)   Morris' proposed remedies conflict with both the
        Jury Selection and Service Act, 28 U.S.C. §1861 et
        seq., (the "Act") and this Court's Plan for Random
        Selection of Jurors (as revised November 2000)
        (the "Plan") and cannot be implemented by this
        Court.

Based on this Court's comments in open court on January 26th, the government understands that the Court agrees with the positions taken by the government.

Based on additional comments from the Court at the same

hearing, the government understands that the Court would like the parties' views on the following questions:

1) Has a violation of the Plan been established?  The government understands that the Court is considering whether less than complete compliance by Massachusetts towns and cities with their obligation under M.G.L. c. 234A ("c. 234A") to prepare resident lists that include all their residents age 17 and older, if so found by the Court based on the questionnaires introduced into evidence at the recent hearing, violates the Plan, which relies on resident lists submitted annually to the Office of the Jury Commissioner for the Commonwealth of Massachusetts (the "OJC") in accordance with c. 234A. [See Plan, ¶5b and c].

2) If such a violation has been established, did it cause an underrepresentation of blacks in the Master Jury Wheel?

3) If such a violation has been established, does that violation constitute a substantial failure to comply with a provision of the Act that can be remedied under 28 U.S.C. §1867(d)?

4) If such a violation constitutes a substantial failure to comply with a provision of the Act, what should the remedy be?

I.   **There Has Been No Violation Of The Plan**

The Court has proposed, as the government understands the

2

Court's comments at the close of the recent hearing [see January 26, 2005 Transcript, pp. 60-61], the following as a possible violation of the Act, triggering the remedy provision of 28 U.S.C. §1867(d):

1. The Act says that each district court shall devise and place into operation a written plan for the random selection of grand and petit jurors. [See 28 U.S.C. §1863(a)].

2. The Act says that the District of Massachusetts may require the names of prospective jurors to be selected from the resident list provided for in Chapter 234A, M.G.L., or comparable authority, rather than from voter lists. [See 28 U.S.C. §1863(b)(2)].

3. The Plan adopted the statutorily permitted option of using Massachusetts resident lists within each division as the source of names for the Master Jury Wheel. [See Plan, ¶5c].

4. The questionnaires marked into evidence at the hearing as Government Exhibits 1A-1F may establish that a number of Massachusetts towns and cities are not providing full and complete listings of all residents (17 or older) residing as of the first day of each year

in the town or city, as required by c. 234A, §10.[1]

5.  Because the Plan relies on resident lists provided for
    in c. 234A, and c. 234A requires resident lists to
    include all residents, the failure of Massachusetts
    towns and cities to prepare full and complete resident
    lists constitutes a violation of the Plan.[2]

6.  Because the Act requires each district court to devise
    and place into operation a jury selection plan, a
    violation of the Plan is also a violation of the Act.

7.  A violation of the Act, if found to be a substantial
    failure to comply with the provisions of the Act,

---

[1]The government understands that the Court has not made any
such finding, and is requesting briefing from both parties on
whether the questionnaires returned by the towns and cities of
Massachusetts establish a violation of the Plan and/or the Act.
For purposes of this argument, the government will assume,
without conceding, that the questionnaires establish that the
resident lists for many towns and cities do not list all
residents of such towns and cities as of the first day of each
year.  Even if that is the case, neither the Act nor the Plan are
violated by the failure of towns and cities to comply with their
obligations imposed by state law.  Accordingly, because no
violation has occurred, the government will not address whether
less than full and complete resident lists causes an
underrepresentation of blacks in the Master Jury Wheel.

[2]M.G.L. c. 234A, §10 provides in pertinent part: "On or
before the first day of June of each year, each city and town
shall make a sequentially numbered list of the names, addresses,
and dates of birth of all persons who were seventeen years of age
or older as of the first day of January of the current year and
who resided as of the first day of January of the current year in
such city or town."  Section 10 further provides that by the same
date each city and town shall submit a copy of the list to the
OJC.

permits this Court to fashion a remedy as provided for in 28 U.S.C. §1867(d).

By breaking down a possible violation of the Plan into its component parts, and focusing on the plain meaning of the language of the Act and the Plan, it is evident that any failure of towns and cities to have their resident lists include all residents, as required by c. 234A, §10, is not a violation of the Act or the Plan.

Neither the Act nor the Plan imposes any obligations on towns and cities of Massachusetts.  Nor do they require that a list of all residents be used as the source of prospective jurors.  Rather, the Act merely permits this district to use the resident lists provided for in c. 234A as the source of names of prospective jurors; the Plan merely requires this district to use the resident lists submitted annually to the OJC as the source of names of prospective jurors.  In other words, the Plan does not require that prospective jurors be selected from a list of all residents.  It only requires that prospective jurors be selected from the resident lists submitted to the OJC.  See Plan, ¶5b ("the names of persons . . . shall be selected at random from the numbered local resident lists within the relevant division").

