UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA      )
                              )    No. 03-10370-DPW
        v.                    )
                              )
FRANK GIGLIO,                 )
    Defendant.                )
```

### GOVERNMENT'S OPPOSITION TO GIGLIO'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE PURSUANT TO FRE 404(B) & 403

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorneys Rachel E. Hershfang and Peter K. Levitt, hereby files this memorandum in opposition to the motion of Frank Giglio (the "defendant" or "Giglio") to exclude evidence pursuant to Federal Rules of Evidence ("FRE") 404(B) and 403.

### I.    INTRODUCTION

On September 15, 2004, CW-6 and Frank Giglio met at the Hardcover Restaurant in Danvers, MA, and had a lengthy conversation in which they reminisced about their prior marijuana trafficking relationship -- with each other, Douglas Bannerman ("Bannerman"), and Karl Brown ("Brown") -- and discussed re-establishing their marijuana trafficking relationship (the "September 15 Meeting").  CW-6 was wearing a recording device and working as a cooperating witness for the Drug Enforcement Administration ("DEA").  A copy of the transcript of the September 15 Meeting is attached hereto as Exhibit A.

1

The defendant filed a motion *in limine*, pursuant to FRE 404(b) & 403, to exclude Giglio's references during the September 15 Meeting to (i) his prior marijuana trafficking with CW-6 and Bannerman, (ii) his own marijuana trafficking activities in 2004, and (iii) his plans to engage in future marijuana trafficking with CW-6 ("Deft's Motion").[1]  With respect to his prior marijuana trafficking with CW-6 and Bannerman, the defendant noted that the government had charged him "with membership in a finite, closed-ended conspiracy" beginning in January 2003 and ending on December 1, 2003, and argued that "[n]othing in Giglio's statements [at the September 15 Meeting] particularizes them to the 2003 time frame charged in the conspiracy."  Deft's Motion at 3 n. 1.  Rather, the defendant argued:

> If anything, in fact, they are *more* consistent with references to 2000-2001.  Bannerman was arrested in California in August, 2000.  CW-6 has told the government that, after his arrest, Bannerman asked CW-6 to supply his customers--one of whom CW-6 says was Giglio--with marijuana and that CW-6 supplied Giglio with marijuana in 2000-2001[2] while Bannerman was on

_____

[1] The defendant also seeks to exclude evidence of a small amount of personal use marijuana found in his home upon his arrest.  The government had planned on introducing testimony of the small amount of marijuana found in Giglio's home--but only in anticipation that the defense would raise it on cross-examination to show that only a small amount of personal use marijuana was found in Giglio's home.  The parties can likely, then, resolve this issue by agreement.

[2] CW-6 has told the government that he continued to supply Bannerman (through Giglio) with marijuana into 2002, took a hiatus for about six months in 2002 because he was unable to obtain sufficient marijuana to supply Bannerman, and then resumed

> home detention.  Giglio's references to events which
> occurred during the time frame when Bannerman was in
> "trouble"--troubles which Giglio says at one point
> began four years earlier, at the time of the Democratic
> National Convention in Los Angeles -- are consistent
> with the topic of discussion being events in 2000-2001,
> two years or more prior to the alleged commencement
> date of the conspiracy charged, January, 2003.

Id. (emphasis in original).

Based on this distinction, Giglio indicated in his motion
that he would not be disputing at trial that he was involved in a
marijuana conspiracy with CW-6 and Bannerman in the early 2000s,
but that his defense would focus on whether the government could
prove beyond a reasonable doubt that he remained a member of that
conspiracy in 2003.  Thus, the defendant stated:

> Unlike such cases, while Giglio will contend at trial
> that he was not a member of the conspiracy charged, he
> will *not* contend that acts testified to by the
> witnesses were innocently done or otherwise argue that
> he acted without the intent or knowledge required to
> make him criminally culpable for the acts regarding
> which he anticipates that the government's witnesses
> will testify.  *The issue at trial will be whether the
> government can prove beyond a reasonable doubt that
> Giglio was a member of the conspiracy which the
> government has chosen to define as spanning the time
> frame between two discrete events, from January, 2003,
> to December 1, 2003.*

Id. at 7 (second emphasis added).

Faced with this precise, temporal defense, in combination
armed with recent pre-trial debriefings of CW-6 and Brown, the
government reconsidered the charges in the case, as compared to

---

supplying Bannerman (through Giglio) toward the end of 2002 and
throughout 2003.

the anticipated evidence.  That evidence was that the conspiracy

began in or about August 2000 (after Bannerman's arrest in

California) and continued throughout 2003.  After that

assessment, the government advised the defendant and the Court of

its intention to seek a superseding indictment to conform the

charges to the evidence.  At the status conference on September

2, 2005, anticipating the government's request for an expanded,

superseding indictment, the Court instructed the government to

address only that portion of the defendant's motion *in limine*

that focused on future marijuana trafficking deals with CW-6,

since the parties' discussions of past deals would be intrinsic

to the newly defined time period of the conspiracy.[3]

## II.  <u>CW-6'S ANTICIPATED TESTIMONY</u>

The government anticipates that CW-6 would testify,

generally, as follows with respect to his relationship with

---

[3] While it is true that this case is similar to many drug
conspiracy cases in that it includes alleged 404(b) evidence
outside the time period of the alleged conspiracy, in this case
the government anticipates that all or most of the direct
evidence (the testimony of CW-6 and, to a lesser extent, Karl
Brown, and the tape recording of the September 15 Meeting), will
show that the real duration of the conspiracy was August 2000
through 2003.  Thus, the alleged 404(b) evidence--which covered
the majority of the conspiracy time period--was really intrinsic
evidence of the conspiracy.  In short, the government realized
(albeit belatedly) that, with respect to Giglio, it made no sense
to unnaturally carve out 2003 as the conspiracy time period when
the evidence at trial would be that the conspiracy started in
August 2000 and continued through 2003.  This came sharply into
focus when the nine-defendant case (to which Giglio was added
approximately one year after indictment) was reduced to Giglio,
and after the defendant filed his motion *in limine*.

Giglio and Bannerman.  Shortly after Bannerman was arrested in California in August 2000, and subsequently released on a bracelet, Bannerman asked CW-6 to start servicing Bannerman's marijuana customers, including Giglio, as well as Bannerman himself, and CW-6 started supplying those people with marijuana.[4] It is anticipated that CW-6 would testify that, from this point until sometime in 2002, CW-6 was getting between 1,300 and 2,600 pounds of marijuana delivered every 6-8 weeks from Arizona to his home in Rockport, MA.[5]

CW-6's customers, and Bannerman's customers, picked up loads of marijuana at CW-6's Rockport house.  It is anticipated that CW-6 would testify that Giglio picked up marijuana every time there was a load during that year, and that Giglio backed his white van into the garage so that they could load the marijuana into the van.  It is anticipated that CW-6 would further testify that, based on his conversations with Giglio and Bannerman, he knew that Giglio was a customer of Bannerman's, and that Giglio was taking the marijuana for Bannerman, and getting some portion of it for himself.  It is further anticipated that CW-6 would

---

[4] It is anticipated that CW-6 would testify that he had met Giglio once or twice in the late 1990s or 2000 with Bannerman, with whom CW-6 had a marijuana trafficking relationship.

[5] It is anticipated that CW-6 would testify that he usually had two trucks operating during 2001, with approximately 1,300 pounds of marijuana per truck, and that, at some point after about a year, one of his drivers got arrested so he only had one truck making the trip.

testify that, on one or two occasions in late 2000 or 2001, he went to Giglio's house in the Winter Hill area of Somerville to pick up money for loads of marijuana.[6]

It is further anticipated that CW-6 would testify that, at some point in 2002, there was a shortage of marijuana supply and, for about six months, CW-6 was not selling any marijuana to

_____

[6] This is corroborated by the following exchange during the September 15 Meeting:

CW-6:       I, I remember going to your house once.  I can't figure out . . .

GIGLIO:     Yeah, in Somerville, you came over to . . .

CW-6:       And you, that's how you got your name, Winter.  You lived in Winter Hill right?

GIGLIO:     Oh yeah, right, right, yeah.

CW-6:       And I remember going to your house but I can't remember why ah.  Was it drugs?

GIGLIO:     Maybe.

CW-6:       Was it money?

GIGLIO:     Yeah you might of picked up money cause he was (unintelligible).

CW-6:       Yeah, yeah, yeah, yeah.  That's what it was.

GIGLIO:     When he was in trouble I ran the business for him.

CW-6:       That's right.  Well you and me.

GIGLIO:     Yeah we ran it, we did.  Yeah we did, we wanted, that's when you came over.

September 15 Meeting at 22.

6

Bannerman.  It is anticipated that CW-6 would testify that he remained in contact with Bannerman during this time and that Bannerman would periodically ask if CW-6 was able to get any marijuana to sell Bannerman.  It is further anticipated that CW-6 would testify that he resumed supplying marijuana to Bannerman (through Giglio) in Fall 2002, and that they operated in the same fashion--i.e., Giglio would pick up the marijuana in his white van at CW-6's Rockport house--and that this lasted until the end of 2003.

## III.  **THE SEPTEMBER 15 MEETING**

The recorded conversation between CW-6 and Giglio on September 15, 2004, corroborates CW-6's anticipated testimony and demonstrates a common scheme or plan for trafficking marijuana. Specifically, the tape recorded conversation shows that Giglio is a long-time marijuana trafficker, who, for many years, has regularly distributed 100 pound quantities of marijuana to an established customer base consisting of older, wealthy clients with discriminating tastes.  The conversation demonstrates that, for this reason, Giglio purchases, and has historically purchased, only high-quality marijuana.  The conversation further shows that Giglio uses, and has historically used, his legitimate antique business to facilitate his illegal activities.

7

A.   **THE LEGAL LANDSCAPE**

As demonstrated below, Giglio's tape recorded conversations about future marijuana deals with CW-6, and about his own marijuana dealing in 2004, are admissible pursuant to FRE 404(b) & FRE 403.[7]  Giglio's taperecorded statements have "special relevance" to the issues described below, and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  See United States v. Decicco, 370 F.3d 206, 212 (1st Cir.2004) ("We review the admissibility of this type of evidence under a two-pronged test:  first, a court must determine whether the evidence in question has any special relevance exclusive of defendant's character or propensity; and second, notwithstanding its special relevance, whether the evidence meets the standard set forth in Fed.R.Evid. 403."). See also United States v. Taylor, 284 F.3d 95, 101 (1st Cir.2002)(stating that Rule 404(a) codified the general prohibition against bad acts evidence, but Rule 404(b) allows for the admission of evidence of

_____

[7] As further demonstrated below, Giglio's statements about future marijuana deals, and about his marijuana dealing in 2004, are also admissible on the grounds that they are inextricably intertwined with his other statements on the tape about prior marijuana trafficking with CW-6 and Bannerman, which latter statements are intrinsic to the conspiracy.  See United States v. DeLuna, 763 F.2d 897, 913 (8th Cir.1985) ("Evidence which is probative of the crime charged, and not solely uncharged crimes, is not 'other crimes' evidence.  Further, where the evidence of an act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and Rule 404(b) is not implicated.") (citations omitted).

prior bad acts to prove elements other than propensity).[8]

First, Giglio's statements are admissible because they are probative of Giglio's common scheme or plan to distribute high-quality marijuana to older, wealthy customers with discriminating tastes, and to use his legitimate antique business to facilitate this scheme. See United States v. Decicco, 370 F.3d 206, 212 (1st Cir.2004) (in arson case, reversing district court's exclusion of evidence that defendant was involved in a fire three years earlier because probative of a "common scheme or plan" by the defendant). See also United States v. Oppon, 863 F.2d 141, 147 (1st Cir.1988) (other act evidence admissible where it was "strikingly similar to the charged offense" and showed that defendant had "a common scheme or plan of falsely identifying himself as a U.S. Citizen in order to obtain employment and employment-related benefits").[9]

