UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA    )
                            )
       v.                   )        CRIMINAL NO. 03-10370-DPW
                            )
FRANK GIGLIO                )
_____)

### Giglio's Motion for Dismissal, Remedial Measures, or Stay of Trial

Now comes the Defendant, by and through undersigned counsel, pursuant to the

Jury Selection and Service Act, 28 U.S.C. §1861 et seq., and hereby moves the Court to

dismiss the operative indictment (third superseding indictment), impose certain remedial

measures, or stay trial until the District Court as a whole amends the existing jury

selection plan, as "the failure of the Federal Jury Administrator to supplement the

existing flawed resident lists amounts to a statutory violation…." (See Memorandum of

the Honorable Nancy Gertner in United States v. Green, (Crim No. 02-10301)).[1] In her

memorandum in United States v. Green, (Crim No. 02-10301), Judge Gertner concluded

that the JSSA imposes higher standards on public officials to supplement their source

lists when necessary to "foster the policy and protect the rights" to a fair cross-section

jury selection process. 28 U.S.C. § 1863(b)(2). In finding that those standards have been

violated, Judge Gertner found that the JSSA imposes "an affirmative obligation on

districts to use jury selection processes that ensure random selection from a 'fair cross-

section of the community.'" Green Memorandum at 9, quoting 28 U.S.C. § 1863(b)(2).

---

[1]. The Court previously allowed the defendant to incorporate the Opinion of Judge Gertner and the relevant pleadings in the Green matter regarding these issues, which were originally raised by the defendant in his pleading entitled "Giglio's Motion for Remedial Measures Regarding Jury Selection" and "Affidavit of Robert M. Goldstein in Support of Giglio's Motion for Remedial Measures Regarding Jury Selection." (See Docket Entry 325). The defendant again reincorporates all of the foregoing materials in support of the instant motion.

Judge Gertner found "that the failure of the Federal Jury Administrator to supplement the existing flawed resident lists amounts to a statutory violation calling for remedial measures." Green Memorandum at 9. In describing the expansive impact under-representation happens upon the entire criminal justice system, Judge Gertner quoted Justice Marshall's opinion that "[w]hen any large and identifiable segment of the community is excluded . . . the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." Green Memorandum at 5, citing Peters v. Kiff, 407 U.S. 493, 503 (1972) (Marshall, J.). "The result," Judge Gertner concluded, "is not merely the appearance of bias; it may well be its reality."

The First Circuit recently rejected the remedial measures ordered by Judge Gertner, directing the court "not to implement paragraphs 1 and 2 of its remedial order entered on September 2, 2005." (In Re: United States of America, On Petition for A Writ of Mandamus to the United States District Court for the District of Massachusetts, hereinafter "First Circuit Opinion", attached hereto as Exhibit 1, at 18). The defendant has filed the instant motion to preserve the issues raised in the relevant pleadings filed in the Green matter and in Judge Gertner's Memorandum, all of which have been incorporated in support of the instant motion. The defendant contends that the statutory violations identified by Judge Gertner warrant a dismissal of the indictment, remedial measures as identified by Judge Gertner in her memorandum, or a stay of trial until the Court as a whole acts to amend the plan.

Respectfully Submitted,
Frank Giglio,
By his attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 905
Boston, Massachusetts 02116
(617) 227-3700

**/s/ Robert M. Goldstein**
Robert M. Goldstein
Mass. Bar No. 630584
20 Park Plaza, Suite 903
Boston, Massachusetts 02116
(617) 742-9015

Dated: October 12, 2005

# United States Court of Appeals
## For the First Circuit

No. 05-2358

IN RE:  UNITED STATES OF AMERICA,

Petitioner.

ON PETITION FOR A WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Boudin, Chief Judge,

Stahl, Senior Circuit Judge,

and Lynch, Circuit Judge.

Timothy Q. Feeley, Assistant United States Attorney with whom Michael J. Sullivan, United States Attorney, Lori J. Holik, Assistant United States Attorney and Theodore B. Heinrich, Assistant United States Attorney were on petition for a writ of mandamus, motion to stay district court order, and request for leave to file a supplemental brief.

Patricia Garin with whom Max D. Stern, Kenneth M. Resnik, Stern, Shapiro, Wiessberg & Garin, LLP, David P. Hoose, Katz, Sasson, Hoose & Turnbill, John H. Cuhna, Jr., Cuhna & Holcomb, P.C., Randolph Gioia, Elizabeth Billowitz, Law Office of Randy Gioia, Sarah Jennings Hunt, William C. Brennan, Jr., Brennan, Trainor, Billman & Bennett, LLP, George F. Gormley and George F. Gormley, P.C. were on opposition to the government's petition for a writ of mandamus and opposition to the government's motion to stay district court order for respondents Branden Morris, Jonathan Hart, Darryl Green and Edward Washington.