It is undisputed on the record before this Court that the Master Jury Wheel is created by a random selection of names from the c. 234A, §10 resident lists provided to the OJC by the towns

5

and cities of the Eastern Division.  Whether the resident lists

provided to the OJC are perfect listings of all residents, or

imperfect listings of less than all residents, has nothing to do

with whether the Plan is being properly implemented.  If resident

lists provided to the OJC under c. 234A, §10 are used by the Plan

as the source of names of prospective jurors for the Master Jury

Wheel, neither the Act nor the Plan is violated.

## II.   **The First Circuit Has Already Determined That The Use Of Massachusetts Resident Lists Does Not Constitute a Substantial Failure to Comply With The Act**

Morris is not breaking new ground with his statistics or his

arguments that blacks are underrepresented as a result of the

Plan's use of c. 234A resident lists as its source of prospective

jurors.  Jerome Royal made the same challenge.  See United States

v. Royal, 7 F. Supp. 2d 96, 101 (D. Mass. 1998) (defendant's

expert "argues that use of the resident lists from which the

Master Jury Wheel names are drawn is problematic and

underrepresents black persons because resident lists are created

in the same manner as the annual census, which is known to

undercount black persons significantly"); and United States v.

Royal, 174 F.3d 1, 11 (1st Cir. 1999) ("Royal argues that the

Massachusetts resident list do not include an adequate number of

blacks").

In Royal, the First Circuit initially defined a substantial

failure to comply with the Act for purpose of triggering a remedy

under 28 U.S.C. §1867(d) as follows:

> "A substantial failure is one that contravenes one of
> . . . two basic principles . . .: (1) random selection
> of jurors, and (2) determination of juror
> disqualification, excuses, exemptions, and exclusions
> on the basis of objective criteria.  Technical
> violations, or even a number of them, that do not
> frustrate the[se] . . .  requirements and do not result
> in discrimination and arbitrariness do not constitute a
> substantial failure to comply." United States v.
> Savides, 787 F.2d 751, 754 (1st Cir. 1986); see also
> United States v. Ramirez, 884 F.2d 1524, 1530 (1st Cir.
> 1989) ("The test . . . for a substantial violation is
> whether it 'either allowed discriminatory selection of
> jurors or otherwise prevented jury panels from
> consisting of fair cross sections of the community.'"
> (quoting United States v. Bearden, 659 F.2d F.2d 590,
> 602 (5th Cir. Unit B Oct. 1981))); H.R. Rep. No 90-1076
> (1968), reprinted in 1968 U.S.C.C.A.N. 1792, 1793-94.

Royal, 174 F.3d at 11.  The Court then held: "The use of the

resident lists cannot be such a substantial failure to comply

with the Act; Congress specifically endorsed the use of resident

lists for Massachusetts.  See 28 U.S.C. §1863(b)(2)." Id.  Thus,

even if this Court were to conclude that the Plan's use of

resident lists that are not full and complete lists of all

residents violated the Plan, and therefore the Act, no remedy is

available under 28 U.S.C. §1867(d) because the use of such lists

is not a substantial failure to comply with any provision of the

Act.

**III. This Court Is Without Power To Reject The Use of
    Massachusetts Resident Lists As The Source Of Names Of
    Prospective Jurors**

The question of the continued wisdom of using c. 234A

7

resident lists as the source of names of prospective jurors is
both difficult and not a matter for a single session of this
Court.  It must be remembered that the Plan, and predecessor
plans, are the result of careful and repeated consideration by
the entire District Court (hereinafter, the entire District Court
will be referred to as the "District Court" and this session of
the Court will be referred to as this "Court").  It must also be
remembered that any plan for selecting juries cannot be examined
in a vacuum; it must be considered in light of and compared to
other available and practical means to obtain a possibly more
inclusive source of names of prospective jurors.

    The District Court's Plan, as revised May 12, 1986, and
which was subject to Judge Young's consideration in United States
v. Levasseur, 704 F. Supp. 1158 (D. Mass. 1989), used voter lists
as the source of names of prospective jurors. [See Plan (as
revised May 12, 1986), ¶4].  In Levasseur, Judge Young welcomed
the then-anticipated change in the Plan from using voter lists to
using Massachusetts resident lists as a more progressive and
inclusive system for selecting jurors in this district.[3]  Id. at

---

[3]Judge Young makes it clear that the District Court chose to
"piggy-back" on the Massachusetts state system for choosing
jurors, and did not create any new obligations, even assuming
such authority exists, on Massachusetts and its towns and cities.
Id. at 1185 ("It is reported to the judges of this court that the
[OJC] . . . will provide the Commonwealth's jury lists to the
United States District Court for the District of Massachusetts at
no charge.").  Thus, the District Court made a conscious decision
to use the Massachusetts system for creating a list of

1165-66.  Nine months after <u>Levasseur</u>, the District Court adopted a new Plan (as revised September 6, 1989) that for the first time required the use of c. 234A resident lists as the source of prospective jurors, specifically finding that resident lists are more inclusive than voter lists. [<u>See</u> Plan (as revised September 6, 1989), ¶5b].