Second, Giglio's statements are admissible because they "tend to suggest a criminal association between the alleged

---

[8] In this respect, it is immaterial that Giglio's statements reference future events or events that occurred later than the charged crime. See United States v. Tse, 375 F.3d 148, 155 (1st Cir.2004). See also United States v. Procopio, 88 F.3cd 21, 29 (1st Cir.1996) ("A later criminal association increases the likelihood of an earlier one--which is all that 'relevance' requires . . . and numerous cases permit such reasoning from a later event or condition to an earlier one.") (citations omitted).

[9] See also United States v. Hadfield, 918 F.2d 987, 994 (1st Cir.1990)(five years between prior bad act and charged act not too long for common scheme or plan).

conspirators," and thus demonstrate the "background of a
relationship, a collaboration among several parties, or a mutual
trust between conspirators." Tse, 375 F.3d at 155.
Specifically, as demonstrated below, Giglio's statements about
future marijuana deals, and about his marijuana dealing in 2004,
help explain the background, formation, and development of the
illegal relationship among Giglio, CW-6, and Bannerman. See
United States v. Santana, 342 F.3d 60, 67 (1ˢᵗ Cir.2003) ("it is
proper to include evidence of prior bad acts in conspiracy cases
if they explain the background, formation, and development of the
illegal relationship"); United States v. Varoudakis, 233 F.3d
113, 121 (1ˢᵗ Cir.2000) (admitting evidence of a prior bad act to
demonstrate mutual trust between alleged conspirators); United
States v. Escobar-de Jesus, 187 F.3d 148, 169 (1ˢᵗ Cir.1999)
("evidence of other bad acts . . . can be admitted to explain the
background, formation and development of the illegal relationship
. . . and, more specifically, to help the jury understand the
basis for the co-conspirators' relationship of mutual trust")
(citations omitted); Procopio, 88 F.3d at 29 (stating that
evidence of a subsequent criminal association "was helpful to the
government's claim that the two men had collaborated" in a prior
robbery).

 Finally, Giglio's statements are admissible to show Giglio's
knowledge, intent, and opportunity with respect to the charged

conspiracy--specifically, to show that Giglio had customers (then and now) who would buy large amounts of high-quality marijuana from him, and to show that he knowingly and intentionally participated in the conspiracy.  See United States v. Rodriquez, 215 F.3d 110, 119 (1st Cir.2000) ("In particular, the government's evidence must overcome the possibility that a particular defendant's association with criminal co-conspirators was wholly innocent or that, if he was with them at the scene of criminal activity, he was 'merely present,' without guilty knowledge or intent.").  Contrary to the suggestion in the defendant's motion, this is true regardless of whether the defendant raises a defense of lack of knowledge, intent, or opportunity.  See Oppon, 863 F.2d 141, 146 (1st Cir.1988) ("We hold that other acts evidence may be admitted when it is probative of an issue other than character even when the defense is a general denial of the charges.").[10]

_____

[10] See also Varoudakis 233 F.3d at 121 (noting that "the fact that the defendant does not contest the issue for which the prior bad act evidence is offered does not, 'by itself, remove those issues from the case,' and stating that "evidence of prior bad acts may be probative even when it is relevant to an issue the defendant does not contest[,]" but excluding the other crime evidence under FRE 403 because its probative value was diminished by the defendant's decision not to contest the issue it addressed).

B.  <u>GIGLIO'S STATEMENTS ABOUT FUTURE MARIJUANA TRAFFICKING AND MARIJUANA TRAFFICKING IN 2004</u>

The following exchange between Giglio and CW-6 is typical of how their discussions of future marijuana trafficking deals is inextricably intertwined with their prior marijuana deals (in this case, they discuss prices by referring back to the prices at which CW-6 was selling to Bannerman).  This exchange is probative of Giglio's common plan or scheme of distributing high quality marijuana to older, wealthy clients with discerning tastes.

GIGLIO:    You should like, listen, if I can get something that's green, nice smell, smokes good . . .

CW-6:      Yeah.

GIGLIO:    I gotta have, a nice bud.

CW-6:      Right.  Especially . . .

GIGLIO:    Specially, yeah, especially being that I haven't worked so much.  I've given, look I talked to both people.  One says "show me what you got," the other guy is looking for something right now and ya know if the timing is great, I got, I did get a couple of things, little things.  I kept them a little busy here and there, um . . .

CW-6:      How's, how's the market, right now?  Just out of curiosity.

GIGLIO:    There's not great product out there.

CW-6:      No?  You haven't seen that much or heard about anything like (unintelligible)?

GIGLIO:    No, although at the beginning of the Summer there was.  And I had gotten my hands on some that was real nice.

CW-6:      Beginning of the Summer?

12

GIGLIO:     Yeah in the beginning of the Summer.  It was like
            this is one Summer that my guy had product cause
            I, I grab a hundred or something that was good.

CW-6:       From him?

GIGLIO:     From another person.

CW-6:       Yeah.  Some guy you used to do business with?

GIGLIO:     Yeah, just somebody, um, I mean I've always had a
            couple things.  I tried to get Dougie[11] to work
            with this one, uh, one of my other friends
            . . .

CW-6:       Yeah.

GIGLIO:     . . . once or twice but the money never worked.
            Ah the price . . .

CW-6:       The price yeah.

GIGLIO:     Yeah.

CW-6:       Oh that's another thing I got to talk about.  I
            mean, numbers ya know what, what price range are
            we, you remember what we, you know what, you know
            what I worked with him before on?

GIGLIO:     No I (unintelligible)

CW-6:       Yeah.

GIGLIO:     *I know it's, we talked once when he was in trouble
            and I was to do things and that was, in the
            twelves or something.*

CW-6:       Yeah, yeah.

GIGLIO:     But anything around thirteen is fine with me, if
            it's a good product.

CW-6:       You won't have a problem with it.

---

[11] CW-6 would testify that they referred to Douglas
Bannerman as "Dougie".

13

GIGLIO:    Yeah no problem at all in the thirteen range.  As
           long as I get a nice product.  If it's a nice
           product and you feel real good about
           it . . .

CW-6:      Yeah.

GIGLIO:    . . . smokes good.  It's seedy, and if it's hard
           packed . . .

CW-6:      Yeah, you got a problem with it.

GIGLIO:    . . . I can't, I can't . . .

CW-6:      Can't do it.

GIGLIO:    . . . I can't take it.

CW-6:      I won't take it anyway.

GIGLIO:    (unintelligible) you know it just slows everything
           down.

CW-6:      Or if it's brown (unintelligible)

GIGLIO:    If it's, yeah, it's gotta be green, it's gotta
           have a nice bud, nice smell.  But it can't, it has
           to be like you push your finger and it feels like
           a cigar.  Ya know what I mean?  That means those
           buds are beautiful, they're not crushed.  Ya know
           some of these guys fucking, crush it so hard they,
           make it like a rock . . . that really ruins what,
           what . . . I deal with an older crowd.

CW-6:      Do you?

GIGLIO:    I'm not dealing with young kids that smoke
           (unintelligible).

CW-6:      Yeah.

GIGLIO:    I deal with an older crowd.

CW-6:      Really.

GIGLIO:    They're all my age.  Fiftyish.

CW-6:      Yeah I understand.

14

GIGLIO:     They got money but they, they want a beautiful
            product . . . goes like crazy.  My friend is,
            he'll give me a hundred grand in a minute, if it's
            a beautiful product, (unintelligible) out of his
            house, (unintelligible) money, ya know?  Or if I
            go, if I say it's beautiful he'll give me the
            money.

CW-6:       (unintelligible) on your word in other words.

GIGLIO:     No (unintelligible), if I say it's good, they'll
            know it's good, if I (unintelligible)  All my life
            I'm doing this, you know, since I'm eighteen years
            old.  That's a long time.

September 15 Meeting at 7-9 (emphasis added).[12]

While much of this exchange concerns future dealings between
CW-6 and Giglio, in the middle of the exchange, Giglio reveals
his knowledge of the details of the late-2000 through 2003
conspiracy with Bannerman and CW-6.  Giglio admits that he talked
with Bannerman when Bannerman was in trouble (i.e., on release on
a bracelet after his August 2000 arrest in Los Angeles), and
Bannerman said he was buying from CW-6 at $1,200 per pound.  Id.
at 8 ("I know it's, we talked once when he was in trouble and I
was to do things and that was, in the twelves or something.").
This, in turn, is the basis for Giglio stating that, going

---

[12] Giglio also corroborates CW-6's testimony by saying,
later in the meeting, that "[w]hen he [Bannerman] was in trouble
I ran the business for him."  September 15 Meeting at 22.  After
CW-6 corrects him by saying that he and Giglio ran the business
together while Bannerman was in trouble, Giglio responds: "Yeah
we ran it, we did."

forward, he has no problem paying in the "thirteen range".[13]

Giglio's statements about his discriminating clientele are also probative of Giglio's continuing common scheme or plan. Giglio's statements during the September 15 Meeting support the inference that distributing high-quality marijuana was, and continued to be, his modus operandi.

In this respect, CW-6 and Giglio had the following exchange.

GIGLIO:    . . . .  He's, you know, the deal I had with Dougie was um, I did a lot of that driving for nothing but I did get the pick of the litter. (unintelligible) they, they were never . . .

CW-6:      Was that, was that what the deal was, that, that basically you would help him out?

GIGLIO:    I used to do, I didn't really, he'd take from me but as soon as I brought them back to my (unintelligible) . . .

CW-6:      Yeah.

GIGLIO:    I would get to look through, and there was four or five really pretty ones, they were mine.

CW-6:      Four or five blocks?

GIGLIO:    Yeah.  Yeah, I used to do a hundred to two hundred.

CW-6:      Was that what you were comfortable with?

GIGLIO:    In my prime.  That's what I'd do, normally do, as long as they're nice, I mean, sometimes there wasn't that many nice ones.  They'd

_____

[13] Giglio also reveals his knowledge of the conspiracy by asking CW-6 at one point:  "Is Karl working with you still?" September 15 Meeting at 5.  It is anticipated that both CW-6 and Karl Brown will testify that Brown assisted CW-6 in his marijuana business during the years leading up to 2003.

                        (unintelligible) but I used to take a hundred
                        'cause that was the nicest.

CW-6:        Right.

GIGLIO:      Cause that's what was (unintelligible) we never
             looked at them real close but there was, they,
             they had a range.  They always had a range if he
             had them.  And if he got four hundred pounds of
             beauties, I still would only get, I'd get a couple
             hundred ya know what I mean?  He'd take the rest.

CW-6:        Okay.

GIGLIO:      But, um, you know, that was the deal, most of the
             time.

CW-6:        What, cause I'm kind of doing a new thing now.
             I'm trying to change everything 'cause obviously,
             you know, I want to change the way I did
             everything.  I'm not working up, out of Rockport
             anymore, um, got rid of that for, for obvious
             reasons, um . . .

GIGLIO:      That was smart.

CW-6:        We would have to work on logistics.  And what
             about, what about money wise.  What did, what did
             you used to do?

GIGLIO:      Well . . .

CW-6:        . . . before?  Can you come up with anything?

GIGLIO:      Yeah usually um, ya know what I'm saying, I did a
             hundred, I could come up with seventy, eighty
             thousand the next day.  And the balance within a
             week or two.  And I'm good for it.  I'm a business
             man, a family man, and I'm not, you know, you know
             where I'm at all the time.  I'm not somebody you
             ever have to worry about.

Id. at 2-3.  Similarly, Giglio and CW-6 had the following

exchange later in the meeting.

CW-6:        Um, so your motivation behind you helping him
             [Bannerman] out was that you got to pick out . . .

                                17