Charles W. Rankin, James L. Sultan and Rankin & Sultan on brief for Nancy Gertner, United States District Judge.

Jackie Gardina, Vermont Law School, on brief for Chief Judge William G. Young, Amicus Curiae.

Michael Avery, Suffolk Law School, on brief for National Lawyers Guild, Massachusetts Association of Criminal Defense Lawyers and Juvenile Justice Center of Suffolk University Law School, Amici Curiae.

Julia M. Wade, David J. Apfel and Goodwin Procter LLP on brief for The Boston Bar Association, The Committee for Public Counsel Services, and The National Association of Criminal Defense Lawyers, Amici Curiae.

William W. Fick, Martin F. Murphy, Foley Hoag LLP, Nadine Cohen, Barbara J. Dougan, Lawyers' Committee for Civil Rights, Dennis Courtland Hayes, General Counsel, Victor L. Goode, Assistant General Counsel, NAACP, Charles J. Ogletree and Charles Hamilton Houston Institute for Race & Justice on brief for Lawyers' Committee for Civil Rights Under Law Of The Boston Bar Association and Boston Branch of the NAACP, Greater Boston Civil Rights Coalition, Community Change, Inc., Jewish Alliance for Law and Social Action, Women's Bar Association, Massachusetts Black Lawyers Association, Charles Hamilton Houston Institute for Race and Justice, and Massachusetts Black Legislative Caucus, Amici Curiae.

---

October 7, 2005

---

**BOUDIN**, **Chief Judge**.  In September 2003, the defendants were charged in federal district court, by a superceding indictment, with racketeering, 18 U.S.C. § 1962(c) (2000), racketeering conspiracy, id. § 1962(d), conspiracy to murder, id. § 1959(a)(5), and various assaults and firearms offenses.  Two defendants were further charged with murder in aid of racketeering. Id. § 1959(a)(1).  Shortly thereafter, the government advised that it would seek the death penalty against the latter two defendants if they were convicted of a specific murder charged in one of the counts.

In November 2004, one of the defendants moved to dismiss the superceding indictment, or in the alternative for an order to supplement the names contained in the master jury wheel currently in use in the district court.  This defendant claimed that the jury selection process under-represented African Americans.  At least some of the defendants are African American and all joined in this challenge.

The district judge held evidentiary hearings in January 2005 and received an expert report in April 2005.  On September 2, 2005, with two of the defendants scheduled for trial on September 19, 2005, the district judge issued a 101-page decision and order. The judge rejected the defendants' constitutional attack but found that the current arrangements in this district for jury selection were unlawful under the statute.  United States v. Green, --- F.

Supp. 2d ---, 2005 WL 2109114, at *22, *32 (D. Mass. Sept. 2, 2005).

In Massachusetts, as in other district courts, the jury selection process is governed by a "plan" adopted by the district court pursuant to the Jury Selection and Service Act ("JSSA" or "the statute"), 28 U.S.C. §§ 1861 <u>et seq.</u> (2000).  The JSSA contains substantive requirements for such plans and specifies the procedures for adopting the plans.  Each such plan must be adopted by a vote of the judges of the district court and then approved by a special review panel comprised of the circuit council and a designated judge of the district court in question.  <u>Id.</u> § 1863(a). The current Massachusetts plan was revised in 2000 and is publicly available.  Plan for Random Selection of Jurors (D. Mass.).

Under the Massachusetts plan, trials held in the Eastern Division of Massachusetts--a set of adjacent counties in the eastern part of the state--draw juries starting with a source list of names of residents from these counties.  Plan §§ 2, 5(c).  A random selection of names from the full source list is placed in a master jury wheel; a large number of names is then periodically drawn at random from the master wheel and sent jury summonses and qualification questionnaires; and after the returned questionnaires are vetted (<u>e.g.</u>, to exclude disqualified persons), the remaining names go into a "qualified jury wheel" from which the needed number of jurors are randomly drawn and eventually dispatched to court

-4-

when a jury or juries are to be selected.  Plan §§ 8-10; see also 28 U.S.C. §§ 1863, 1864, 1866(a), (b).