The Plan has been revised by the District Court twice since 1989: on February 23, 1998, and most recently in November 2000. Both revisions followed the initial challenge to the 1989 Plan by Jerome Royal.  <u>United States v. Royal</u>, 100 F.3d 1019 (1st Cir. 1996).  The November 2000 Plan (the current Plan) actually followed the First Circuit's rejection of Royal's jury selection challenge.  <u>United States v. Royal</u>, 174 F.3d 1 (1st Cir. 1999). Thus, on two occasions after a Plan using the c. 234A resident lists has been attacked as improperly excluding blacks from the Master Jury Wheel, the District Court has reaffirmed the use of those lists.  The government can only assume that in 1998 and in

---

prospective jurors.  Presumably, that decision was made because the Massachusetts resident lists were viewed by the District Court to be a more inclusive source of names of prospective jurors than the prior practice of using voter lists.  <u>See</u> <u>United States v. Royal</u>, 7 F. Supp. 2d 96, 102 (D. Mass. 1998) ("[r]esident lists are broader than voter lists"); <u>United States v. Pion</u>, 25 F.3d 11, 18 (1st Cir. 1994) ("The district court [Young, J.] rejected the Pion claim on the fundamental ground that the Amended Jury Plan for the District of Massachusetts is as broadly inclusive as any in the nation . . ."). If that system is less than perfect, or not optimal, it remains the chosen system until the District Court decides otherwise.

9

2000 the District Court considered the continued wisdom of using resident lists, considered any practical alternatives, and concluded that the resident lists provided the most inclusive practicable system for selecting prospective jurors.[4]

The question about using c. 234A resident lists as the source of prospective jurors is not a question of meeting the constitutional standard, as both the First Circuit and this Court have concluded that the Plan passes constitutional muster.  The question is much narrower: does the use of such resident lists, when compared to other possible sources of names of prospective jurors, come closest to effectuating the District Court's policy "that all citizens of this district shall have the opportunity to be considered for service on grand and petit juries?"[5]  Plan,

_____

[4]Although the questionnaires returned by the towns and cities of Massachusetts may show that some towns and cities do a better and more thorough job than others in compiling accurate and complete resident lists, the questionnaires establish without question that c. 234A  resident lists provide the District Court, as anticipated and intended, a broader and more inclusive source of names of prospective jurors than the prior system's use of voter lists.  Whatever the failings of particular resident lists, in all instances they consist of voter lists plus additional names gathered by means of one or more of the following:  census, utilities, assessors, schools, dog licenses, vital statistics, board of health, council on aging, hunting licenses, building permits, rooming houses, group homes, colleges, public housing, apartments, registry of motor vehicles, post office, health care facilities, etc.  Updated information is entered into the state computer system and used to generate the resident lists.

[5]The practical difficulties of devising a new source of names of prospective jurors are daunting.  The District Court moved from voter lists to c. 234A resident lists in order to use a broader, more inclusive source of names.  The government knows

¶5a.  That is not a question that can be answered in this case, as it is not a question this Court can answer.  The Plan for selecting juries in this district has been amended two times within the last decade by the District Court.  This Court is a signatory on those Plans, as is each session of the District Court.  If the Plan requires further amendment, it is for the District Court, and not this Court, to so conclude.[6]

---

of no existing alternative source, and Morris has suggested none, that is broader and more inclusive than c. 234A resident lists. It is one thing for this Court to think that the answer is to have Massachusetts towns and cities do a better job of preparing their resident lists.  It is another thing to make that happen. The preparation of resident lists is not a federal obligation. The government knows of no authority that would permit this Court to order the Commonwealth of Massachusetts, or various towns and cities therein, to do a better job meeting their obligations under c. 234A.  It should not be forgotten that Massachusetts has no obligation to provide its resident lists to the District Court.  It could stop doing so tomorrow if it so chose.  It provides the list voluntarily and apparently without charge.  If this Court does not like the lists provided by the OJC, it can seek to have the District Court find and use an alternative source of names of prospective jurors.  It cannot order the Commonwealth of Massachusetts or its towns and cities to do anything.  However, that is not to say that compliance with c. 234A is beyond the reach of judicial power.  See Jury Commissioner of the Commonwealth of Massachusetts v. Mayor and City Clerk of the City of Boston, Suffolk Superior Court No. 1993-4718 [Attached to Morris' Response to the Court's Order of January 12, 2005].  It is just beyond the reach of this Court.

[6]As this Court recognized in its comments at the January 26, 2005 hearing [Transcript, pp. 65-66], it cannot take steps within this case that would amend the Plan.  By statute, each district court (i.e. the entire sitting of each district court) must devise and place into operation a written jury selection plan. The required plan can be placed into operation only after approval by a reviewing panel, and although district courts have the power to modify plans, those modifications become effective only after approval by the reviewing panel.  28 U.S.C. §1683(a).

                                    Respectfully submitted,

                                    MICHAEL J. SULLIVAN
                                    United States Attorney

                            By:    /s/ Lori J. Holik
                                   THEODORE B. HEINRICH
                                   TIMOTHY Q. FEELEY
                                   LORI J. HOLIK
                                   Assistant U.S. Attorneys

February 11, 2005


                      CERTIFICATE OF SERVICE

       I hereby certify that on February 11, 2005, I caused a copy
of the above memorandum to be served by causing same to be
electronically filed with the Court.