```
GIGLIO:      Yeah.  I would get, (unintelligible) he'd give me
             eighteen pieces or twenty pieces.  I'd get to look
             at every one, close, with my black light . . .

CW-6:        . . . and pick out . . .

GIGLIO:      . . . in my garage, no better place, and if there
             were four or five pretty ones, they were mine.
             And he would take the rest.
```

Id. at 14.

These exchanges reveal that Giglio was using the same modus operandi in these prospective dealings as he was in his prior dealings with CW-6 and Bannerman.  They corroborate his involvement in the earlier conspiracy by showing a common scheme or plan for making money in the marijuana business, as well as corroborating Giglio's earlier sales to the same customers of the marijuana he got from CW-6.  See Oppon, 863 F.2d at 147 (1st Cir.1988) (other act evidence admissible where it was "strikingly similar to the charged offense" and showed that defendant had "a common scheme or plan of falsely identifying himself as a U.S. Citizen in order to obtain employment and employment-related benefits").  See also Tse, 375 F.3d at 155 (other act statements admissible because they "tend to suggest a criminal association between the alleged conspirators," and thus demonstrate the "background of a relationship, a collaboration among several parties, or a mutual trust between conspirators").

Similarly, Giglio's statements during the September 15 Meeting about how he uses his legitimate antique business and

"subterfuge" to avoid detection as a marijuana trafficker show a common scheme or plan consistent with what he was doing during the time period of the conspiracy.

CW-6:     That place up there was good.  The reason I liked it was it was so far away, yeah.[14]

GIGLIO:   Yeah, and I used to do things that he didn't even know I used to do, but I would come one way and leave another, never be the same vehicle going back and forth, you know what I mean?

CW-6:     And that one time you came up with the, uh,  the bamboo (unintelligible)

GIGLIO:   That was funny.

CW-6:     (unintelligible) bamboo trees.

GIGLIO:   Oh yeah.

CW-6:     Bamboo trees ah . . .

GIGLIO:   Yeah anything I can do to, set, that's called subterfuge, you know it looks like one thing's going on . . .[15]

CW-6:     Yeah . . .

GIGLIO:   . . . and something else is going on.

CW-6:     Right.

_____

[14] CW-6 would testify, and it's apparent from the context of the conversation, that he was referring to his house in Rockport.

[15] It is anticipated that CW-6 will testify that, on one occasion during the period late August 2000 through 2003, Giglio came to pick up marijuana at CW-6's house in Rockport and had bamboo trees in the back of his van.  CW-6 will further testify that Giglio told him he bought the trees from a guy in Rockport and that Giglio and CW-6 had to move the trees to fit 3-4 boxes (about 300 pounds) of marijuana into the back of the van.

GIGLIO:    It's the same thing with my store.  If you, if I
           come and see you and I have the van, nobody is
           suspicious if somebody puts his name on the side
           of the fucking truck.  That's a legitimate
           operation.

CW-6:      That's right.

GIGLIO:    That's, that's ah, that's also, people who are
           looking to find out things are investigators.
           Investigators, when they don't see a name, they
           say: "Now what's going on here."

CW-6:      Right.

GIGLIO:    You know.  That's the first thing in their head --
           "What's going on here?"

CW-6:      Right.

GIGLIO:    'Cause you put your name all over the truck, call
           me, I'm in the furniture business.  They know
           what's going on here, so now it has to be
           somebody's ratted you out but I mean, I'm a
           legitimate business.

September 15 Meeting at 18-19.[16]

     Similarly, after offering his antique store, after hours, as

a location for CW-6 to show Giglio the marijuana,[17] Giglio makes

_____

     [16] It is anticipated that Karl Brown will testify that, on
one occasion when Brown loaded marijuana into Giglio's white van
in 2002 or 2003, Brown recalls that the van was full of antiques
and a painting, and Giglio told him that he was in the antique
business.  The government will also introduce into evidence
photographs of Giglio's white van with a sign on the side for
"East West Antiques" and/or "Antiques on Cambridge", as well as
Registry of Motor Vehicles records showing that Giglio first
registered a white, Ford Econoline van for East West Antiques,
1076 Cambridge Street, Cambridge, MA (Gigilo's antique business),
in 1991 and maintained that registration through December 2004.

     [17] Id. at 23 ("my store is a really big store and I have two
loading dock entrances in the back and have the van and my store
at six o'clock, it's closed everyone goes home . . . .  I have

the following statement demonstrating his common scheme for marijuana trafficking.

> GIGLIO:    No one knows about my other life, the dark side of me.  Which is what you do.
>
>            . . . .
>
>            Yeah that's what I call it.  'Cause no one knows. Ya know we live this life, (unintelligible) families, we have a side but ya have to like, you have to be like a, it's like Tony Soprano, ya know you have a, life, kids and family, they love you and everything . . .
>
>            . . . .
>
>            . . . so in a dark sense . . . it's a secret.

Id. at 29.

Giglio also talks about marijuana purchases he made in 2004, stating that "in the beginning of the Summer" his "guy had product" and Giglio "grab[bed] a hundred or something that was good."  Id. at 8.  CW-6 asked if Giglio had bought it from "him" (i.e., Bannerman) and Giglio responded that it was from someone else.  Id.  They then engaged in the following exchange.

> CW-6:      Yeah.  Some guy you used to do business with?
>
> GIGLIO:    Yeah, just somebody, um, I mean I've always had a couple things.  I tried to get Dougie to work with this one, uh, one of my other friends . . .
>
> CW-6:      Yeah.

─────────────────

access twenty four seven. . . .  So if I need to go look at something.").

21

GIGLIO:    . . . once or twice but the money never worked.
           Ah the price . . .

Id.

This exchange is probative of Giglio's involvement in the
charged conspiracy because it helps to explain the relationship
of mutual trust between Giglio and Bannerman, and to explain the
background, formation and development of the illegal
relationship.  See Varoudakis, 233 F.3d at 121; Escobar-de Jesus,
187 F.3d at 169.

Finally, at trial, the defense may seek to impeach the
testimony of CW-6 and of Brown, who will identify Giglio as
someone who picked up marijuana from CW-6 during the period late
2000 through 2003.  Once the credibility of those witnesses has
been called into question, the evidence of Giglio's additional
marijuana trafficking is admissible to corroborate the testimony
of those witnesses.  See United States v. Figueroa, 976 F.2d
1446, 1454 (1st Cir.1992) (Rule 404(b) permits introduction of
evidence for purely corroborative purposes on matters
"significant to the government's case"); United States v.
Blakely, 942 F.2d 1001, 1019 (5th Cir.1995) (once credibility of
government witness had been challenged by defense, 404(b)
evidence to corroborate was admissible); United States v.
Everett, 825 F.2d 658, 660 (2$^{d}$ Cir.1987) (admitting 404(b)
evidence for corroborative purposes where the corroboration is
"direct and the matter corroborated is significant").  See also

22

United States v. Pitts, 6 F.3d 1366, 1371 (9th Cir. 1993)

(adopting Everett rule and permitting use of 404(b) evidence to

corroborate government cooperator who had been subject to cross-

examination and offered only direct evidence of defendant's

involvement in the distribution of cocaine).

     **C.**   **RISK OF UNFAIR PREJUDICE**

     Under Rule 403, bad act evidence shall be excluded if "its

probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the

jury, or by considerations of undue delay, waste of time, or

needless presentation of cumulative evidence." FRE 403. The

probative value of Giglio's statements about future marijuana

trafficking, and his statements about trafficking marijuana in

2004, are not *substantially* outweighed by the risk of *unfair*

prejudice. See United States v. Smith, 292 F.3d 90, 99 (1st

Cir.2002) (noting that Rule 403 protects only against unfair

prejudice rather than all prejudice); United States v.

Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir.1989) ("[A]ll

evidence is meant to be prejudicial; it is only unfair prejudice

which must be avoided.").