In this case, the district judge determined from the evidence that although African Americans comprised over 6 percent of the Eastern Division population in the last several years, just over 3 percent out of all those who returned questionnaires (and identified their race) were African American.  Green, 2005 WL 2109114, at *7.  For the period 2001-2003 inclusive, the average disparity was 3.66 percent.  Id. at *18.  In short, African Americans appeared among the questionnaire answerers about half as often as their presence in the population of the Eastern Division.

Out-of-date (or otherwise incorrect) addresses and a lower response rate by African Americans than in the population as a whole appeared to be the main reasons for the disparity.  Green, 2005 WL 2109114, at *20-*21, *30-*31.  Some letters are returned to the jury administrator or clerk marked "undeliverable" (e.g., the addressee moved).  Id. at *20-*21.  Others are not returned but no questionnaire is filed by the addressee--a category that includes some persons who never received a summons and questionnaire and others who did but chose not to return the questionnaire.  Id. at *21.  Although such misdeliveries and nonresponses occur in all communities, the data suggest that they occurred proportionally more often in areas that contained more poor or minority inhabitants.  Id. at *20-*21.

-5-

After an analysis of existing case law and statutory provisions, the district judge concluded that no Sixth Amendment violation had been proved, <u>Green</u>, 2005 WL 2109114, at *22, but that the statute required supplementation of the names originally drawn from the master wheel in order to remedy or ameliorate the racial disparity, <u>id.</u> at *27-*28, *31-*32.  The district judge directed the federal jury administrator to draw an additional name from the master wheel, but from the same zip code, for each name to whom a questionnaire was sent that was returned "undeliverable"; for any questionnaire that was not returned at all after two attempted mailings to the same address, the same remedy was ordered.  These newly drawn names, to the extent their questionnaires were returned, were then to be merged with original persons drawn who had returned their questionnaires.[1]

---

[1]The challenged paragraphs of the order provided that with respect to the present case:

> 1.  For all summonses returned to the Court as "undeliverable," the same number of new summonses should be mailed to residents who live in the same zip code area as the undeliverable summonses. Replacement summonses will be selected from a supplemental array, merged with the existing array and randomized;
>
> 2.  For all summonses for which there is no response ("nonresponses") after a second mailing, the same number of new summonses should be mailed to residents who live in the same zip code area as the nonrespondents. Replacement summonses will be selected from a supplemental

This procedure would draw proportionately more supplemental names from zip codes where the original response rate had been low--which the evidence showed would tend to have a larger than average population of African Americans. Green, 2005 WL 2109114, at *35. The process would in turn tend to produce a blended list of persons filing questionnaire answers containing a greater proportion of African Americans than the original list. The supplementation remedy adopted by the district judge thus sought to increase the likelihood of African Americans (and other groups similarly situated) appearing on the final jury in numbers more closely aligned with their presence in the Eastern Division's population.

After objecting to this remedy as inconsistent with the statute and with the current plan, see 28 U.S.C. § 1867(e), the government sought mandamus in this court to prevent the district court's use of the supplemented list. We granted a stay of the order and expedited our hearing on the mandamus petition, making clear that the district court was free to delay the upcoming trial, which it has now done. Issues of law are reviewed de novo, Porn v. Nat'l Grange Mut. Ins. Co., 93 F.3d 31, 33 (1st Cir. 1996); some deference may be accorded to a court's interpretation of its own

---

array, merged with the existing array and randomized; . . .

jury plan, but only to a "reasonable interpretation." Cf. Nehmer v. Veterans' Admin., 284 F.3d 1158, 1160 (9th Cir. 2002).

In this court, the defendants contest our authority to intervene. They argue that there is no final judgment in this case and that it does not fit within the few categories of criminal cases for which Congress has allowed interlocutory appeals. See 18 U.S.C. § 3731 (permitting, e.g., interlocutory appeal of suppression orders). The short answer is that well settled precedent treats mandamus as an alternative means of securing interlocutory relief in the limited class of extraordinary cases where the requirements for mandamus have been met.