                                   /s/ LORI J. HOLIK
                                   LORI J. HOLIK
                                   Assistant U.S. Attorney

                                    12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
          v.             )          Criminal No. 02-10301-NG
                         )
DARRYL GREEN, et al.,    )
                         )
          Defendants.    )


GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE SUPERSEDING INDICTMENT ON ACCOUNT OF THE RACIAL
COMPOSITION OF THE MASTER JURY WHEEL, OR ALTERNATIVELY,
TO SUPPLEMENT THE MASTER JURY WHEEL

Defendant Branden Morris moves the Court for an Order
dismissing the superseding indictment because, he alleges, the
selection process used to pick the grand jurors who indicted him
violated the Sixth Amendment and the Jury Selection and Service
Act, 28 U.S.C. §§1861 et seq., (the "Act").  Alternatively,
defendant moves the Court for an Order supplementing the Master
Jury Wheel from which the names of his petit jurors will be
drawn.  Specifically, defendant bases his challenge on the
alleged underrepresentation of African Americans on the Master
Jury Wheel for the Eastern Division of the District of
Massachusetts and the resulting failure of that Master Jury Wheel
to reflect a fair cross section of the community.  Defendant's
most recent remedy proposal, filed on January 10, 2005, also
alleges violation of the proportionality requirement of 28 U.S.C.
§1863(b)(3) that he claims exists in the implementation of this
Court's Plan for Random Selection of Jurors (as revised November
2000) (the "Plan").

The defendant fails to establish a prima facie violation of the fair cross section requirement and likewise fails to establish any violation of the Act's requirement of substantial proportional county representation on the Master Jury Wheel. The motion should be denied in its entirety.

> A. Defendant fails to establish a constitutional or statutory violation of the fair cross section requirement.

The selection of a jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial. <u>Taylor v. Louisiana</u>, 419 U.S. 522, 528 (1975). That same requirement is incorporated into the provisions of the Act, namely, that each United States district court devise and place into operation a written plan for random selection of grand and petit juries, including the specification of detailed procedures "designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes." 28 U.S.C. §1863(b)(3).

Here, the defendant's claim of fair cross section constitutional and statutory violations is based on the operation and implementation of the Plan, implemented pursuant to 28 U.S.C. §1863(a). According to the Plan, the random selection of jurors is to be made from "the numbered local resident lists submitted annually to the Office of the Jury Commission for the

Commonwealth of Massachusetts in accordance with Massachusetts General Laws Chapter 234A," which is identified as including "all registered voters, supplemented by all residents not registered to vote,"[1] and representing "a fair cross section of the community in this District."  The Plan, ¶5(b).  Upon gathering information from the Federal Court Jury Administrator pursuant to a court authorized survey, and based upon various other master jury wheel, census and zip code data, defendant presents several statistical methods purportedly measuring the disparity of African Americans on the Master Jury Wheel and challenging the fair cross section of that representation.

To establish a prima facie violation of the fair cross section requirement, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the group's representation in the source from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation results from systematic exclusion of the group in the jury selection process.  <u>Duren v. Missouri</u>, 439 U.S. 357 (1979); <u>United States v. Hafen</u>, 726 F.2d 21 (1st Cir. 1984).

---

[1]  Section 10 of Chapter 234 A provides: "On or before the first day of June of each year, each city and town shall make a sequentially numbered list of names, addresses, and dates of birth of all persons who were seventeen years of age or older as of the first day of January of the current year and who resided as of the first day of January of the current year in such city or town."

3

The same test applies to fair cross section claims under the Act. United States v. Royal, 174 F.3d 1 (1st Cir. 1999). The nature of the charged conduct is not relevant to the analysis.

Defendant can satisfy only the first prong of Duren, as the Supreme Court has held that blacks are a "distinctive group" for the purpose of jury composition challenges. See Peters v. Kiff, 407 U.S. 493, 498-499 ( 1972). However, as defendant cannot make the requisite showing as to either of the other two Duren prongs, the challenge must fail.

As the defendant acknowledges, the First Circuit has applied, and repeatedly reaffirmed use of, the absolute disparity statistical method for measuring the representation of any distinctive group. Defendant Morris' Memorandum of Law in Support of his Motion to Dismiss the Superseding Indictment on Account of the Racial Composition of the Master Jury Wheel, or Alternatively, to Supplement the Master Jury Wheel ("Defendant's Memorandum"), pp. 11, 15-16. This Court is bound to follow that authority. Cf. United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995) ("[i]t is axiomatic that, '[i]n a multi-panel circuit, newly constituted panels are, for the most part, bound by prior panel decisions closely on point'"). The First Circuit's decisions in Hafen, Royal, and United States v. Pion, 25 F.3d 18 (1st Cir. 1994) provide for the absolute disparity method as the analysis of choice in this circuit; these decisions are on point

4

with this case and are, therefore, controlling.

Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel. See Hafen, 726 F.2d at 23 (calculating "the difference between the percentage of eligible blacks in the population and the percentage of blacks on the master wheel"); see also Pion, 25 F.3d 18, 23 n.5 (1st Cir. 1994)(defining the absolute disparity standard as "the gross spread between the percentage of eligible Hispanics ... in the relevant population and the percentage of Hispanic representation on the Master Jury Wheel").