     With respect to all of Giglio's statements in the September

15 Meeting, the probative value of the statements is strong

because they are so closely linked in time and character to the

charged crime. See United States v. Rodriguez-Estrada, 877 F.2d

153, 156 (1st Cir.1989) ("When, as in this case, the linked
incident occurs close in time, and is highly relevant to the
charged conduct, the argument for admissibility is powerful");
United States v. Devin, 918 F.2d 280, 288 (1st Cir.1990) ("Put
another way, 'other acts' evidence which is closely bound up with
the crimes charged is eligible for admissibility under Rule
404(b)").  Moreover, given that the evidence is so closely
intertwined with Giglio's statements about his prior dealings
with CW-6, Bannerman, and Brown, which statements are intrinsic
to the charged conspiracy, it is difficult to discern how Giglio
would be any more prejudiced by admission of the forward looking
statements than he is by his retrospective statements.  Cf. Tse,
375 F.3d at 163 ("Usually, courts use the term 'unfair prejudice'
for evidence that invites the jury to render a verdict on an
improper emotional basis.").  See also Varoudakis, 233 F.3d at
122; United States v. Currier, 836 F.2d 11, 18 (1st Cir.1987)
(noting that "unfair prejudice" is prejudice that causes "a jury
to base its decision on something other than the established
proposition in the case") (quoting 1 Weinstein's Evidence §
403[03], 36-39 (1986)).

In any event, the Court can minimize any potential danger of
unfair prejudice caused by the admission of this evidence by
issuing a limiting jury instruction regarding the proper
relevance of the evidence.  The First Circuit has approved the

use of such limiting instructions as an appropriate means of protecting a defendant against the possibility that a jury might draw improper conclusions from a defendant's prior bad acts. See, e.g., U.S. v. Garcia, 983 F.2d 1160, 1173 (1st Cir. 1993)("district court handled the prior acts evidence with care, providing the jury with a limiting instruction . . . and again instructing the jury of the scope of prior acts evidence in his final charge"); U.S. v. Nickens, 955 F.2d 112, 125-126 (1st Cir. 1992)("given that the court minimized prejudice to [defendant] by giving clear limiting instructions to the jury, we are satisfied that the district court did not abuse its discretion in admitting the evidence of [defendant's] prior drug conviction.").

## CONCLUSION

For the foregoing reasons, the defendant's motion in limine should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s PETER K. LEVITT
RACHEL E. HERSHFANG
PETER K. LEVITT
Assistant U.S. Attorneys

Dated:    September 6, 2005

**UNITED STATES V. FRANK GIGLIO,**
**CR NO. 03-10370 DPW**

```
EXHIBIT #:          N-439
TYPE:               MEETING (EXCERPT)
LOCATION:           HARDCOVER RESTAURANT, DANVERS, MA
PARTICIPANTS:       FRANK GIGLIO
                    CW-6
                    WAITRESS
DATE:               SEPTEMBER 15, 2004
```

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

\*     \*     \*     \*     \*

WAITRESS:       Sure.  Are you guys going in the dining room?

CW-6:           No, just gonna hang out and have a few drinks.
                Thank you.  Salud.  So, uh, you're a newlywed huh?

GIGLIO:         Yeah.

CW-6:           You were married before right?

GIGLIO:         I've been married three times.  Four.

CW-6:           Fourth times a charm then.

GIGLIO:         This is the fourth.

CW-6:           Fourth?  Um, anyway I just wanted to, to basically
                let you know I'm getting back, I'm gonna probably
                head down there next week.

GIGLIO:         Ah huh.

CW-6:           And ah, I'm, I'm being told that, ya know, that
                there's product coming up.

GIGLIO:         OK.  Good.

1

CW-6:        And, ah, I'm hoping, ya know it could be as soon
             as a couple weeks, could be could be anywhere from
             two to four weeks.

GIGLIO:      And I'm around.  I put some feelers out and I
             didn't do that much.

CW-6:        (unintelligible) that much?

GIGLIO:      I did a little bit of something with somebody and
             my friend eh, one of my friends just went the
             other way but I called him up and said "Hey, ya
             know, if it's good product, I'm here at the
             store."  But the other guy is ready to go.  He's,
             you know, the deal I had with Dougie was um, I did
             a lot of that driving for nothing but I did get
             the pick of the litter.  (unintelligible) they,
             they were never . . .

CW-6:        Was that, was that what the deal was, that, that
             basically you would help him out?

GIGLIO:      I used to do, I didn't really, he'd take from me
             but as soon as I brought them back to my
             (unintelligible) . . .

CW-6:        Yeah.

GIGLIO:      I would get to look through, and there was four or
             five really pretty ones, they were mine.

CW-6:        Four or five blocks?

GIGLIO:      Yeah.  Yeah, I used to do a hundred to two
             hundred.

CW-6:        Was that what you were comfortable with?

GIGLIO:      In my prime.  That's what I'd do, normally do, as
             long as they're nice, I mean, sometimes there
             wasn't that many nice one's.  They'd
             (unintelligible) but I used to take a hundred
             cause that was the nicest.

CW-6:        Right.

2

GIGLIO:      Cause that's what was (unintelligible) we never
             looked at them real close but there was, they,
             they had a range.  They always had a range if he
             had them.  And if he got four hundred pounds of
             beauties, I still would only get, I'd get a couple
             hundred ya know what I mean?  He'd take the rest.

CW-6:        Okay.

GIGLIO:      But, um, you know, that was the deal, most of the
             time.

CW-6:        What, cause I'm kind of doing a new thing now.
             I'm trying to change everything cause obviously,
             you know, I want to change the way I did
             everything.  I'm not working up, out of Rockport
             anymore, um, got rid of that for, for obvious
             reasons, um . . .

GIGLIO:      That was smart.

CW-6:        We would have to work on logistics.  And what
             about, what about money wise.  What did, what did
             you used to do?

GIGLIO:      Well . . .

CW-6:        . . . before?  Can you come up with anything?

GIGLIO:      Yeah usually um, ya know what I'm saying, I did a
             hundred, I could come up with seventy, eighty
             thousand the next day.  And the balance within a
             week or two.  And I'm good for it.  I'm a business
             man, a family man, and I'm not, you know, you know
             where I'm at all the time.  I'm not somebody you
             ever have to worry about.

CW-6:        The only problem I have is, I, I kinda have to
             come with something like, like at, at the time.
             Is that possible?

GIGLIO:      Um . . .

CW-6:        At the time of delivery?  Something.

GIGLIO:         Well I'll see if I can come up with half or, you
                know, if I could, you know if I can
                (unintelligible) using a hundred as a number.

CW-6:           Yeah.

GIGLIO:         If I was just able to go somewhere with it I could
                come back with fifty grand, at least, minimum, if
                not more.  I could do that.

CW-6:           Right, what about logistics?  What about um, how,
                you know where, where do you, where are you
                comfortable doing this?  Are you comfortable me
                coming to you or are you comfortable you coming to
                me or, ah.  We have to work out the logistics.

GIGLIO:         Yeah.

CW-6:           I don't really have the same set up I had.

GIGLIO:         You know, that's, that would be important, what
                set up you do have.

CW-6:           Well, I'm gonna be work . . . I'm gonna be working
                on it.

GIGLIO:         Okay.

CW-6:           Alright.

GIGLIO:         Well, so if you have something where, similar to
                what we had in the past, then ah . . .

CW-6:           That's easy for you.  Yeah, easy for you to take a
                ride.

GIGLIO:         If you have another way ah, say you say ah,
                alright, I have ah, four nice pieces in the trunk
                huh, I'll bring you a vehicle . . . .

CW-6:           Yeah.

GIGLIO:         . . . bring me a vehicle, I'll be back quicker
                with it.

4