The most familiar track, so-called "supervisory mandamus," is traditionally available where judicial power has been exceeded, there is a threat of irreparable harm, and the underlying order is clearly erroneous. United States v. Horn, 29 F.3d 754, 769 (1st Cir. 1994). Even absent such conditions, "advisory mandamus" has sometimes been granted in this circuit, United States v. Green, 407 F.3d 434, 439-40 (1st Cir. 2005), petition for cert. filed (U.S. Aug. 12, 2005) (No. 05-360), and elsewhere, e.g., In re von Bulow, 828 F.2d 94, 97-100 (2d Cir. 1987), to settle critical questions of law that affect multiple cases and warrant immediate resolution.[2]

---

[2]The Supreme Court cautioned in Will v. United States, 389 U.S. 90 (1967), against the over-ready use of mandamus in criminal cases, id. at 96-98; but its own precedents--both before and after

Our case is a classic "exceptional" instance justifying interlocutory intervention.  The central issue is one of judicial authority--namely, whether the district judge's action contravenes or unlawfully supplements the jury plan adopted by the district court as a whole and approved by the review panel.  See Schlagenhauf v. Holder, 379 U.S. 104, 110 (1964).  As for irreparable injury, Horn, 29 F.3d at 769, the government has no ready way to appeal if there is an acquittal and no standing to appeal if there is a conviction.  And, as we shall see, the district judge's order clearly departs from the existing jury plan.

Further, the district judge's decision effectively indicts the existing plan as applied to grand jury and petit jury actions in a vast array of criminal cases, past and future.  The decision has already prompted motions in other pending cases.  In statements that are part of the record, the district judge's order has been endorsed by the chief judge of the district court, suggesting that he (and likely some other judges) will follow the same course.  Advisory, as well as supervisory, mandamus is thus wholly appropriate.[3]

---

Will--make clear that mandamus is available in exceptional circumstances in both civil and criminal cases.  Schlagenhauf v. Holder, 379 U.S. 104, 110 (1964); United States v. United States Dist. Ct. for E. Dist. of Mich., 407 U.S. 297, 301 n.3 (1972).

[3]The JSSA provides a short pre-trial window within which a party must move to challenge non-compliance with the provisions of the statute and further provides, with some qualifications, that this is an "exclusive" remedy.  28 U.S.C. §§ 1867(a)-(c), (e).  The

Turning to the merits, we begin by asking whether the district judge's order comports with the existing plan or whether, if not, the order can be justified in this case by claims that the plan is at odds with the statute. Concluding that the answer to both questions is no, our decision then explains why the order must be enjoined even if a legitimately amended plan designed to improve on the existing one might be permissible.

Central to this case is the relationship between the plan and the statute. The statute provides a purpose and framework for jury selection plans and some of the mechanical detail for collecting jurors. A plan, which the statute requires from each district, provides additional detail and mechanics, and it must not conflict with the statute, 28 U.S.C. § 1863(a), but may differ from district court to district court (e.g., as to the source of names for the master wheel and the number drawn, id. § 1863(b)(2)). Once adopted, the plan is intended to provide a uniform procedure for assembling jurors in that district court binding upon each district judge. See id. § 1863; S. Rep. No. 90-891, at 34 (1967); H. Rep. No. 90-1076 (1968), as reprinted in 1968 U.S.C.C.A.N. 1792, 1805.[4]

---

government did make its objection within this period and the statute does not specify how or when such challenges may be presented to an appellate court and it does not preclude mandamus.

[4]Employing identical language, both the Senate and House reports explain: "The specific and comprehensive nature of the provisions of the act and the local plan will assure that there are readily available standards against which the selection procedures may be measured. Thus, procedural regularity is the measure of the

In this case, the plan pertinently provides that the state's local resident lists constitute "a fair cross section of the community"--the grouping prescribed by the statute for jury selection--and that the names of the persons "to be considered for service . . . shall be selected at random" from the lists.  Plan § 5(c).  It also provides that the selection of names from the source list and then from the master wheel (which are two separate steps) "must . . . insure that the mathematical odds of any single name being picked are substantially equal."  Id. § 7(a); see also, e.g., District of Maine Plan §§ IV, V.

Then, from the names so drawn (first from the source list of residents and then from the master wheel), the clerk sends a summons and qualification form, Plan § 9(b), (c).  From the returned forms and through other procedures, some names are removed for disqualification, exemption or excuse.  Id. § 10.  Under the statute, the names of persons so qualified constitute a "qualified jury wheel" from which jurors are drawn at random as necessary for grand juries and for arrays periodically summoned to court (e.g., for Monday, September 19, 2005) as potential petit jurors for trials.  28 U.S.C. § 1863(b)(8).

---

validity of the selection system.  It is an appropriate measure since the bill sets up a largely mechanical process in which the role of human discretion is minimized.  The bill does not guarantee that each venire or each jury will mirror the structure of the community.  It guarantees only that appropriate selection procedures have been used."