The defendant submits that the absolute disparity of the percentage of the black population measured against the percentage of blacks on the master wheel, for the Eastern Division, is 3.66%. Defendant's Exhibit 3, Table 7. Accepting that percentage, for the purpose of this argument only and without conceding that the defendant's numbers, calculations, or methodology is correct, the defendant has failed to satisfy his burden under the second prong of Duren. See Royal, 174 F.3d at 10-11; Hafen, 726 F.2d at 23-24, citing with approval an absolute disparity as high as 10%. The defendant concedes as much. Defendant's Memorandum at p.18.

While defendant's Memorandum focuses on attempting to establish that the representation of African Americans on the

5

Master Jury Wheel is not fair and reasonable in relation to the community, the defendant must also make the requisite showing to meet the third prong of <u>Duren</u>, that any such underrepresentation results from systematic exclusion of the group in the jury selection process.  As observed by the First Circuit, uniquely in the Commonwealth of Massachusetts "the broadest data available - resident lists - are used to make up the Master Jury Wheel." <u>Pion</u>, 25 F.3d at 23.[2]  To date, the defendant has not supplied the Court with any basis to determine what better data, or other method, would provide identifiable prospective jurors. Defendant's speculation as to the reasons for failed summonses cannot form the basis of meeting <u>Duren</u>'s third prong.  "The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes."  <u>United States v. Rioux</u>, 97 F.3d 648, 658 (2d Cir. 1996).  Such deficiencies, if they exist, cannot constitute systematic exclusion.

A mirror image of the community at large is not the required

---

[2]  Congress concluded that "[u]niquely in the State of Massachusetts . . . an alternative to voter lists exists that both improves the representative juries and enhances administrative efficiency." S.Rep. 102-342, 102d Cong., 2d Sess. 1992, 1992 U.S.C.C.A.N. 3921.  The Senate Report went on to note that the amendment which provides for the use of resident lists complies "fully with the objectives of the Jury Act that all citizens have the opportunity to be considered for service and that juries be selected from a fair cross-section of the community."  <u>Id</u>.

result of a jury selection plan.  The "[A]ct does not require that at any state beyond the initial source list the selection process shall produce groups that accurately mirror community makeup.  Thus, no challenge lies on that basis."  United States v. Gometz, 730 F.2d 475 (7th Cir. 1984), quoting S.Rep. No. 891, H.R.Rep. No. 1076, 90th Cong.2d Sess., U.S.C.C.A.N. 1968, p. 1794.  "The Sixth Amendment assures only the opportunity for a representative jury, rather that a representative jury itself." United States v. Biaggi, 909 F.2d 662, 678 (2d Cir. 1990).

Defendant can establish neither a constitutional nor a statutory violation of the fair cross section requirement, and the motion to dismiss the indictment must be denied.

> B.  Defendant fails to establish a statutory violation of the substantial proportional representation requirement.

In its Order dated January 7, 2005, the Court asked the parties to address the issue of whether the jury data compiled by defendant implicates the strictures of 28 U.S.C. §1863(b)(3), paying particular attention to the First Circuit's decision in United States v. Foxworth, 599 F.2d 1 (1st Cir. 1979). Foxworth's challenge included a focus on that section of the Act that provides that each jury selection plan shall ensure that each county or similar subdivision within the district is substantially proportionally represented in the master jury wheel.  Here, in connection with defendant's supplemented remedy

7

proposal (Exhibit 6, Second Declaration of Andrew A. Beveridge in Support of Defendant's Motion to Dismiss, January 10, 2005 )the "Second Declaration")), defendant submits calculations that purport to show a proportionality violation of the Act, apparently assuming that proportionality, as required by 28 U.S.C. §1863(b)(3), should be calculated with reference to census data rather than the residence lists from which the Master Jury Wheel is actually drawn in this District.  This calculation ignores both the Act and the Plan.

The Act provides that procedures followed in selecting names from specified sources (here the Massachusetts resident lists) for inclusion in the master jury wheel "shall ensure that each county . . . within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division or combination of divisions."  28 U.S.C. §1683(b)(3).  Significantly, the Act limits the proportionality requirement to a comparison of the county make-up of the master jury wheel to the county make-up of the specified sources, in this district, the Massachusetts resident lists. Specifically, the Act provides: "For the purposes of determining proportional representation in the master jury wheel, either the number of actual voters at the last general election in each county, parish, or similar political subdivision, or the number of registered voters if registration of voters is uniformly

required throughout the district or division, may be used."[3]
Thus, there is no legal requirement that the master jury wheel
reflect proportional representation by county based on census
data.  As long as the master jury wheel provides each county the
substantially same proportion of names as the proportion
contained on the resident lists, there is no proportionality
violation of the Act (or the Plan).

Defendant's calculations relating to county proportionality
are based on statutory irrelevance (proportionality based on
census data).  In fact, the data collected by the defendant and
submitted to the Court establishes that the master jury wheel **is**
substantially proportionally representative of the counties when
compared with the relevant data, the residents lists compiled by
the Office of the Jury Commissioner.  See Government's Exhibit A,
attached.