```
CW-6:          Okay.

GIGLIO:        Or I can meet you and switch vehicles.

CW-6:          Right right.

GIGLIO:        And meet you again with money.

CW-6:          Yeah.

GIGLIO:        I'll do that.

CW-6:          Okay.  Alright.

GIGLIO:        Is Karl working with you still?

CW-6:          No, ah, nah he's (unintelligible) actually he's
               working.  In the shop actually.  In a leather
               shop.  (unintelligible) ya know we all took some
               time off so we could go back and earn.

GIGLIO:        Yeah, no, I, I've always had my business.  I, I
               always work hard.  This is always my something on
               the side for me, which is old school.  As long as
               you have something going that's really nice . . .

CW-6:          Absolutely.

GIGLIO:        . . . you could do something out the back door.

CW-6:          Absolutely.

GIGLIO:        And I've always been like that.

CW-6:          Have ya?

GIGLIO:        Yeah, I've always tried to, yeah, I've always
               worked really hard (unintelligible) I've always,
               (unintelligible) Dougie, I jumped to attention as
               soon as he called me.  It's good for you that I
               have the legitimate side of my life that's so
               straight.  The other part is ya got to respect
               that.  I got to go to work in the morning.

CW-6:          Yeah.
```

GIGLIO:      (unintelligible) you know, I could plan a day off
             so you can't call me up on a, on a Sunday night
             and say "tomorrow morning you got to be somewhere
             at eleven o'clock."  You got to be, you know, I
             can't jump like that.  But you'll get to know my
             schedule, I mean, if you know Monday's my day off.
             Monday's always a day that I could do things.

CW-6:        And, and evenings are okay?

GIGLIO:      Evenings are fine.

CW-6:        Your usually busy from nine to . . .

GIGLIO:      I'm busy from seven in the morning . . .

CW-6:        Really?

GIGLIO:      . . . until six.  Yeah, three days a week I work
             really hard.  It starts tomorrow morning at seven
             o'clock I'll be leaving my store with a truck load
             of furniture.  It's loaded right now.

CW-6:        Is it really?

GIGLIO:      Yeah.  And then at ten thirty I open my store.  So
             I deliver things all morning, go for a cup of
             coffee, open the store and then I'm there all day.
             But I, I, I'm, it's my business.

CW-6:        You can get out if you have to?

GIGLIO:      Yeah, if I had to . . .

CW-6:        I'm flexible in terms of time.  I mean evenings
             are okay with me.

GIGLIO:      Yeah even if you said to me, "I need you to you
             know, I'll hook up with you here" and it's, when
             it's in the morning, I can't because I got a
             commitment tomorrow morning to four people to
             deliver furniture.  But if you said, "ya know one
             o'clock can you take lunch and meet for a couple
             hours."  I could do that.

6

CW-6:        Okay.

GIGLIO:      I could be there.  As long as you say, "you know,
             I want to see you tomorrow, in the afternoon,"
             tell my partner--I got to go.  Occasionally, I'm
             the only one there.  Then I don't, can't leave.
             But that's very seldom.

CW-6:        The only, the only thing I see is that there being
             an issue is ah, is the, is the money that I got.
             You know, I really lost so much, so many losses
             that I really have a hard time giving it up.

GIGLIO:      Yeah.

CW-6:        You know I was hoping that I could get you to
             (unintelligible) come up with some cash.  That's
             kind of what I was hoping.

GIGLIO:      I could if you want me to.

CW-6:        That's the only thing.

GIGLIO:      You should like, listen, if I can get something
             that's green, nice smell, smokes good . . .

CW-6:        Yeah.

GIGLIO:      I gotta have, a nice bud.

CW-6:        Right.  Especially . . .

GIGLIO:      Specially, yeah, especially being that I haven't
             worked so much.  I've given, look I talked to both
             people.  One says "show me what you got," the
             other guy is looking for something right now and
             ya know if the timing is great, I got, I did get a
             couple of things, little things.  I kept them a
             little busy here and there, um . . .

CW-6:        How's, how's the market, right now?  Just out of
             curiosity.

GIGLIO:      There's not great product out there.

7

CW-6:       No?  You haven't seen that much or heard about
            anything like (unintelligible)?

GIGLIO:     No, although at the beginning of the Summer there
            was.  And I had gotten my hands on some that was
            real nice.

CW-6:       Beginning of the Summer?

GIGLIO:     Yeah in the beginning of the Summer.  It was like
            this is one Summer that my guy had product cause
            I, I grab a hundred or something that was good.

CW-6:       From him?

GIGLIO:     From another person.

CW-6:       Yeah.  Some guy you used to do business with?

GIGLIO:     Yeah, just somebody, um, I mean I've always had a
            couple things.  I tried to get Dougie to work with
            this one, uh, one of my other friends
            . . .

CW-6:       Yeah.

GIGLIO:     . . . once or twice but the money never worked.
            Ah the price . . .

CW-6:       The price yeah.

GIGLIO:     Yeah.

CW-6:       Oh that's another thing I got to talk about.  I
            mean, numbers ya know what, what price range are
            we, you remember what we, you know what, you know
            what I worked with him before on?

GIGLIO:     No I (unintelligible)

CW-6:       Yeah.

GIGLIO:     I know it's, we talked once when he was in trouble
            and I was to do things and that was, in the
            twelve's or something.

8

CW-6:        Yeah, yeah.

GIGLIO:      But anything around thirteen is fine with me, if it's a good product.

CW-6:        You won't have a problem with it.

GIGLIO:      Yeah no problem at all in the thirteen range. As long as I get a nice product. If it's a nice product and you feel real good about it . . .

CW-6:        Yeah.

GIGLIO:      . . . smokes good. It's seedy, and if it's hard packed . . .

CW-6:        Yeah, you got a problem with it.

GIGLIO:      . . . I can't, I can't . . .

CW-6:        Can't do it.

GIGLIO:      . . . I can't take it.

CW-6:        I won't take it anyway.

GIGLIO:      (unintelligible) you know it just slows everything down.

CW-6:        Or if it's brown (unintelligible)

GIGLIO:      If it's, yeah, it's gotta be green, it's gotta have a nice bud, nice smell. But it can't, it has to be like you push your finger and it feels like a cigar. Ya know what I mean? That means those buds are beautiful, there not crushed. Ya know some of these guys fucking, crush it so hard they, make it like a rock . . . that really ruins what, what . . . I deal with an older crowd.

CW-6:        Do you?

GIGLIO:         I'm not dealing with young kids that smoke
                (unintelligible).

CW-6:           Yeah.

GIGLIO:         I deal with an older crowd.

CW-6:           Really.

GIGLIO:         There all my age.  Fiftyish.

CW-6:           Yeah I understand.

GIGLIO:         They got money but they, they want a beautiful
                product . . . goes like crazy.  My friend is,
                he'll give me a hundred grand in a minute, if it's
                a beautiful product, (unintelligible) out of his
                house, (unintelligible) money, ya know?  Or if I
                go, if I say it's beautiful he'll give me the
                money.

CW-6:           (unintelligible) on your word in other words.

GIGLIO:         No (unintelligible), if I say it's good, they'll
                know it's good, if I (unintelligible)  All my life
                I'm doing this, you know, since I'm eighteen years
                old.  That's a long time.

CW-6:           I know.  (unintelligible) did you say you're in
                your fifties?

GIGLIO:         Yeah, fifty five.

CW-6:           Oh.

GIGLIO:         I just turned fifty five.

CW-6:           Wow.  I'm gonna be, turn forty nine next month.

GIGLIO:         Yeah.

CW-6:           Just looking at the beer.

GIGLIO:         Oh this is a great beer.  If you find this on tap,
                drink it.  It's ten times better but it's a
                wonderful beer by Newcastle.

CW-6:           Ya Dougie was definitely a trip, because, I always
                get curious as to, you know, how much you were
                doing with him, cause I was
                doing . . .

GIGLIO:         There were times, you know, he, the people he got
                in trouble with . . . .  This whole thing was out
                in Los Angeles, he never did, he never got bail.
                That's why I really don't know much.  But his
                attorney, or his accountant, I got information
                through him.  The whole case was West Coast
                (unintelligible).  All I could do, he got cut a
                sweet deal, because the Feds do not want any
                disclosure of what was going on.
CW-6:           What'd you mean his first deal?

GIGLIO:         The first time he got, that's why he he walked and
                I told him to use his, you know, two hundred
                thousand dollars and six hundred pounds of pot.
                And you're coming out of jail on a bracelet, and
                then out of jail on travel (unintelligible)
                recognizance.  Be careful with these people will
                ya, there's something going on here, and he said,
                yeah he said yeah J JZ or JD, his lawyer . . .

CW-6:           Yeah.

GIGLIO:         . . . said um, that the prosecutor, the California
                prosecutor said "they're cutting you a deal, they
                don't want any disclosure."  Ya know once you,
                once you . . .

CW-6:           (unintelligible) want a disclosure
                (unintelligible)

GIGLIO:         Once you, if you, if you get, if you accept their
                deal and you take a deal, take a bargain . . .

CW-6:           Yeah.

GIGLIO:     The Feds do not have to bring their case forward. So if the case doesn't open up, you don't know who's, involved . . .

CW-6:       Ahhh.

GIGLIO:     The second you, if everybody, if everybody plea bargains . . .

CW-6:       Yeah.

GIGLIO:     . . . they don't have to tell you anything.  They don't have to say anything.

CW-6:       So as . . .

GIGLIO:     So the case doesn't open up and they don't really know what's going on even though the investigation, they don't know who the narc is, who, who's the agency and they had undercover agents on these people, from somewhere in California . . .

CW-6:       Yeah.

GIGLIO:     I'm telling you, you know, the only reason he got backers was that product was so good.

CW-6:       I know, he was . . .

GIGLIO:     This was, this was like beautiful product.  He'd always talk about these people, the kings, of this whole business.

CW-6:       Right.

GIGLIO:     And he spent all these years trying to get back, since the trouble happened.  He had this beautiful product (unintelligible)

CW-6:       Was it?

GIGLIO:     That was during the Democratic National Convention, four years ago.

CW-6:           Out in L.A. right?

GIGLIO:         L.A. that's right.  That's right, and then you
                know it just past this month and um . . .

CW-6:           And he said the product was real good?

GIGLIO:         Yeah it was beautiful and I think this is what he
                had coming.

CW-6:           Now did you, did you work that part of it?

GIGLIO:         I used to work it for few years until, you know,
                he couldn't get anymore because of problems.

CW-6:           Right.

GIGLIO:         But um, yeah, it used to, used to come in these
                foil packages and beautiful packages, gorgeous
                product.  It was like Californian home grown,
                manicured.  It was beautiful.  There's nothing as
                nice as the, that stuff.  But those people were
                under heavy investigation.  I mean, over the years
                he told me that, "this guys missing, this guy got