The district judge's order departs from this regime by providing that a new name chosen in the supplemental draw must come from the same zip code as an original addressee whose questionnaire was not returned. This violates the "equal odds" requirement of the plan because the supplemental draw, constrained by the preferences for those in certain zip codes, does not give equal odds of selection to every name in the master wheel. Indeed, if the equal odds requirement were met, the results of the supplemental draw would tend to reflect the very same demographics as the original one.

The district judge pointed to a different provision of the plan, namely, the authority in section 11 for the court to direct a further draw from the master wheel to create a "supplemental array" to be added to the regular array summoned from the qualified wheel. But the expressed purpose of section 11 is to add a small list of potential jurors when additional names are needed "because of excused or increased jury requirements,"--i.e., an inadequate number of qualified jurors in a regular array. Nothing in this provision authorizes new jurors because of low return rates in a particular zip code.

Further, what the plan prescribes for a shortage of qualified jurors is supplementation by a further draw from the master jury wheel, Plan § 11(d), and not a draw only from identified zip codes within the master wheel. Regardless of the

-12-

purpose of the supplemental array, the plan authorizes additions only through a new "equal odds" draw from the entire master wheel. Id. § 7(a).  The successive new draws directed by the district judge's order are not "equal odds" draws from the wheel but draws only from individual zip codes.

Even without regard to the plan's equal odds language, the order fails for a different reason.  As just noted, the plan's mechanism provides for additional draws from the master wheel only in one specific situation--a draw of a supplemental array occasioned by a shortage of qualified jurors in a regularly-selected array.  Plan § 11(d).  A consequential enlargement of the bases for a new draw amounts to a de facto amendment, even if performed by an individual judge, and does not thereby escape the statute's procedural requirements;[5]  the failure formally to amend the plan by vote of the whole court is not a defense of the present order but its vice.

Imagine that the district judge in question adopted this new, zip-code-oriented approach and that another judge in the district insisted on using the pre-existing practice.  Quite apart from the mechanical complications--normally an array is summoned

---

[5]This is well settled in the closely related area of rulemaking. See, e.g., United States v. Hoyts Cinemas Corp., 380 F.3d 558, 569 (1st Cir. 2004); Levesque v. Block, 723 F.2d 175, 178-85 (1st Cir. 1983); Hoctor v. U.S. Dept. of Agric., 82 F.3d 165, 170-72 (7th Cir. 1996); Mission Group Kan. v. Riley, 146 F.3d 775, 782-83 (10th Cir. 1998); United States v. Picciotto, 875 F.2d 345, 346-49 (D.C. Cir. 1989).

for multiple trials before different judges--this would result in some defendants getting juries selected under one regime and others under a significantly different one.    Compare note 4, above (quoting legislative history).    Alternatively, if all judges informally followed the district judge's lead, it would merely emphasize that a plan amendment had been improperly implemented without the approvals required by the statute.

Certainly some details in jury administration are too minor to require inclusion in a plan; for instance, the Massachusetts plan does not specify the number of mailings to a non-responding addressee and the government does not challenge the district judge's contemplation of additional mailings to the same address.    But the plan does specify the use of equal odds draws from the master wheel and the basis upon which a supplementary draw can be ordered.    The challenged portion of the district judge's order is not a minor adjustment of administration on a matter left unaddressed by the existing plan.

Possibly a major departure from the existing plan by one judge might be justified if that plan were unconstitutional or in conflict with the JSSA.    Such a situation would create a conflict between the substance of the plan and the procedure for altering it.  The government says that in such a case the conflict-resolving solution would be to stay the trial and seek a formal amendment to the plan by the district court as a whole.    Cf., e.g., United

States v. Gordon, 961 F.2d 426, 431 (3d Cir. 1992).  But we will assume, solely for the sake of argument, that a judge might depart from the plan where compliance would cause a constitutional or statutory violation.  Here, the district judge did claim that the statute compelled such a departure.  It does not.

The district judge recognized that under our prior governing precedent the plan, without any supplemental drawings, complied with the Sixth Amendment.  Green, 2005 WL 2109114, at *11-*22; see United States v. Royal, 174 F.3d 1, 10-11 (1st Cir. 1999).  However, her decision invoked a statutory requirement that the district court prescribe "some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights" secured by the statute (which include both the fair cross section requirement and equal access of citizens to consideration for service on juries).  Green, 2005 WL 2109114, at *27-*30 (citing 28 U.S.C. § 1863(b)(2)).  The district judge then deemed the racial disparity in qualified names as triggering the statutory duty to supplement.  Id. at *30-*32.