Exhibit A demonstrates that each county within the Eastern
Division is substantially proportionally represented in the
Master Jury Wheel in accordance with the Act and the Plan.  Using
the data obtained from the Office of the Jury Commissioner
("OJC") (Defendant's Exhibit 10, Table 24), specifically, the

---

[3]In this district, where Congress has authorized the use of
residents lists in lieu of voter registration data as the source
for creation of the master jury wheel, it is fair to read the
county proportionality requirement of 28 U.S.C. §1683(b)(3) to
require that the county proportionality in the master jury wheel
be substantially equal to the county proportionality in the
resident lists.

number of names on the residents lists as collected by the OJC,
by county, for 2001, 2002, and 2003, a simple calculation results
in the percent of total names, by county, for each of the subject
years.  Each of those percentages, by county, is then averaged to
arrive at one percentage for each county for the three year
period 2001-2003.  Next, the proportionate representation of
potential jurors on the actual master wheel (or Master Jury
Wheel), by county, is computed by using the data provided by the
defendant in his Exhibit 3, Table 17, p.1 (Analyses of Master
Jury Wheel and Jury Pools on the County Level, column titled
"Total on Actual Master Wheels).  Finally, the percentages, by
county, on the OJC resident lists are compared with the
percentages on the Master Jury Wheel, which show wholly
insignificant variances.  See page 3 of Government's Exhibit A,
attached hereto.

The Act (and the Plan) require only that the make-up of the
Master Jury Wheel reflect representation by counties in the same
proportion that the counties are represented in the resident
lists.  As demonstrated by the analysis performed in Government's
Exhibit A, the Master Jury Wheel does substantially reflect that
representation and no proportionality violation exists.

    C.   Defendant's proposed remedies conflict with both the
        Act and the Plan and cannot be implemented by this
        Court.

The most recent remedy suggested by the defendant conflicts

10

with both the Act and the Plan and, if implemented, would violate
both. Moreover, it appears to be designed to correct a perceived
inadequacy in the use of Massachusetts resident lists for the
formulation of the Master Wheel, a practice that has been
approved by 28 U.S.C. §1863(b)(2), by Section 5(b) of the Plan,
and by the First Circuit. <u>Royal</u>, 174 F.3d at 11 ("The use of the
resident lists cannot be such a substantial failure to comply
with the Act; Congress specifically endorsed the use of resident
lists for Massachusetts.").[4]

In Dr. Beveridge's Second Declaration, the proposed remedy
is explained in general terms as follows: "The proposed remedy
would adjust the chance of a prospective juror receiving a jury
summons based upon the percentage deviation from the
representative Available Jury Wheel for each Census Zip Code
Tabulation Area in the Eastern District."

Although the government stands to be corrected by Dr.
Beveridge, it currently understands his proposed remedy to be
based on the following analysis. Based on 2000 census data, he
has learned the number of persons older than 18 in the Eastern

---

[4]This section specifically addresses the proposed remedy put
forth in the Second Declaration. The defendant proposed a
similar but different remedy in his January 5, 2005 memorandum in
support of his motion to dismiss. The earlier proposed remedy
appears to focus on the perceived problem of undeliverable and
non-returned summonses, but suffers from the same defects as the
one in the Second Declaration; it proposes a selection process
for persons to be summonsed that is non-random, in violation of
the Act and the Plan.

Division of this District, broken down by all of the various zip code areas of Massachusetts ("ZCTA").  Using that data, he has determined the number of persons he claims should be on the Master Jury Wheel (the "Actual Master Wheel") for each ZCTA, apparently based on the proportion of the number of such persons in each ZCTA compared to the number of such persons in the Eastern Division.   He calls the numbers calculated from the census data the "ideal number" on the master wheel for each ZCTA, or in other words, the number that would be determined if the Actual Master Wheel was exactly reflective of the 2000 census data.  He also refers to his census data calculations as the "Ideal or Available Master Wheel," as opposed to the "Actual Master Wheel."  He has also apparently determined for each ZCTA the number of persons on the Actual Master Wheel for the Eastern Division.  Using the two numbers for each ZCTA (the numbers from the Actual Master Wheel and the numbers from his Ideal or Available Master Wheel), he determined for each ZCTA what he considers to be underrepresentation or overrepresentation within each ZCTA in the Actual Master Wheel.

    Dr. Beveridge's remedy proposes to use his calculated over and underrepresentation numbers to adjust the number of summons sent to persons within each ZCTA.  By way of example, Dr. Beveridge highlighted two ZCTA's, one in Sudbury, where the number of persons on the Actual Master Wheel was greater than the

12

ideal number he calculated from the census data for his Available Master Wheel, and one in Dorchester, where the number of persons on the Actual Master Wheel was less than the ideal number he calculated from the census data for his Available Master Wheel. He then calculated the number of summons that would be expected (apparently based on a random selection process) to be sent into each ZCTA in the particular example he used, first based on the Actual Master Wheel, and then based on his Ideal or Available Master Wheel.