                killed."  I mean these people took people out and
                apparently someone's in trouble and stuff like
                that.

CW-6:           Really.

GIGLIO:         Oh yeah, oh yeah he told me a couple times, he's
                like, the fucking guy is gone, he's gone.  Wife
                and kids, gone.

CW-6:           Oh my God.

GIGLIO:         Yeah.  They were, they were heavy, heavy hitters.
                I don't know if they were from Mexico, from L.A.,
                or San Diego, or whatever, I don't, I don't know
                anything, I mean, I was just a peon in helping him
                do his thing.

CW-6:           Right.

13

GIGLIO:           . . . but, he was tied into some heavy duty people
                  and I know that (unintelligible) he's got, I said,
                  "You got (unintelligible), you got another guy,
                  and stay there, don't, just stay here and let
                  those guys (unintelligible) do the work."  He kept
                  going back there.

CW-6:             Yeah.

GIGLIO:           He, he kept going back there.  He had a . . .

WAITRESS:         (unintelligible) like to order an appetizer?

CW-6:             No but I'll take one more glass of wine and do you
                  have bottles of water by chance, small ones?

WAITRESS:         I have Perrier with bubbles and Saratoga, the
                  large bottle, without bubbles.

CW-6:             I'll take the Perrier please.

WAITRESS:         Okay.

CW-6:             Thank you.  You want anything else, you all right?

GIGLIO:           I'm all set thanks.

CW-6:             Um, so your motivation behind you helping him out
                  was that you got to pick out . . .

GIGLIO:           Yeah.  I would get, (unintelligible) he'd give me
                  eighteen pieces or twenty pieces.  I'd get to look
                  at every one, close, with my black light . . .

CW-6:             . . . and pick out . . .

GIGLIO:           . . . in my garage, no better place, and if there
                  were four or five pretty ones, they were mine.
                  And he would take the rest.

CW-6:             Do you, do you, you don't have a place to work
                  anymore though?  You got . . .

GIGLIO:           I sold my house.

CW-6:          You did?  Cause you got a little panicky huh?

GIGLIO:        Well you know after that happened with him I
               decided it's time.  But, it also had, had a lot to
               do with Lauren.  It was, you know, Lauren and I
               have had five years of a rocky relationship cause
               of my ex-wife and, uh, and she had a beautiful
               place on, on Commonwealth Avenue.  So you have
               two of us, we'd go back to our mutual corners and
               we never really could be committed to this
               relationship.  So, he got in trouble, and Lauren
               and I were talking and I said, "Listen Lauren I'll
               put the house up for sale.  I'll sell my house.
               You give up your apartment."  She has a beautiful,
               she has a fireplace and all on Comm Ave.

                        *     *     *     *     *

CW-6:          Especially the Fall is nice.  Logistics again, ah,
               I really think, I think something's gonna happen
               in the next couple of weeks (unintelligible), um,
               let's say, cause I am gonna end up with more.  I
               think I could use a thousand.

GIGLIO:        Yeah sure.

CW-6:          Ah, (unintelligible) end up with um, a little bit
               extra probably.  I don't know if you can use
               (unintelligible) but I'm end up with a bunch more,
               um, (unintelligible) if it's good it goes on it's
               own.

GIGLIO:        Yeah it's good hearing it.  You're not gonna have
               problems.  What I'm gonna do is, um, um ah, if
               it's good, I know I'm gonna be able
               (unintelligible) show my other guy who has been
               working, but drifted away from me because of me
               not being able to supply him.

CW-6:          Right.

GIGLIO:        He was the guy that I, I could buy, he'd take two
               hundred from me.

CW-6:        Okay.

GIGLIO:      He was good.  He has no problems taking some of
             them.  He's been working so and he has, ya know,
             he calls me now and then and see how I'm doing or
             stops in the store to see how I'm doing.  I, I put
             the feelers out and he says he's been working,
             it's the same old Summer, it's been nothing great
             around but he's been working (unintelligible) he's
             smart, I would be able to call him
             (unintelligible)

CW-6:        Alright.  Um, but in terms of cash, I need to, I
             need to get a little something, you should, if I
             kept something you should be able to come up with
             some cash.

GIGLIO:      Okay.

CW-6:        That's what I need.  Logistics wise I'll, I'll
             work out the logistics.  If you don't mind taking
             a ride.  Up here.  I'll work out the logistics.

GIGLIO:      (unintelligible) I don't mind taking a ride
             (unintelligible) ya know I got a wife and kids and
             I want to come to a cool situation.  I felt good
             with you and the other guy and then I was like ya
             know of course, I, I, I . . .

CW-6:        Of course . . . we won't go backwards.

GIGLIO:      I've already, I've already ah scoped out your
             place and I personally go there (unintelligible) I
             used to give, like, Dougie a report.  I'd say,
             "you know, place is really cool to me, don't have
             too many vehicles, uh, too much (unintelligible)
             ya know, pick-up trucks" and then, you know, says
             sometimes we used to say, "I have a feeling
             there's too many vehicles around that house I'm a
             little worried."  (unintelligible) I'm never, I
             haven't been in trouble I'm a good person to talk
             to, right, I have a good sense, common sense, I
             have ingenuity . . .

CW-6:        Yeah.

16

GIGLIO:         . . . I didn't go to college but I have a good
                sense, and I, I know the ropes.

CW-6:           Right.

GIGLIO:         You know what I mean, I can smell trouble when I
                smell susp . . . ya know, when things, people
                aren't right.

CW-6:           Good.

GIGLIO:         I mean, uh . . .

CW-6:           No there was always (unintelligible)

GIGLIO:         There were years ago when Dougie was a fucking
                total cocaine addict.

CW-6:           I didn't know him back then.

GIGLIO:         I, I saw him one night and I said I can't do any,
                I can't be around this guy.  I'm somebody else.

CW-6:           How long have you known him for?

GIGLIO:         I know him about fifteen years, maybe more.

CW-6:           So you knew him . . .

GIGLIO:         So there was a time when I went to his house with
                another guy who I stole as one of my partners,
                very close friend, he's my age and he's an older
                guy.  He took me to Dougie's some years ago to ah,
                to buy some pot (unintelligible) go into the
                apartment (unintelligible)

CW-6:           He was messed up?

GIGLIO:         (unintelligible)

CW-6:           I've heard a lot of stories about him, cause I met
                him after that . . .

GIGLIO:         He's been straight a long time.

17

CW-6:          He's been straight a long time.

GIGLIO:        Yeah.

CW-6:          But I heard the people that introduced me to him
               told me he used to be a nut case

GIGLIO:        Yeah, he was nut case.

CW-6:          Well, Doug used to tell me he was a nut case.

GIGLIO:        Yeah, no, he was like, I would not be around him.
               I will not be around people who aren't level
               headed, you know, I'm not an alcoholic, I'm not a
               druggie, I'm not a gambler, I'm not a, ya know,
               I'm a conservative person, but I know this
               business, since I'm a teenager, I know this
               business.  I'm from Brooklyn, New York, I know
               this business, you know.  I know, I look people in
               their eyes, and I know what's good or bad going on
               here.

CW-6:          Oh, without question.

GIGLIO:        Yeah.  So . . .

CW-6:          You have to, you have to have it.

GIGLIO:        Yeah, you gotta.  But I'm good with, you know,
               doing that, with you, you know, ah . . .

CW-6:          That place up there was good.  The reason I liked
               it was it was so far away, yeah.

GIGLIO:        Yeah, and I used to do things that he didn't even
               know I used to do, but I would come one way and
               leave another, never be the same vehicle going
               back and forth, you know what I mean?

CW-6:          And that one time you came up with the, uh,  the
               bamboo (unintelligible)

GIGLIO:        That was funny.

CW-6:          (unintelligible) bamboo trees.

18

GIGLIO:          Oh yeah.

CW-6:            Bamboo trees ah . . .

GIGLIO:          Yeah anything I can do to, set, that's called
                 subterfuge, you know it looks like one thing's
                 going on . . .

CW-6:            Yeah . . .

GIGLIO:          . . . and something else is going on.

CW-6:            Right.

GIGLIO:          It's the same thing with my store.  If you, if I
                 come and see you and I have the van, nobody is
                 suspicious if somebody puts his name on the side
                 of the fucking truck.  That's a legitimate
                 operation.

CW-6:            That's right.

GIGLIO:          That's, that's ah, that's also, people who are
                 looking to find out things are investigators.
                 Investigators, when they don't see a name, they
                 say: "Now what's going on here."

CW-6:            Right.

GIGLIO:          You know.  That's the first thing in their head --
                 "What's going on here?"

CW-6:            Right.

GIGLIO:          Cause you put your name all over the truck, call
                 me, I'm in the furniture business.  They know
                 what's going on here, so now it has to be
                 somebody's ratted you out but I mean, I'm a
                 legitimate business.

CW-6:            No that's a good business.

GIGLIO:          I mean, I'm a strict legitimate business and I,
                 you know.

CW-6:       No, that's why whenever we do (unintelligible)
            escort (unintelligible) house, ah um, or it could
            be the vehicle thing, where I give you a vehicle.
            Whatever it be it'll be, it'll look like
            legitimate business.

GIGLIO:     Yeah.

CW-6:       But just give me a chance to work it out.  I
            haven't, (unintelligible) I haven't, but whatever
            I do it will be a . . .

GIGLIO:     I'm happy your calling and ah (unintelligible) and
            ah . . .

CW-6:       We'll work it out.

GIGLIO:     And I know we don't have any heat from him.  I
            know that, that's all out there.

CW-6:       (unintelligible)?

GIGLIO:     Yeah, yeah, especially now that's it's been this
            long, I mean he never got bailed out because
            (unintelligible).  Other people who are little
            people did get bailed out, were around, but they
            shipped him right out to California.  He never got
            bail.  So it's all (unintelligible) one
            investigation out there.  And no, no, nobody,
            nothing ever, I was never approached or talked to
            by anybody, even . . .

CW-6:       And he kept you um (unintelligible)

GIGLIO:     I didn't know any of his friends.  I went to him,
            his, his, girlfriend Karen, the Chinese girl.

CW-6:       I met her once.

GIGLIO:     Yeah well I met her occasionally but never really,
            I never went to his house over there, but she
            bought a house in Newton and, ah, they had a house
            warming party.  And I went there and he
            introduced me to some of his friends who I know
            were his friends that he might have done business

20