This amounts to saying that the cross section language in the statute is more demanding than the constitutional cross section holdings.  Yet the statutory language was drawn from the Supreme Court's constitutional holdings, and this court, Royal, 174 F.3d at

-15-

6, like others,[6] has held the statute to impose essentially the same obligation.  Whether or not the record in this case is factually better developed than that in <u>Royal</u>, the disparities are of the same general magnitude, <u>compare</u> <u>Royal</u>, 174 F.3d at 10-11, <u>with</u> <u>Green</u>, 2005 WL 2109114, at *18, and <u>Royal</u> binds this panel quite as much as it binds the district judge.  <u>Irving</u> v. <u>United States</u>, 162 F.3d 154, 160 (1st Cir. 1998), <u>cert. denied</u>, 528 U.S. 812 (1999).

What is more, the "in addition" language in section 1863(b)(2) is directed to the specification of the <u>source lists</u> for the master wheel.  This is a function expressly to be performed by the district court <u>as a whole</u> through the plan, <u>see</u> Plan § 5(b), and it <u>was</u> performed when that court found that the Massachusetts local resident lists satisfied the statute's requirements (a finding expressly permitted by the statute as to the Massachusetts lists, 28 U.S.C. § 1863(b)(2)).  Nothing in the "in addition" language has anything to do with how names are selected <u>from</u> the master wheel.

In certain cases we have upheld convictions despite deviations from a jury selection plan where the deviation did not

---

[6]<u>United States</u> v. <u>Rioux</u>, 97 F.3d 648, 660 (2d Cir. 1996); <u>United States</u> v. <u>Allen</u>, 160 F.3d 1096, 1102 (6th Cir. 1998), <u>cert. denied</u>, 526 U.S. 1044 (1999); <u>United States</u> v. <u>Clifford</u>, 640 F.2d 150, 154-55 (8th Cir. 1981); <u>United States</u> v. <u>Miller</u>, 771 F.2d 1219, 1227 (9th Cir. 1985); <u>United States</u> v. <u>Shinault</u>, 147 F.3d 1266, 1270-71 (10th Cir.), <u>cert. denied</u>, 525 U.S. 988 (1998).

frustrate core concerns of the statute, specifically, random selection of jurors and objective criteria for juror disqualification. See United States v. Savides, 787 F.2d 751, 754-55 (1st Cir. 1986); see also United States v. Tarnowski, 429 F. Supp. 783, 790-91 (E.D. Mich. 1977), aff'd, 583 F.2d 903 (6th Cir. 1978), cert. denied, 440 U.S. 918 (1979).  Our concern here, however, is not with the rights of an individual party seeking redress on appeal but with the use of mandamus to assure that the district court complies with an existing plan in a series of trials yet to be held.

As a final source of authority for the order, the district judge's decision cites the long-recognized inherent "supervisory" power of the court to manage its business. Green, 2005 WL 2109114, at *32-*33 (citing Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988)).  The court's supervisory power does not license it to ignore an otherwise valid existing jury plan or to bypass the mechanism provided by statute to alter such plan. "To allow otherwise 'would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing.'"  Bank of Nova Scotia, 487 U.S. at 254 (quoting United States v. Payner, 447 U.S. 727, 737 (1980)).

No one is entitled automatically to be tried by a jury of persons comprised of his or her own race, religion or gender. Taylor v. Louisiana, 419 U.S. 522, 538 (1975); Barber v. Ponte, 772

F.2d 982, 997 (1st Cir. 1985) (en banc), <u>cert. denied</u>, 475 U.S. 1050 (1986). Yet there is assuredly cause for concern, as this court said six years ago, <u>Royal</u>, 174 F.3d at 12, where African American defendants have been indicted for major crimes, and the proportion of blacks who return jury questionnaires is half the percentage to be expected from their presence in the division of the district concerned. The district court has always been free to revise its jury plan in compliance with the statute.

Without developing its argument in detail, the government has questioned whether the district court's remedy would comport with the statute even if embodied in a properly adopted plan. But what plan the district court as a whole might adopt is uncertain; and we have expedited both oral argument and issuance of this decision because of the need for a prompt resolution of the mandamus petition. The statute provides for the district court as a whole and then the review panel to consider plan changes in the first instance. 28 U.S.C. § 1863(a).

The writ of mandamus is <u>granted</u> and the district court is <u>directed</u> not to implement paragraphs 1 and 2 of its remedial order entered on September 2, 2005. The writ shall issue forthwith without prejudice to petitions for rehearing. No costs are to be awarded.

<u>It is so ordered</u>.