In his example, based on the Actual Master Wheel data, seven summons would be sent into each ZCTA. To correct over and underrepresentations based on the comparison of his Available Master Wheel data (i.e. census data) and Actual Master Wheel data, Dr. Beveridge then calculated the number of summons which needed to be sent into each ZCTA in order for the numbers to reflect the proportions on his Ideal or Available Master Wheel. The remedy adjustment would require decreasing the number of summons sent to Sudbury to five (from seven) and increasing the number of summons sent to Dorchester to 11 (from seven). The Actual Master Wheel is not adjusted or affected by Dr. Beveridge's proposed remedy. Nor is the total number of summonses sent out affected. It is only the number of summonses that would otherwise be sent in each ZCTA that is changed by his proposed remedy.

Dr. Beveridge also provides in his example the effect of his remedy adjustment on the likelihood that any one person on the Actual Master Wheel from each of the two ZCTA's would receive a summons.  In his example, with no remedy adjustment, and based strictly on a random mailing of summons based on the Actual Master Wheel, the chance of anyone person on the Actual Master Wheel from Sudbury and Dorchester (or any other ZCTA) would be sent a summons would be 5.714%.  With the proposed remedy adjustment, the probability that a person from Sudbury on the Actual Master Wheel would be sent a summons would drop to 3.63%, and the probability that a person from Dorchester on the Actual Master Wheel would be sent a summons would increase to 9.44%.

This Court is without power to implement Dr. Beveridge's proposed remedy, as it would conflict with both the Act and the Plan.  The Congressionally declared policy of the Act is, in part, as follows: "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries <u>selected</u> <u>at</u> <u>random</u> <u>from</u> a <u>fair</u> <u>cross</u> <u>section</u> <u>of</u> <u>the</u> <u>community</u> <u>in</u> <u>the</u> <u>district</u> <u>or</u> <u>division</u> <u>wherein</u> <u>the</u> <u>court</u> <u>convenes</u>."  28 U.S.C. §1861 (emphasis added).  It is clear from the legislative history of the Act that it "does not insist upon randomness in the sense in which that term might be understood by statisticians."  S.Rep.No. 891, 90th Cong., 1st Sess., p.16 n.9.  Rather, all that is required is that the names

14

be selected by chance.[5]

To effect the policy of random selection of jurors, Congress requires each United States District Court to "devise and place into operation a written plan for random selection of grand and petit jurors."[6]  28 U.S.C. §1863(a).  The Statute requires each plan to specify detailed procedures "designed to ensure the <u>random selection of a fair cross section of the persons residing in the community in the district or division</u> wherein the court convenes."  <u>Id</u>.  If this Court upholds, as the government argues it must, the indictment in this case against defendant's fair cross section attack alleging the systematic exclusion of blacks, and seeks only to remedy a perceived violation of the county proportionality requirement of 28 U.S.C. §1683(b)(3), Dr. Beveridge's remedy adjustment cannot be implemented because it proposes a selection system that is not random within the Eastern Division, as required by 28 U.S.C. §1683(b)(3).  Essentially, Dr.

---

[5]<u>Webster's New Collegiate Dictionary</u> (1979) defines "random" in pertinent part as follows: "being or relating to a set or to an element of a set each of whose elements has equal probability of occurrence <a ~ sample>; also: characterized by procedures designed to obtain such sets or elements < ~sampling>."

[6]The required plan can be placed into operation only after approval by a reviewing panel, and although district courts have the power to modify plans, those modifications become effective only after approval by the reviewing panel.  28 U.S.C. §1683(a).  Thus, any proposed remedy by Dr. Beveridge that modifies the Plan in this district cannot be imposed without the district court as a whole adopting such a modification and the reviewing panel approving it.

Beveridge's remedy would be random within subparts of counties
(as defined by ZCTA's), but not random within the Eastern
Division as a whole, as the Act requires.

By Dr. Beveridge's own calculations, his adjustments would
change the probability of a person on the Actual Master Wheel
being sent a juror summons from a probability that is equal to
that of all others on the Actual Master Wheel, and therefore
fully random within the Eastern Division and in compliance with
the Act, to a probability that is equal only for members of the
Actual Master Wheel with the same ZCTA, and that differs from the
probability of every person on the Actual Master Wheel not within
the same ZCTA, in violation of Act's randomness requirement.  The
statute is specific, the required randomness must be within the
division wherein the court convenes as a whole, and cannot be
based upon subdivisions of the division such as counties or
ZCTA's.

The Plan mirrors the Act in its requirement of random
selection.  Section 5(c) provides in pertinent part: "[T]he names
of persons to be considered for service as grand or petit jurors,
on or after the effective date of the Plan shall be selected at
random from the numbered local resident lists within the relevant
division."  Thus, as in the Act, the Plan requires a random
selection from a specified source, the Massachusetts resident
lists for the Eastern Division as a whole, for inclusion in the

16

master jury wheel.