```
                    with, but he was always like, "I got that
                    beautiful armoire from Frank and he's got an
                    antique business."  My girlfriend came with me,
                    total, ya know, I'm not sitting next to him like
                    his buddy in the pot business, you know?

CW-6:               Right.

GIGLIO:             But huh, you know, we kept it that way.  I never
                    even went over, I never go to his house at the
                    Prudential, never.  I never called there.  We have
                    mutual friends "what's his num, what's his
                    number?"  (unintelligible) you better call him, I
                    don't know.  You know you can't figure that one
                    out, you know what I  mean, I don't know.

CW-6:               He was real, really, I was gonna say bad, but he
                    was really good in that regard.  He, um, he
                    didn't, whatever, remember he told you before
                    about the telephone.

GIGLIO:             Yeah.

CW-6:               Like whenever ah, he would change phones every
                    thirty days and I wouldn't even have a number for
                    him sometimes.

GIGLIO:             Yeah.

CW-6:               I'd have to wait for him to get his new number.

GIGLIO:             Yeah I know that's what pissed me off too,
                    sometimes, but it was good and he'd get rid of
                    phones and ah, and, and never if he had to meet me
                    in town, he lived, he lived right near the
                    Prudential and he's say meet me at Starbuck's,
                    meet me at Aubonpan, or meet me over around the
                    corner at the Cap.

CW-6:               Right.