More specifically, the Plan also requires a random selection of names from the master jury wheel for the purpose of summoning persons to serve as jurors.  Section 7(a) provides in pertinent part: "Similarly, at the option of the Clerk, exercised after consultation with the Chief Judge, a properly programmed electronic data processing system for pure randomized selection may be used to select names from the master wheel for the purpose of summoning persons to serve as grand or petit jurors. . . . The selection of names from the source list and the master wheel must also insure the mathematical odds of any single name being picked are substantially equal."  Thus, the Plan incorporates the dictionary definition of randomness, and requires random selection from the resident lists for the make-up of the Actual Master Wheel, and random selection from the Actual Master Wheel for the list of persons to be summonsed.  By specifying the data from which random selections must be made, the Plan does not permit random selection from any quantum of data other than the resident lists and the Actual Master Wheel.

It follows that Dr. Beveridge's proposed remedy violates the Plan.  By his own admission, under an unadjusted selection of persons to receive summonses, the probability that any name on the Actual Master Wheel would be chosen would be identical, thereby meeting the dictionary definition of randomness and the

Plan's own definition of the term. [See Second Declaration, ¶3].
Under the proposed remedy, the mathematical odds of any single
name on the master wheel being picked are not substantially
equal, as required by Section 7(a) of the Plan.  Defendant's
remedy suggestions cannot be implemented by this Court.

D.   Conclusion.

For all of the foregoing reasons, as well as any additional
briefing necessary as a result of the continuation of the
evidentiary hearing now scheduled to resume on January 25, 2005,
the government respectfully submits that defendant's motion must
be denied in its entirety.


Dated: January 19, 2005          Respectfully submitted,

                                 MICHAEL J. SULLIVAN
                                 United States Attorney

                           By:   /s/ Lori J. Holik
                                 Theodore B. Heinrich
                                 Timothy Q. Feeley
                                 Lori J. Holik
                                 Assistant U.S. Attorneys


                       CERTIFICATE OF SERVICE

    I hereby certify that on January 19, 2005, I caused a copy
of the above Memorandum to be served by causing same to be
electronically filed with the Court.


                                 /s/ Lori J. Holik
                                 Lori J. Holik
                                 Assistant U.S. Attorney

## Names on OJC Residents List, by County

| County | Names on OJC Residents List 2001 | Percent of Total Names (by County) 2001 | Names on OJC Residents List 2002 | Percent of Total Names (by County) 2002 | Names on OJC Residents List 2003 | Percent of Total Names (by County) 2003 | Percent of Total Names (by County) 3-year Avg. |
|---|---|---|---|---|---|---|---|
| Barnstable | 181,903 | 5.08% | 183,349 | 5.13% | 181,974 | 5.10% | 5.11% |
| Bristol | 405,342 | 11.33% | 410,116 | 11.48% | 407,143 | 11.42% | 11.41% |
| Dukes | 13,001 | 0.36% | 13,134 | 0.37% | 13,313 | 0.37% | 0.37% |
| Essex | 532,600 | 14.89% | 536,826 | 15.03% | 527,731 | 14.80% | 14.90% |
| Middlesex | 1,078,544 | 30.15% | 1,076,395 | 30.13% | 1,066,829 | 29.91% | 30.06% |
| Nantucket | 8,012 | 0.22% | 8,304 | 0.23% | 8,740 | 0.25% | 0.23% |
| Norfolk | 514,489 | 14.38% | 511,161 | 14.31% | 507,095 | 14.22% | 14.30% |
| Plymouth | 367,509 | 10.27% | 364,253 | 10.20% | 366,110 | 10.27% | 10.24% |
| Suffolk | 476,379 | 13.31% | 469,286 | 13.13% | 487,296 | 13.66% | 13.37% |
| | 3,577,779 | 100.00% | 3,572,824 | 100.00% | 3,566,231 | 100.00% | 100.00% |

Source of Data: Beveridge Table 24

Proportionate Representation of Potential Jurors on the Actual Master Wheel, by County

| County | Total Number on Actual Master Wheel | Percent on Actual Master Wheel |
|---|---|---|
| Barnstable | 5,437 | 5.08% |
| Bristol | 12,156 | 11.35% |
| Dukes | 377 | 0.35% |
| Essex | 15,931 | 14.88% |
| Middlesex | 32,525 | 30.37% |
| Nantucket | 161 | 0.15% |
| Norfolk | 15,453 | 14.43% |
| Plymouth | 10,887 | 10.17% |
| Suffolk | 14,164 | 13.23% |
| | 107,091 | 100.00% |

Source of Data:  Beveridge Table 17

Proportional Representation Comparison: % on OJC Residents List vs. % on Actual Master Jury Wheel

| County | Percent of Total Names on OJC List 3-year Avg. | Percent of Names on Actual Master Jury Wheel | Variance |
|---|---|---|---|
| Barnstable | 5.11% | 5.08% | 0.03% |
| Bristol | 11.41% | 11.35% | 0.06% |
| Dukes | 0.37% | 0.35% | 0.02% |
| Essex | 14.90% | 14.88% | 0.03% |
| Middlesex | 30.06% | 30.37% | -0.31% |
| Nantucket | 0.23% | 0.15% | 0.08% |
| Norfolk | 14.30% | 14.43% | -0.13% |
| Plymouth | 10.24% | 10.17% | 0.08% |
| Suffolk | 13.37% | 13.23% | 0.15% |
| | 100.00% | 100.00% | |

Source of Data: Beveridge Tables 7 and 24