GIGLIO:             Ya know, he'd have names for the, for the
                    restaurants and they were like popular places.  We
                    bumped into you at the Cap
```

CW-6:          I know.

GIGLIO:        Maybe he called it the Cap . . . or he'd say, "ya
               know down from Sonsie" or (unintelligible).

CW-6:          Right.

GIGLIO:        You know, "met me there, alright."  And then we'd
               go in my car, take a drive and talk business.

CW-6:          I, I remember going to your house once.  I can't
               figure out . . .

GIGLIO:        Yeah, in Somerville, you came over to . . .

CW-6:          And you, that's how you got your name, Winter.
               You lived in Winter Hill right?

GIGLIO:        Oh yeah, right, right, yeah.

CW-6:          And I remember going to your house but I can't
               remember why ah.  Was it drugs?

GIGLIO:        Maybe.

CW-6:          Was it money?

GIGLIO:        Yeah you might of picked up money cause he was
               (unintelligible).

CW-6:          Yeah, yeah, yeah, yeah.  That's what it was.

GIGLIO:        When he was in trouble I ran the business for him.

CW-6:          That's right.  Well you and me.

GIGLIO:        Yeah we ran it, we did.  Yeah we did, we wanted,
               that's when you came over.

CW-6:          Yeah that's when I came over.  Okay because I was
               trying to figure out (unintelligible).  When you
               told me you sold it I was like (unintelligible)
               that was such a nice place.

GIGLIO:      Yeah it was (unintelligible).  I did real good
             (unintelligible).

CW-6:        (unintelligible) got some place where we could
             work (unintelligible).  You'll figure out
             something.

GIGLIO:      I figure out something.  Um . . .

CW-6:        Stuff I gotta figure out (unintelligible).

GIGLIO:      Yeah.

CW-6:        Alright.

GIGLIO:      You know, I have a, my store is a really big store
             and I have two loading dock entrances in the back
             and I have the van and my store at six o'clock,
             it's closed everyone goes home . . .

CW-6:        Wow.

GIGLIO:      I have access twenty four seven.

CW-6:        OK.

GIGLIO:      So if I need to go look at something, I . . .

CW-6:        I'm just thinking, if I need to bring you
             something and I wanted to get cash back quick, we
             would, unless I have a place, you would have a
             place to do it?

GIGLIO:      Yeah.

CW-6:        Alright.  Okay.  I'm just trying to think of all
             the options ya know.

GIGLIO:      Yeah.

CW-6:        You might have to go downtown somewhere.

GIGLIO:      Yup.  If I, um, if I could see something and know
             that it's nice quality.

CW-6:            (unintelligible)

GIGLIO:          Yeah, I'll go get the money and come back ...

CW-6:            Alright.

GIGLIO:          . . . and then grab, you know, how many and then
                 I, I'd owe you some, but I'd . . .

CW-6:            That's alright.

GIGLIO:          (unintelligible)

CW-6:            As long as I know I could get something.

GIGLIO:          Yeah.

CW-6:            (unintelligible)

GIGLIO:          Ya, no, no I'd do it.

CW-6:            At least the beginning, you know, and then
                 afterwards we could . . .

GIGLIO:          Why don't we start with . . . it's a nice product,
                 I'll, I'll come up with the cash.

CW-6:            Alright.  What I think we'll probably do is, um .
                 . .

GIGLIO:          And then I'll get a chance to show it somewhere
                 else and they collect, that guys big money, he'll,
                 he'll buy in.

CW-6:            (unintelligible)

GIGLIO:          He'll buy in.

CW-6:            I'm going down there and look for myself.  I don't
                 trust anybody else as far as making the
                 investment, ya know?

GIGLIO:          Yeah.

CW-6:       I don't trust anybody else.  (unintelligible) see
            for my own eyes.  If it looks like something
            worthwhile I invest in it (unintelligible) thats
            why its so important.  Um . . .

GIGLIO:     Alright.  Well, give me a chance to get started
            with you ya know ah . . .

CW-6:       Alright.

GIGLIO:     I'm a good worker.  I mean I'm in a stalled
            situation so you got understand that.  We got to
            make it start somehow because I haven't been
            working that much.  I worked in the beginning of
            the Summer, I worked ah, once around Christmas or
            New Years but after he got in trouble, I didn't
            work in like six months.

CW-6:       Yeah, it's been, been a long haul.  Almost, almost
            a year.

GIGLIO:     Yeah it's almost a year.  October's a year.  Late
            October.

CW-6:       Since he got in trouble?

GIGLIO:     Yup.

CW-6:       Time flies doesn't it?

GIGLIO:     Ya know I was on Newbury Street the other day,
            with my kids, and it's like, well, not seeing him
            at Sonsie, I mean he hung there, around there,
            just in the afternoons but on Sunday
            (unintelligible) actually, (unintelligible) and I,
            I was just reminiscing, ya know just sitting down
            there, having a water or a ginger ale at Sonsie
            and all the time I'd meet him at these bars, you
            know, he was a good influence, I mean I don't
            drink a lot so I would go and not drink, but we'd
            go hang out.

CW-6:       (unintelligible) he was never a (unintelligible)
            have a cigar until they stopped smoking . . .

25

GIGLIO:          That's the only bad influence.

CW-6:            So yeah but (unintelligible).

GIGLIO:          Yeah and it's not so bad to smoke a cigar.

CW-6:            (unintelligible) the cigar smoke.

GIGLIO:          Oh yeah cause it was the only thing he could do.

CW-6:            Yeah he wasn't, and coffee.

GIGLIO:          And coffee, yeah right.

CW-6:            He liked his coffee.

GIGLIO:          We always met at the coffee shop.

CW-6:            (unintelligible) coffee shop downtown, cause he
                 wanted to look at the girls.

GIGLIO:          Yeah.

CW-6:            You know what, we'll take the check
                 (unintelligible).  Um, I'm thinking about, I'm
                 gonna try and make it back up like around the
                 twenty fourth, something like that, um, so I'll
                 report back to you at that point, okay?

GIGLIO:          And you can call me on the cell phone . . .

CW-6:            Yup.

GIGLIO:          . . . call me on the store phone because there's
                 seven roaming numbers there (unintelligible)

CW-6:            Two three four zero, zero . . .

GIGLIO:          Zero one, yeah, six one seven two three zero.
                 Because that's, we have seven lines, so you
                 (unintelligible) that number it goes to one of the
                 numbers, its OK, I'm always there and Tuesday
                 through Saturday, eleven to six, in case you need
                 to find me there.

26

CW-6:           Okay.

GIGLIO:         And you can talk about furniture and you can say,
                "Franko, I'm looking for Frank, ah din, dining
                room set I want to see." (unintelligible) you know
                . . .

CW-6:           Yeah.

GIGLIO:         . . . looking for a really nice, high end dining
                room set, I got one (unintelligible) I got two.

CW-6:           Okay and then we can ah, we'll leave it at that.

GIGLIO:         We'll leave it at that.

CW-6:           (unintelligible) I'll call ya in a couple weeks.
                (unintelligible) and I'll um, we'll probably get
                together again, chit chat, and then,
                (unintelligible) work out the logistics.


                        *       *       *       *       *

CW-6:           Just get me five back, we'll be fine.  So what
                else is going on?  How's the ah, furniture
                business?

GIGLIO:         It's good.  I'm good.  I'm having a great month
                this month.  August was good for me.  And
                September's good for me.

CW-6:           I was . . .

GIGLIO:         There's two sides to my business, ya know, it's
                selling and buying.  I just bought two houses,
                estates, two clean outs, two big houses, one in ah
                West Roxbury . . .

CW-6:           And how do you get those, auction?

GIGLIO:         I've had an ad in the yellow pages for twenty two
                years.  No, I don't go to auctions.

CW-6:           How do you get them?  They call you?

GIGLIO:         People call me up selling things.  That ad in the
                yellow pages is not for people looking to buy
                furniture.

WAITRESS:       Thank you so much.

CW-6:           Thank you.

WAITRESS:       Have a nice night.

GIGLIO:         It's for, selling (unintelligible)

CW-6:           If there's somebody, if there some guy, or
                whatever has an estate.

GIGLIO:         Right, right.

CW-6:           (unintelligible)

GIGLIO:         Yeah.

CW-6:           They call you.

GIGLIO:         (unintelligible) the Yellow Pages.  And then
                there's a lot, ya know, I'm in this business
                twenty two years, so, ya know, one
                (unintelligible) West Roxbury somebody said, gave
                my name, said "call this guy he'll take good care
                of ya."  And that's something that takes years to
                get that, that, rapport with people.

CW-6:           Now do you buy, newer, old?

GIGLIO:         No I only buy old.  I don't buy nothing new used.
                But, if it was made in the seventies and it was
                artisan made, Vermont cherry dining room set made
                by this little guy in his shop, I'd buy it.
                That's good stuff.

CW-6:           Would you spend a lot of time going out looking?

GIGLIO:         I (unintelligible) go to (unintelligible) I don't
                go to the auctions.  I used to do the auctions and
                that's how (unintelligible) day and night.  I'm in

the, I'm in the Co-op business.  I'm, I'm at work
every day.

CW-6:        Right.

GIGLIO:      So I can't work at night to.  I can't go can't go
             (unintelligible) these to auctions and things
             . . .

CW-6:        There you go.  So you do house calls?

GIGLIO:      Yeah I do house calls.  That's how I get my stuff.
             My wife thinks I'm doing a house call in Peabody
             and one in Lynnfield.  I don't go to re-auctions.

CW-6:        You have to look at, my point is you have to go
             out and look at something before you say whether
             or not your going to buy it or . . .

GIGLIO:      Oh yeah, I got to go to, I, even now, I get a lot
             of calls.  I weed them out.  The one's I want to
             go on.  I got some questions I got to ask and then
             ya know if it's the right thing and I specialize
             in certain stuff, it's, it's  quality stuff,
             (unintelligible) get it.

CW-6:        Your showroom was impressive.

GIGLIO:      And then I have another guy who does the auctions
             and everything.  He's called a (unintelligible).
             One guy kind of knows the business and knows what
             I like.  And he goes to all the auctions.  He's
             divorced, doesn't have anyone to come home to
             . . .  Ya know those guys work day and night.

CW-6:        Alright bud.

GIGLIO:      No one knows about my other life, the dark side of
             me.  Which is what you do.

CW-6:        (unintelligible)

GIGLIO:      Yeah that's what I call it.  Cause no one knows.
             Ya know we live this life, (unintelligible)
             families, we have a side but ya have to like, you

|         |                                                                                                                                                                                                  |
|---------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|         | have to be like a, it's like Tony Soprano, ya know you have a, life, kids and family, they love you and everything . . .                                                                           |
| CW-6:   | Yeah.                                                                                                                                                                                             |
| GIGLIO: | . . . so in a dark sense . . . it's a secret.                                                                                                                                                     |
| CW-6:   | It is.                                                                                                                                                                                            |
| GIGLIO: | (unintelligible)  That's not good.  Ya know, if you have to, if you have to spend your money renting office, say "honey I'm going to work." You go to that office and you, ya know . . . exactly . . . |
| CW-6:   | Alright.                                                                                                                                                                                          |
| GIGLIO: | (unintelligible) spend (unintelligible) money (unintelligible) I like to work (unintelligible) It's good but I like to go to work.  I go to my store in the morning.  (unintelligible)            |
| CW-6:   | (unintelligible)                                                                                                                                                                                  |
| GIGLIO: | Yes.  (unintelligible) that's perfect, that's the time I'm not there and (unintelligible) for delivering furniture and doing what I do.                                                           |
| CW-6:   | Yeah (unintelligible)                                                                                                                                                                            |
| GIGLIO: | (unintelligible)                                                                                                                                                                                  |
| CW-6:   | Alright buddy.                                                                                                                                                                                    |
| GIGLIO: | Where are you?                                                                                                                                                                                    |
| CW-6:   | Right here.  Where are you?                                                                                                                                                                       |
| GIGLIO: | Down (unintelligible)                                                                                                                                                                             |
| CW-6:   | (unintelligible) Alright have a safe trip back.  Look at that.  We're right beside each other.                                                                                                    |