UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
) No. 03-10370-DPW
v. )
)
FRANK GIGLIO, )
Defendant. )

**OPPOSITION OF THE UNITED STATES TO GIGLIO'S
MOTION *IN LIMINE* TO EXCLUDE THE SEPTEMBER 15, 2004
TAPE RECORDING AND OTHER EVIDENCE**

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorneys Rachel E. Hershfang and Peter K. Levitt, hereby files this memorandum in opposition to the motion of Frank Giglio (the "defendant" or "Giglio") to exclude from evidence the September 15, 2004 tape recording and other evidence.

**I.    INTRODUCTION**

On September 15, 2004, CW-6 and Frank Giglio met at the Hardcover Restaurant in Danvers, MA, and had a lengthy conversation in which they reminisced about their prior marijuana trafficking relationship -- with each other, Douglas Bannerman ("Bannerman"), and Karl Brown ("Brown") -- and discussed re-establishing their marijuana trafficking relationship (the "September 15 Meeting").  CW-6 was wearing a recording device and and working as a cooperating witness for the Drug Enforcement Administration ("DEA").  A copy of the draft transcript of the September 15 Meeting is attached hereto as Exhibit A.

The defendant has filed a motion *in limine*, pursuant to FRE 403 and 106, "as well as the Court's general supervisory and discretionary powers," to exclude the entire tape recording on the grounds that a prior meeting between CW-6 and Giglio, on August 20, 2004, was not successfully recorded.  In the alternative, the defendant requests that the Court cut up the September 15, 2004 tape recording until it is unrecognizable by excluding all portions of the tape that relate to (i) Giglio's future marijuana dealing with CW-6, (ii) Giglio's past marijuana dealings with his own customers, and (iii) Giglio's past marijuana dealings with the same parties (which are not explicitly specified as to date on the tape).  For the reasons presented below, the defendant's motion should be denied.

## II.  **THE ANTICIPATED TESTIMONY OF CW-6**

The government anticipates that CW-6 would testify, generally, as follows with respect to his relationship with Giglio and Bannerman.  Shortly after Bannerman was arrested in California in August 2000, and subsequently released on a bracelet, Bannerman asked CW-6 to start servicing Bannerman's marijuana customers, including Giglio, as well as Bannerman himself, and CW-6 started supplying those people with marijuana.[1] It is anticipated that CW-6 would testify that, from this point

---

[1] It is anticipated that CW-6 would testify that he had met Giglio once or twice in the late 1990s or 2000 with Bannerman, with whom CW-6 had a marijuana trafficking relationship.

2

until sometime in 2002, CW-6 was getting between 1,300 and 2,600 pounds of marijuana delivered every 6-8 weeks from Arizona to his home in Rockport, MA.[2]

CW-6's customers, and Bannerman's customers, picked up loads of marijuana at CW-6's Rockport house.  It is anticipated that CW-6 would testify that Giglio picked up marijuana every time there was a load during that year, and that Giglio backed his white van into the garage so that they could load the marijuana into the van.  It is anticipated that CW-6 would further testify that, based on his conversations with Giglio and Bannerman, he knew that Giglio was a customer of Bannerman's, and that Giglio was taking the marijuana for Bannerman, and getting some portion of it for himself.  It is further anticipated that CW-6 would testify that, on one or two occasions in late 2000 or 2001, he went to Giglio's house in the Winter Hill area of Somerville to pick up money for loads of marijuana.[3]

_____

[2] It is anticipated that CW-6 would testify that he usually had two trucks operating during 2001, with approximately 1,300 pounds of marijuana per truck, and that, at some point after about a year, one of his drivers got arrested so he only had one truck making the trip.

[3] This is corroborated by an exchange between CW-6 and Giglio during the September 15 Meeting in which they discuss the fact that, when Bannerman was out of the picture, CW-6 had gone to Giglio's house on Winter Hill in Somerville to pick up money from a marijuana transaction.

CW-6:    I, I remember going to your house once.  I can't figure out . . .

It is further anticipated that CW-6 would testify that, at some point in 2002, there was a shortage of marijuana supply and, for about six months, CW-6 was not selling any marijuana to Bannerman.  It is anticipated that CW-6 would testify that he remained in contact with Bannerman during this time and that Bannerman would periodically ask if CW-6 was able to get any marijuana to sell Bannerman.  It is further anticipated that CW-6 would testify that he resumed supplying marijuana to Bannerman (through Giglio) in Fall 2002, and that they operated in the same

---

GIGLIO:    Yeah, in Somerville, you came over to . . .

CW-6:      And you, that's how you got your name, Winter.  You lived in Winter Hill right?

GIGLIO:    Oh yeah, right, right, yeah.

CW-6:      And I remember going to your house but I can't remember why ah.  Was it pot?

GIGLIO:    Maybe.

CW-6:      Was it money?

GIGLIO:    Yeah you might of picked up money cause he was (unintelligible).

CW-6:      Yeah, yeah, yeah, yeah.  That's what it was.

GIGLIO:    When he was in trouble I ran the business for him.

CW-6:      That's right.  Well you and me.

GIGLIO:    Yeah we ran it, we did.  Yeah we did, we wanted, that's when you came over.

September 15 Meeting at 22.

fashion--i.e., Giglio would pick up the marijuana in his white van at CW-6's Rockport house--and that this lasted until the end of 2003.

## III.  THE SEPTEMBER 15, 2004 RECORDED MEETING

The recorded conversation between CW-6 and Giglio on September 15, 2004, corroborates CW-6's anticipated testimony and demonstrates a common scheme or plan for trafficking marijuana. Specifically, the tape recorded conversation shows that Giglio is a long-time marijuana trafficker, who, for many years, has regularly distributed 100 pound quantities of marijuana to an established customer base consisting of older, wealthy clients with discriminating tastes.  The conversation demonstrates that, for this reason, Giglio purchases, and has historically purchased, only high-quality marijuana.  The conversation further shows that Giglio uses, and has historically used, his legitimate antique business to facilitate his illegal activities.

### A.  THE DEFENDANT'S MOTION TO EXCLUDE THE ENTIRE TAPE

The defendant's motion to exclude the entire tape recording of the September 15, 2004 meeting is supported by neither law, logic, nor common sense.  Giglio attempts to analogize his situation to cases in which tape recordings have been excluded because substantial parts of *the same tape recording* are inaudible.  The theory behind the cases cited by the defendant is that the Court has discretion to exclude a tape recording if it

5

is "so inaudible or unintelligible as to make [it] more misleading than helpful." United States v. Carbone, 798 F.2d 21, 25 (1st Cir.1986). See also United States v. Rengifo, 789 F.2d 975, 978-79 (1st Cir.1986). The September 15, 2004 tape recording is perfectly audible and intelligible. Defendant does not cite a single case in which a tape recording is excluded because a prior conversation was not successfully recorded.

Unlike the cases cited by the defendant, the defendant's motion is not based on the helpfulness (i.e., audibility) of the September 15 tape recording. Rather, the defendant's motion is based on pure speculation about what might have been contained in the August 20 tape recording and how *that tape* might have been helpful to the defense. The defendant's argument is based on the following musings about how the August 20 tape might have been helpful to the defendant.

> [T]he probative value of the September 15, 2004 recording rests on the predicate that the statements made during the conversation are not distorted by statements, representations, or overtures made by CW-6 during the "missing" conversation. Because the government has failed to produce a recording for the August 20th conversation, the defendant has lost the ability to use such a recording to present to the jury the full and exact contours of CW-6's engagement of Giglio in CW-6's efforts to earn his "substantial assistance" reward from the government. Moreover, because the tape has been lost, there is no means to verify that the September 15, 2004 conversation reflects the true nature of the past or (then) present relationship of Giglio and CW-6, rather than a distorted prism initially erected by CW-6 during the first recorded conversation.

6

Deft's Motion at 3.[4]

The defendant offers no evidence that "statements made during the [September 24] conversation are [] distorted by statements, representations, or overtures made by CW-6 during the 'missing' conversation." The natural extension of the defendant's argument is that, whenever the government records one or more conversations involving a CW during an investigation, but does not record all then conversations, then the recorded conversations must be excluded because they may be "distorted by statements, representations, or overtures made by [the CW] during the 'missing' conversation." In any event, the defendant has offered no legal support whatsoever for the notion that a tape recording should be excluded solely because of the possibility that a prior, non-recorded conversation, if recorded, might have cast the recorded conversation in a different light.

The defendant's second point -- that he has lost the ability to present the "full and exact contours of CW-6's engagement of Giglio" to the jury -- again would apply to every case in which a CW is used and all conversations are not recorded. In any event, the argument cuts both ways -- because the tape malfunctioned,

---

[4] The tape recording of the August 20 meeting was not "lost", is not "missing", and the government "failed to produce a recording" of the meeting only in the sense that there was no recording to produce. As is not uncommon during investigations, the tape recorder malfunctioned on August 20, 2004, so there is no audio tape of the meeting.

the government is not able to play an additional tape recorded conversation in which Giglio admits that he is a marijuana trafficker and discusses his past marijuana trafficking business with CW-6 and Bannerman.  It is a truism that, when a tape malfunctions, both sides lose the evidence that would have been on the tape.  This is unfortunate but it is no basis for excluding all of the other, successful tape recordings in the case.

Finally, the defendant's last argument is merely an extension of the first and second.  The September 15, 2004 tape recording is clear and unambiguous; it is plain from the tape that Giglio is a long time marijuana trafficker who has worked in the past with CW-6 and Bannerman.  The bald speculation that the relationship revealed on the September 20 tape is, or may be, a "distorted prism initially erected by CW-6 during the first recorded conversation," may be fodder for cross examination and closing argument by a savvy defense lawyer, but it does not support exclusion of the evidence.

The defendant's far-reaching and creative attempt to exclude the September 15, 2004 tape recording is more indicative of its devastating evidentiary value than any sound legal theory.  There is no basis in law or fact to exclude the September 15 tape recording simply because a previous meeting, a month earlier, was not successfully recorded.  The motion should be denied.

8

**B.    THE DEFENDANT'S MOTION TO EXCLUDE PORTIONS OF THE TAPE**

    **1.    The Legal Landscape**

Giglio's tape recorded statements about future dealings with CW-6, past dealings with his own customers, and past dealings with Bannerman and CW-6 (not tied to specific time period), are admissible because they have "special relevance" to the issues described below, and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  See United States v. Decicco, 370 F.3d 206, 212 (1st Cir.2004) ("We review the admissibility of this type of evidence under a two-pronged test:  first, a court must determine whether the evidence in question has any special relevance exclusive of defendant's character or propensity; and second, notwithstanding its special relevance, whether the evidence meets the standard set forth in Fed.R.Evid. 403.").  See also United States v. Taylor, 284 F.3d 95, 101 (1st Cir.2002)(stating that Rule 404(a) codified the general prohibition against bad acts evidence, but Rule 404(b) allows for the admission of evidence of prior bad acts to prove elements other than propensity).  In this respect, it is immaterial that Giglio's statements reference future events or events that occurred later than the charged crime.  See United States v. Tse, 375 F.3d 148, 155 (1st Cir.2004).  See also United States v. Procopio, 88 F.3cd 21, 29 (1st Cir.1996) ("A later criminal association increases the likelihood of an earlier one--

9

which is all that 'relevance' requires . . . and numerous cases permit such reasoning from a later event or condition to an earlier one.") (citations omitted).

First, Giglio's statements are admissible because they are probative of Giglio's common scheme or plan to distribute high-quality marijuana to older, wealthy customers with discriminating tastes, and to use his legitimate antique business to facilitate this scheme.  See United States v. Decicco, 370 F.3d 206, 212 (1st Cir.2004) (in arson case, reversing district court's exclusion of evidence that defendant was involved in a fire three years earlier because probative of a "common scheme or plan" by the defendant).  See also United States v. Oppon, 863 F.2d 141, 147 (1st Cir.1988) (other act evidence admissible where it was "strikingly similar to the charged offense" and showed that defendant had "a common scheme or plan of falsely identifying himself as a U.S. Citizen in order to obtain employment and employment-related benefits").[5]

Second, Giglio's statements are admissible because they "tend to suggest a criminal association between the alleged conspirators," and thus demonstrate the "background of a relationship, a collaboration among several parties, or a mutual trust between conspirators."  Tse, 375 F.3d at 155.

---

[5] See also United States v. Hadfield, 918 F.2d 987, 994 (1st Cir.1990)(five years between prior bad act and charged act not too long for common scheme or plan).

10

Specifically, as demonstrated below, Giglio's statements about future marijuana deals, and about his marijuana dealing in 2004, help explain the background, formation, and development of the illegal relationship among Giglio, CW-6, and Bannerman.  See United States v. Santana, 342 F.3d 60, 67 (1st Cir.2003) ("it is proper to include evidence of prior bad acts in conspiracy cases if they explain the background, formation, and development of the illegal relationship"); United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir.2000) (admitting evidence of a prior bad act to demonstrate mutual trust between alleged conspirators); United States v. Escobar-de Jesus, 187 F.3d 148, 169 (1st Cir.1999) ("evidence of other bad acts . . . can be admitted to explain the background, formation and development of the illegal relationship . . . and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust") (citations omitted); Procopio, 88 F.3d at 29 (stating that evidence of a subsequent criminal association "was helpful to the government's claim that the two men had collaborated" in a prior robbery).

Giglio's statements are also admissible to show Giglio's knowledge, intent, and opportunity with respect to the charged conspiracy--specifically, to show that Giglio had customers (then and now) who would buy large amounts of high-quality marijuana from him, and to show that he knowingly and intentionally

participated in the conspiracy.  See United States v. Rodriguez, 215 F.3d 110, 119 (1st Cir.2000) ("In particular, the government's evidence must overcome the possibility that a particular defendant's association with criminal co-conspirators was wholly innocent or that, if he was with them at the scene of criminal activity, he was 'merely present,' without guilty knowledge or intent.").  Contrary to the suggestion in the defendant's motion, this is true regardless of whether the defendant raises a defense of lack of knowledge, intent, or opportunity.  See Oppon, 863 F.2d 141, 146 (1st Cir.1988) ("We hold that other acts evidence may be admitted when it is probative of an issue other than character even when the defense is a general denial of the charges.").[6]

Finally, Giglio's statements about future marijuana deals with CW-6, and about his own marijuana dealings, are also admissible on the independent, but related, ground that they are inextricably intertwined with his other statements on the tape about prior marijuana trafficking with CW-6 and Bannerman, which latter statements are intrinsic to the conspiracy.  See United

_____

[6] See also Varoudakis 233 F.3d at 121 (noting that "the fact that the defendant does not contest the issue for which the prior bad act evidence is offered does not, 'by itself, remove those issues from the case,' and stating that "evidence of prior bad acts may be probative even when it is relevant to an issue the defendant does not contest[,]" but excluding the other crime evidence under FRE 403 because its probative value was diminished by the defendant's decision not to contest the issue it addressed).

States v. DeLuna, 763 F.2d 897, 913 (8th Cir.1985) ("Evidence which is probative of the crime charged, and not solely uncharged crimes, is not 'other crimes' evidence.  Further, where the evidence of an act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and Rule 404(b) is not implicated.") (citations omitted).

> **2.   Giglio's Statements about Future Marijuana Trafficking, Trafficking with his Own Customers, and Other Trafficking not Specified by Date**

The following exchange between Giglio and CW-6 is typical of how their discussions of future marijuana trafficking deals is inextricably intertwined with their prior marijuana deals (in this case, they discuss prices by referring back to the prices at which CW-6 was selling to Bannerman).  This exchange is probative of Giglio's common plan or scheme of distributing high quality marijuana to older, wealthy clients with discerning tastes, and it also shows how the statements are inextricably interwined with intrinsic evidence of the conspiracy.

    GIGLIO:    You should like, listen, if I can get something
               that's green, nice smell, smokes good . . .

    CW-6:      Yeah.

    GIGLIO:    I gotta have, a nice bud.

    CW-6:      Right.  Especially . . .

    GIGLIO:    Specially, yeah, especially being that I haven't
               worked so much.  I've given, look I talked to both
               people.  One says "show me what you got," the
               other guy is looking for something right now and
               ya know if the timing is great, I got, I did get a

```
                    couple of things, little things.  I kept them a
                    little busy here and there, um . . .

CW-6:       How's, how's the market, right now?  Just out of
            curiosity.

GIGLIO:     There's not great product out there.

CW-6:       No?  You haven't seen that much or heard about
            anything like (unintelligible)?

GIGLIO:     No, although at the beginning of the Summer there
            was.  And I had gotten my hands on some that was
            real nice.

CW-6:       Beginning of the Summer?

GIGLIO:     Yeah in the beginning of the Summer.  It was like
            this is one Summer that my guy had product cause
            I, I grab a hundred or something that was good.

CW-6:       From him?

GIGLIO:     From another person.

CW-6:       Yeah.  Some guy you used to do business with?

GIGLIO:     Yeah, just somebody, um, I mean I've always had a
            couple things.  I tried to get Dougie[7] to work
            with this one, uh, one of my other friends
            . . .

CW-6:       Yeah.

GIGLIO:     . . . once or twice but the money never worked.
            Ah the price . . .

CW-6:       The price yeah.

GIGLIO:     Yeah.

CW-6:       Oh that's another thing I got to talk about.  I
            mean, numbers ya know what, what price range are
            we, you remember what we, you know what, you know
```

---

[7] CW-6 would testify that they referred to Douglas Bannerman as "Dougie".

14

what I worked with him before on?

GIGLIO:    No I (unintelligible)

CW-6:      Yeah.

GIGLIO:    *I know it's, we talked once when he was in trouble*
           *and I was to do things and that was, in the*
           *twelves or something.*

CW-6:      Yeah, yeah.

GIGLIO:    But anything around thirteen is fine with me, if
           it's a good product.

CW-6:      You won't have a problem with it.

GIGLIO:    Yeah no problem at all in the thirteen range.  As
           long as I get a nice product.  If it's a nice
           product and you feel real good about
           it . . .

CW-6:      Yeah.

GIGLIO:    . . . smokes good.  It's seedy, and if it's hard
           packed . . .

CW-6:      Yeah, you got a problem with it.

GIGLIO:    . . . I can't, I can't . . .

CW-6:      Can't do it.

GIGLIO:    . . . I can't take it.

CW-6:      I won't take it anyway.

GIGLIO:    (unintelligible) you know it just slows everything
           down.

CW-6:      Or if it's brown (unintelligible)

GIGLIO:    If it's, yeah, it's gotta be green, it's gotta
           have a nice bud, nice smell.  But it can't, it has
           to be like you push your finger and it feels like
           a cigar.  Ya know what I mean?  That means those
           buds are beautiful, they're not crushed.  Ya know
           some of these guys fucking, crush it so hard they,

make it like a rock . . . that really ruins what, what . . . I deal with an older crowd.

CW-6:    Do you?

GIGLIO:    I'm not dealing with young kids that smoke (unintelligible).

CW-6:    Yeah.

GIGLIO:    I deal with an older crowd.

CW-6:    Really.

GIGLIO:    They're all my age.  Fiftyish.

CW-6:    Yeah I understand.

GIGLIO:    They got money but they, they want a beautiful product . . . goes like crazy.  My friend is, he'll give me a hundred grand in a minute, if it's a beautiful product, (unintelligible) out of his house, (unintelligible) money, ya know?  Or if I go, if I say it's beautiful he'll give me the money.

CW-6:    (unintelligible) on your word in other words.

GIGLIO:    No (unintelligible), if I say it's good, they'll know it's good, if I (unintelligible)  All my life I'm doing this, you know, since I'm eighteen years old.  That's a long time.

September 15 Meeting at 7-9 (emphasis added).[8]

While much of this exchange concerns future dealings between CW-6 and Giglio, in the middle of the exchange, Giglio reveals his knowledge of the details of the late-2000 through 2003

_____

[8] Giglio also corroborates CW-6's testimony by saying, later in the meeting, that "[w]hen he [Bannerman] was in trouble I ran the business for him."  September 15 Meeting at 22.  After CW-6 corrects him by saying that he and Giglio ran the business together while Bannerman was in trouble, Giglio responds: "Yeah we ran it, we did."

conspiracy with Bannerman and CW-6.  Giglio admits that he talked

with Bannerman when Bannerman was in trouble (i.e., on release on

a bracelet after his August 2000 arrest in Los Angeles), and

Bannerman said he was buying from CW-6 at $1,200 per pound.  Id.

at 8 ("I know it's, we talked once when he was in trouble and I

was to do things and that was, in the twelves or something.").

This, in turn, is the basis for Giglio stating that, going

forward, he has no problem paying in the "thirteen range".[9]

Giglio's statements about his discriminating clientele are

also probative of Giglio's continuing common scheme or plan.

Giglio's statements during the September 15 Meeting support the

inference that distributing high-quality marijuana was, and

continued to be, his modus operandi.

In this respect, CW-6 and Giglio had the following exchange.

GIGLIO:    . . . .  He's, you know, the deal I had with
           Dougie was um, I did a lot of that driving for
           nothing but I did get the pick of the litter.
           (unintelligible) they, they were never . . .

CW-6:      Was that, was that what the deal was, that, that
           basically you would help him out?

GIGLIO:    I used to do, I didn't really, he'd take from me
           but as soon as I brought them back to my
           (unintelligible) . . .

CW-6:      Yeah.

---

[9] Giglio also reveals his knowledge of the conspiracy by asking CW-6 at one point:  "Is Karl working with you still?" September 15 Meeting at 5.  It is anticipated that both CW-6 and Karl Brown will testify that Brown assisted CW-6 in his marijuana business during the years leading up to 2003.

GIGLIO:     I would get to look through, and there was four or
            five really pretty ones, they were mine.

CW-6:       Four or five blocks?

GIGLIO:     Yeah.  Yeah, I used to do a hundred to two
            hundred.

CW-6:       Was that what you were comfortable with?

GIGLIO:     In my prime.  That's what I'd do, normally do, as
            long as they're nice, I mean, sometimes there
            wasn't that many nice ones.  They'd
            (unintelligible) but I used to take a hundred
            'cause that was the nicest.

CW-6:       Right.

GIGLIO:     Cause that's what was (unintelligible) we never
            looked at them real close but there was, they,
            they had a range.  They always had a range if he
            had them.  And if he got four hundred pounds of
            beauties, I still would only get, I'd get a couple
            hundred ya know what I mean?  He'd take the rest.

CW-6:       Okay.

GIGLIO:     But, um, you know, that was the deal, most of the
            time.

CW-6:       What, cause I'm kind of doing a new thing now.
            I'm trying to change everything 'cause obviously,
            you know, I want to change the way I did
            everything.  I'm not working up, out of Rockport
            anymore, um, got rid of that for, for obvious
            reasons, um . . .

GIGLIO:     That was smart.

CW-6:       We would have to work on logistics.  And what
            about, what about money wise.  What did, what did
            you used to do?

GIGLIO:     Well . . .

CW-6:       . . . before?  Can you come up with anything?

18

> GIGLIO:    Yeah usually um, ya know what I'm saying, I did a
>            hundred, I could come up with seventy, eighty
>            thousand the next day.  And the balance within a
>            week or two.  And I'm good for it.  I'm a business
>            man, a family man, and I'm not, you know, you know
>            where I'm at all the time.  I'm not somebody you
>            ever have to worry about.

Id. at 2-3.  Similarly, Giglio and CW-6 had the following

exchange later in the meeting.

> CW-6:     Um, so your motivation behind you helping him
>           [Bannerman] out was that you got to pick out . . .
>
> GIGLIO:   Yeah.  I would get, (unintelligible) he'd give me
>           eighteen pieces or twenty pieces.  I'd get to look
>           at every one, close, with my black light . . .
>
> CW-6:     . . . and pick out . . .
>
> GIGLIO:   . . . in my garage, no better place, and if there
>           were four or five pretty ones, they were mine.
>           And he would take the rest.

Id. at 14.

These exchanges reveal that Giglio was using the same modus

operandi in these prospective dealings as he was in his prior

dealings with CW-6 and Bannerman.  They corroborate his

involvement in the earlier conspiracy by showing a common scheme

or plan for making money in the marijuana business, as well as

corroborating Giglio's earlier sales to the same customers of the

marijuana he got from CW-6.  See Oppon, 863 F.2d at 147 (1st

Cir.1988) (other act evidence admissible where it was "strikingly

similar to the charged offense" and showed that defendant had "a

common scheme or plan of falsely identifying himself as a U.S.

Citizen in order to obtain employment and employment-related

benefits"). See also Tse, 375 F.3d at 155 (other act statements admissible because they "tend to suggest a criminal association between the alleged conspirators," and thus demonstrate the "background of a relationship, a collaboration among several parties, or a mutual trust between conspirators").

The defendant argues that the Court should exclude several of the statements above because, although they clearly relate to the defendant dealing drugs with Bannerman and CW-6, they do not have a "date stamp" on them. For example, the defendant argues that the following statement by Giglio should be excluded: "the deal I had with Dougie [Bannerman] was um, I did a lot of that driving for nothing but I did get the pick of the litter." But the statement "*that* driving" clearly corroborates CW-6's testimony that, during the time period of the conspiracy, Giglio would drive to CW-6's house in Rockport to pick up the marijuana. Moreover, statements regarding *past* deals are admissible for the same reasons that statements about *future* deals are admissible. That is, they are probative of Giglio's common scheme or plan to sell only high-grade marijuana ("the pick of the litter") to customer's with discerning tastes. They also suggest a criminal association between the alleged conspirators and thus demonstrate the "background of a relationship, a collaboration among several parties, or a mutual trust between conspirators." Tse, 375 F.3d

20

at 155.[10]

Similarly, Giglio's statements during the September 15
Meeting about how he uses his legitimate antique business and
"subterfuge" to avoid detection as a marijuana trafficker show a
common scheme or plan consistent with what he was doing during
the time period of the conspiracy.

        CW-6:      That place up there was good.  The reason I liked
                   it was it was so far away, yeah.[11]

        GIGLIO:    Yeah, and I used to do things that he didn't even
                   know I used to do, but I would come one way and
                   leave another, never be the same vehicle going
                   back and forth, you know what I mean?

        CW-6:      And that one time you came up with the, uh,  the
                   bamboo (unintelligible)

        GIGLIO:    That was funny.

        CW-6:      (unintelligible) bamboo trees.

        GIGLIO:    Oh yeah.

        CW-6:      Bamboo trees ah . . .

        GIGLIO:    Yeah anything I can do to, set, that's called
                   subterfuge, you know it looks like one thing's
                   going on . . .[12]

_____

    [10] All of the challenged past statements by Giglio that are
not "date Stamped" are admissible for the same reasons presented
herein as to future statements.

    [11] CW-6 would testify, and it's apparent from the context of
the conversation, that he was referring to his house in Rockport.

    [12] It is anticipated that CW-6 will testify that, on one
occasion during the period late August 2000 through 2003, Giglio
came to pick up marijuana at CW-6's house in Rockport and had
bamboo trees in the back of his van.  CW-6 will further testify
that Giglio told him he bought the trees from a guy in Rockport

```
CW-6:      Yeah . . .

GIGLIO:    . . . and something else is going on.

CW-6:      Right.


GIGLIO:    It's the same thing with my store.  If you, if I
           come and see you and I have the van, nobody is
           suspicious if somebody puts his name on the side
           of the fucking truck.  That's a legitimate
           operation.

CW-6:      That's right.

GIGLIO:    That's, that's ah, that's also, people who are
           looking to find out things are investigators.
           Investigators, when they don't see a name, they
           say: "Now what's going on here."

CW-6:      Right.

GIGLIO:    You know.  That's the first thing in their head --
           "What's going on here?"

CW-6:      Right.

GIGLIO:    'Cause you put your name all over the truck, call
           me, I'm in the furniture business.  They know
           what's going on here, so now it has to be
           somebody's ratted you out but I mean, I'm a
           legitimate business.
```

September 15 Meeting at 18-19.[13]

---

and that Giglio and CW-6 had to move the trees to fit 3-4 boxes
(about 300 pounds) of marijuana into the back of the van.

[13] It is anticipated that Karl Brown will testify that, on
one occasion when Brown loaded marijuana into Giglio's white van
in 2002 or 2003, Brown recalls that the van was full of antiques
and a painting, and Giglio told him that he was in the antique
business.  The government will also introduce into evidence
photographs of Giglio's white van with a sign on the side for
"East West Antiques" and/or "Antiques on Cambridge", as well as
Registry of Motor Vehicles records showing that Giglio first
registered a white, Ford Econoline van for East West Antiques,

Similarly, after offering his antique store, after hours, as a location for CW-6 to show Giglio the marijuana,[14] Giglio makes the following statement demonstrating his common scheme for marijuana trafficking.

> GIGLIO: No one knows about my other life, the dark side of me. Which is what you do.
>
> . . . .
>
> Yeah that's what I call it. 'Cause no one knows. Ya know we live this life, (unintelligible) families, we have a side but ya have to like, you have to be like a, it's like Tony Soprano, ya know you have a, life, kids and family, they love you and everything . . .
>
> . . . .
>
> . . . so in a dark sense . . . it's a secret.

Id. at 29.

Giglio also talks about marijuana purchases he made in 2004, stating that "in the beginning of the Summer" his "guy had product" and Giglio "grab[bed] a hundred or something that was good." Id. at 8. CW-6 asked if Giglio had bought it from "him" (i.e., Bannerman) and Giglio responded that it was from someone else. Id. They then engaged in the following exchange.

_____

1076 Cambridge Street, Cambridge, MA (Gigilo's antique business), in 1991 and maintained that registration through December 2004.

[14] Id. at 23 ("my store is a really big store and I have two loading dock entrances in the back and have the van and my store at six o'clock, it's closed everyone goes home . . . . I have access twenty four seven. . . . So if I need to go look at something.").

```
CW-6:      Yeah.  Some guy you used to do business with?

GIGLIO:    Yeah, just somebody, um, I mean I've always had a
           couple things.  I tried to get Dougie to work with
           this one, uh, one of my other friends
           . . .

CW-6:      Yeah.

GIGLIO:    . . . once or twice but the money never worked.
           Ah the price . . .
```

Id.

This exchange is probative of Giglio's involvement in the charged conspiracy because it helps to explain the relationship of mutual trust between Giglio and Bannerman, and to explain the background, formation and development of the illegal relationship.  See Varoudakis, 233 F.3d at 121; Escobar-de Jesus, 187 F.3d at 169.

Finally, at trial, the defense may seek to impeach the testimony of CW-6 and of Brown, who will identify Giglio as someone who picked up marijuana from CW-6 during the period late 2000 through 2003.  Once the credibility of those witnesses has been called into question, the evidence of Giglio's additional marijuana trafficking is admissible to corroborate the testimony of those witnesses.  See United States v. Figueroa, 976 F.2d 1446, 1454 (1st Cir.1992) (Rule 404(b) permits introduction of evidence for purely corroborative purposes on matters "significant to the government's case"); United States v. Blakely, 942 F.2d 1001, 1019 (5th Cir.1995) (once credibility of

24

government witness had been challenged by defense, 404(b)

evidence to corroborate was admissible); <u>United States v.

Everett</u>, 825 F.2d 658, 660 (2$^d$ Cir.1987) (admitting 404(b)

evidence for corroborative purposes where the corroboration is

"direct and the matter corroborated is significant"). <u>See also

United States v. Pitts</u>, 6 F.3d 1366, 1371 (9th Cir. 1993)

(adopting <u>Everett</u> rule and permitting use of 404(b) evidence to

corroborate government cooperator who had been subject to cross-

examination and offered only direct evidence of defendant's

involvement in the distribution of cocaine).

## C.  **RISK OF UNFAIR PREJUDICE**

Under Rule 403, bad act evidence shall be excluded if "its

probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the

jury, or by considerations of undue delay, waste of time, or

needless presentation of cumulative evidence."  FRE 403.  The

probative value of Giglio's statements about future marijuana

trafficking, and his statements about trafficking marijuana in

2004, are not *substantially* outweighed by the risk of *unfair*

prejudice.  <u>See United States v. Smith</u>, 292 F.3d 90, 99 (1st

Cir.2002) (noting that Rule 403 protects only against unfair

prejudice rather than all prejudice); <u>United States v.

Rodriquez-Estrada</u>, 877 F.2d 153, 156 (1st Cir.1989) ("[A]ll

evidence is meant to be prejudicial; it is only unfair prejudice

25

which must be avoided.").

     With respect to all of Giglio's statements in the September
15 Meeting, the probative value of the statements is strong
because they are so closely linked in time and character to the
charged crime.  See United States v. Rodriquez-Estrada, 877 F.2d
153, 156 (1st Cir.1989) ("When, as in this case, the linked
incident occurs close in time, and is highly relevant to the
charged conduct, the argument for admissibility is powerful");
United States v. Devin, 918 F.2d 280, 288 (1st Cir.1990) ("Put
another way, 'other acts' evidence which is closely bound up with
the crimes charged is eligible for admissibility under Rule
404(b)").  Moreover, given that the evidence is so closely
intertwined with Giglio's statements about his prior dealings
with CW-6, Bannerman, and Brown, which statements are intrinsic
to the charged conspiracy, it is difficult to discern how Giglio
would be any more prejudiced by admission of the forward looking
statements than he is by his retrospective statements.  Cf. Tse,
375 F.3d at 163 ("Usually, courts use the term 'unfair prejudice'
for evidence that invites the jury to render a verdict on an
improper emotional basis.").  See also Varoudakis, 233 F.3d at
122; United States v. Currier, 836 F.2d 11, 18 (1st Cir.1987)
(noting that "unfair prejudice" is prejudice that causes "a jury
to base its decision on something other than the established
proposition in the case") (quoting 1 Weinstein's Evidence §

403[03], 36-39 (1986)).

In any event, the Court can minimize any potential danger of unfair prejudice caused by the admission of this evidence by issuing a limiting jury instruction regarding the proper relevance of the evidence.  The First Circuit has approved the use of such limiting instructions as an appropriate means of protecting a defendant against the possibility that a jury might draw improper conclusions from a defendant's prior bad acts. See, e.g., U.S. v. Garcia, 983 F.2d 1160, 1173 (1st Cir. 1993)("district court handled the prior acts evidence with care, providing the jury with a limiting instruction . . . and again instructing the jury of the scope of prior acts evidence in his final charge"); U.S. v. Nickens, 955 F.2d 112, 125-126 (1st Cir. 1992)("given that the court minimized prejudice to [defendant] by giving clear limiting instructions to the jury, we are satisfied that the district court did not abuse its discretion in admitting the evidence of [defendant's] prior drug conviction.").

**CONCLUSION**

For the foregoing reasons, the defendant's motion in limine should be denied.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:  /s PETER K. LEVITT
                              RACHEL E. HERSHFANG
                              PETER K. LEVITT
                              Assistant U.S. Attorneys

Dated:    October 26, 2005

**UNITED STATES V. FRANK GIGLIO,**
**CR NO. 03-10370 DPW**

EXHIBIT #:          N-439
TYPE:              MEETING (EXCERPT)
LOCATION:          HARDCOVER RESTAURANT, DANVERS, MA
PARTICIPANTS:      FRANK GIGLIO
                   CW-6
                   WAITRESS
DATE:              SEPTEMBER 15, 2004


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


\*       \*       \*       \*       \*


WAITRESS:      Sure.  Are you guys going in the dining room?

CW-6:          No, just gonna hang out and have a few drinks.
               Thank you.  Salud.  So, uh, you're a newlywed huh?

GIGLIO:        Yeah.

CW-6:          You were married before right?

GIGLIO:        I've been married three times.  Four.

CW-6:          Fourth times a charm then.

GIGLIO:        This is the fourth.

CW-6:          Fourth?  Um, anyway I just wanted to, to basically
               let you know I'm getting back, I'm gonna probably
               head down there next week.

GIGLIO:        Ah huh.

CW-6:          And ah, I'm, I'm being told that, ya know, that
               there's product coming up.

GIGLIO:        OK.  Good.

CW-6:       And, ah, I'm hoping, ya know it could be as soon
            as a couple weeks, could be could be anywhere from
            two to four weeks.

GIGLIO:     And I'm around.  I put some feelers out and I
            didn't do that much.

CW-6:       (unintelligible) that much?

GIGLIO:     I did a little bit of something with somebody and
            my friend eh, one of my friends just went the
            other way but I called him up and said "Hey, ya
            know, if it's good product, I'm here at the
            store."  But the other guy is ready to go.  He's,
            you know, the deal I had with Dougie was um, I did
            a lot of that driving for nothing but I did get
            the pick of the litter.  (unintelligible) they,
            they were never . . .

CW-6:       Was that, was that what the deal was, that, that
            basically you would help him out?

GIGLIO:     I used to do, I didn't really, he'd take from me
            but as soon as I brought them back to my
            (unintelligible) . . .

CW-6:       Yeah.

GIGLIO:     I would get to look through, and there was four or
            five really pretty ones, they were mine.

CW-6:       Four or five blocks?

GIGLIO:     Yeah.  Yeah, I used to do a hundred to two
            hundred.

CW-6:       Was that what you were comfortable with?

GIGLIO:     In my prime.  That's what I'd do, normally do, as
            long as they're nice, I mean, sometimes there
            wasn't that many nice one's.  They'd
            (unintelligible) but I used to take a hundred
            cause that was the nicest.

CW-6:       Right.

2

GIGLIO:         Cause that's what was (unintelligible) we never
                looked at them real close but there was, they,
                they had a range.  They always had a range if he
                had them.  And if he got four hundred pounds of
                beauties, I still would only get, I'd get a couple
                hundred ya know what I mean?  He'd take the rest.

CW-6:           Okay.

GIGLIO:         But, um, you know, that was the deal, most of the
                time.

CW-6:           What, cause I'm kind of doing a new thing now.
                I'm trying to change everything cause obviously,
                you know, I want to change the way I did
                everything.  I'm not working up, out of Rockport
                anymore, um, got rid of that for, for obvious
                reasons, um . . .

GIGLIO:         That was smart.

CW-6:           We would have to work on logistics.  And what
                about, what about money wise.  What did, what did
                you used to do?

GIGLIO:         Well . . .

CW-6:           . . . before?  Can you come up with anything?

GIGLIO:         Yeah usually um, ya know what I'm saying, I did a
                hundred, I could come up with seventy, eighty
                thousand the next day.  And the balance within a
                week or two.  And I'm good for it.  I'm a business
                man, a family man, and I'm not, you know, you know
                where I'm at all the time.  I'm not somebody you
                ever have to worry about.

CW-6:           The only problem I have is, I, I kinda have to
                come with something like, like at, at the time.
                Is that possible?

GIGLIO:         Um . . .

CW-6:           At the time of delivery?  Something.

GIGLIO:        Well I'll see if I can come up with half or, you
               know, if I could, you know if I can
               (unintelligible) using a hundred as a number.

CW-6:          Yeah.

GIGLIO:        If I was just able to go somewhere with it I could
               come back with fifty grand, at least, minimum, if
               not more.  I could do that.

CW-6:          Right, what about logistics?  What about um, how,
               you know where, where do you, where are you
               comfortable doing this?  Are you comfortable me
               coming to you or are you comfortable you coming to
               me or, ah.  We have to work out the logistics.

GIGLIO:        Yeah.

CW-6:          I don't really have the same set up I had.

GIGLIO:        You know, that's, that would be important, what
               set up you do have.

CW-6:          Well, I'm gonna be work . . . I'm gonna be working
               on it.

GIGLIO:        Okay.

CW-6:          Alright.

GIGLIO:        Well, so if you have something where, similar to
               what we had in the past, then ah . . .

CW-6:          That's easy for you.  Yeah, easy for you to take a
               ride.

GIGLIO:        If you have another way ah, say you say ah,
               alright, I have ah, four nice pieces in the trunk
               huh, I'll bring you a vehicle . . . .

CW-6:          Yeah.

GIGLIO:        . . . bring me a vehicle, I'll be back quicker
               with it.

CW-6:           Okay.

GIGLIO:         Or I can meet you and switch vehicles.

CW-6:           Right right.

GIGLIO:         And meet you again with money.

CW-6:           Yeah.

GIGLIO:         I'll do that.

CW-6:           Okay.  Alright.

GIGLIO:         Is Karl working with you still?

CW-6:           No, ah, nah he's (unintelligible) actually he's
                working.  In the shop actually.  In a leather
                shop.  (unintelligible) ya know we all took some
                time off so we could go back and earn.

GIGLIO:         Yeah, no, I, I've always had my business.  I, I
                always work hard.  This is always my something on
                the side for me, which is old school.  As long as
                you have something going that's really nice . . .

CW-6:           Absolutely.

GIGLIO:         . . . you could do something out the back door.

CW-6:           Absolutely.

GIGLIO:         And I've always been like that.

CW-6:           Have ya?

GIGLIO:         Yeah, I've always tried to, yeah, I've always
                worked really hard (unintelligible) I've always,
                (unintelligible) Dougie, I jumped to attention as
                soon as he called me.  It's good for you that I
                have the legitimate side of my life that's so
                straight.  The other part is ya got to respect
                that.  I got to go to work in the morning.

CW-6:           Yeah.

5

GIGLIO:        (unintelligible) you know, I could plan a day off
               so you can't call me up on a, on a Sunday night
               and say "tomorrow morning you got to be somewhere
               at eleven o'clock."  You got to be, you know, I
               can't jump like that.  But you'll get to know my
               schedule, I mean, if you know Monday's my day off.
               Monday's always a day that I could do things.

CW-6:          And, and evenings are okay?

GIGLIO:        Evenings are fine.

CW-6:          Your usually busy from nine to . . .

GIGLIO:        I'm busy from seven in the morning . . .

CW-6:          Really?

GIGLIO:        . . . until six.  Yeah, three days a week I work
               really hard.  It starts tomorrow morning at seven
               o'clock I'll be leaving my store with a truck load
               of furniture.  It's loaded right now.

CW-6:          Is it really?

GIGLIO:        Yeah.  And then at ten thirty I open my store.  So
               I deliver things all morning, go for a cup of
               coffee, open the store and then I'm there all day.
               But I, I, I'm, it's my business.

CW-6:          You can get out if you have to?

GIGLIO:        Yeah, if I had to . . .

CW-6:          I'm flexible in terms of time.  I mean evenings
               are okay with me.

GIGLIO:        Yeah even if you said to me, "I need you to you
               know, I'll hook up with you here" and it's, when
               it's in the morning, I can't because I got a
               commitment tomorrow morning to four people to
               deliver furniture.  But if you said, "ya know one
               o'clock can you take lunch and meet for a couple
               hours."  I could do that.

CW-6:       Okay.

GIGLIO:     I could be there.  As long as you say, "you know,
            I want to see you tomorrow, in the afternoon,"
            tell my partner--I got to go.  Occasionally, I'm
            the only one there.  Then I don't, can't leave.
            But that's very seldom.

CW-6:       The only, the only thing I see is that there being
            an issue is ah, is the, is the money that I got.
            You know, I really lost so much, so many losses
            that I really have a hard time giving it up.

GIGLIO:     Yeah.

CW-6:       You know I was hoping that I could get you to
            (unintelligible) come up with some cash.  That's
            kind of what I was hoping.

GIGLIO:     I could if you want me to.

CW-6:       That's the only thing.

GIGLIO:     You should like, listen, if I can get something
            that's green, nice smell, smokes good . . .

CW-6:       Yeah.

GIGLIO:     I gotta have, a nice bud.

CW-6:       Right.  Especially . . .

GIGLIO:     Specially, yeah, especially being that I haven't
            worked so much.  I've given, look I talked to both
            people.  One says "show me what you got," the
            other guy is looking for something right now and
            ya know if the timing is great, I got, I did get a
            couple of things, little things.  I kept them a
            little busy here and there, um . . .

CW-6:       How's, how's the market, right now?  Just out of
            curiosity.

GIGLIO:     There's not great product out there.

CW-6:       No?  You haven't seen that much or heard about
            anything like (unintelligible)?

GIGLIO:     No, although at the beginning of the Summer there
            was.  And I had gotten my hands on some that was
            real nice.

CW-6:       Beginning of the Summer?

GIGLIO:     Yeah in the beginning of the Summer.  It was like
            this is one Summer that my guy had product cause
            I, I grab a hundred or something that was good.

CW-6:       From him?

GIGLIO:     From another person.

CW-6:       Yeah.  Some guy you used to do business with?

GIGLIO:     Yeah, just somebody, um, I mean I've always had a
            couple things.  I tried to get Dougie to work with
            this one, uh, one of my other friends
            . . .

CW-6:       Yeah.

GIGLIO:     . . . once or twice but the money never worked.
            Ah the price . . .

CW-6:       The price yeah.

GIGLIO:     Yeah.

CW-6:       Oh that's another thing I got to talk about.  I
            mean, numbers ya know what, what price range are
            we, you remember what we, you know what, you know
            what I worked with him before on?

GIGLIO:     No I (unintelligible)

CW-6:       Yeah.

GIGLIO:     I know it's, we talked once when he was in trouble
            and I was to do things and that was, in the
            twelve's or something.

CW-6:        Yeah, yeah.

GIGLIO:      But anything around thirteen is fine with me, if
             it's a good product.

CW-6:        You won't have a problem with it.

GIGLIO:      Yeah no problem at all in the thirteen range.  As
             long as I get a nice product.  If it's a nice
             product and you feel real good about
             it . . .

CW-6:        Yeah.

GIGLIO:      . . . smokes good.  It's seedy, and if it's hard
             packed . . .

CW-6:        Yeah, you got a problem with it.

GIGLIO:      . . . I can't, I can't . . .

CW-6:        Can't do it.

GIGLIO:      . . . I can't take it.

CW-6:        I won't take it anyway.

GIGLIO:      (unintelligible) you know it just slows everything
             down.

CW-6:        Or if it's brown (unintelligible)

GIGLIO:      If it's, yeah, it's gotta be green, it's gotta
             have a nice bud, nice smell.  But it can't, it has
             to be like you push your finger and it feels like
             a cigar.  Ya know what I mean?  That means those
             buds are beautiful, there not crushed.  Ya know
             some of these guys fucking, crush it so hard they,
             make it like a rock . . . that really ruins what,
             what . . . I deal with an older crowd.

CW-6:        Do you?

GIGLIO:      I'm not dealing with young kids that smoke
             (unintelligible).

9

CW-6:          Yeah.

GIGLIO:        I deal with an older crowd.

CW-6:          Really.

GIGLIO:        There all my age.  Fiftyish.

CW-6:          Yeah I understand.

GIGLIO:        They got money but they, they want a beautiful
               product . . . goes like crazy.  My friend is,
               he'll give me a hundred grand in a minute, if it's
               a beautiful product, (unintelligible) out of his
               house, (unintelligible) money, ya know?  Or if I
               go, if I say it's beautiful he'll give me the
               money.

CW-6:          (unintelligible) on your word in other words.

GIGLIO:        No (unintelligible), if I say it's good, they'll
               know it's good, if I (unintelligible)  All my life
               I'm doing this, you know, since I'm eighteen years
               old.  That's a long time.

CW-6:          I know.  (unintelligible) did you say you're in
               your fifties?

GIGLIO:        Yeah, fifty five.

CW-6:          Oh.

GIGLIO:        I just turned fifty five.

CW-6:          Wow.  I'm gonna be, turn forty nine next month.

GIGLIO:        Yeah.

CW-6:          Just looking at the beer.

GIGLIO:        Oh this is a great beer.  If you find this on tap,
               drink it.  It's ten times better but it's a
               wonderful beer by Newcastle.

10

CW-6:        Ya Dougie was definitely a trip, because, I always
             get curious as to, you know, how much you were
             doing with him, cause I was doing . . .

GIGLIO:      There were times, you know, he, the people he got
             in trouble with . . . .  This whole thing was out
             in Los Angeles, he never did, he never got bail.
             That's why I really don't know much.  But his
             attorney, or his accountant, I got information
             through him.  The whole case was West Coast
             (unintelligible).  All I could do, he got cut a
             sweet deal, because the Feds do not want any
             disclosure of what was going on.

CW-6:        What'd you mean his first deal?

GIGLIO:      The first time he got, that's why he he walked and
             I told him to use his, you know, two hundred
             thousand dollars and six hundred pounds of pot.
             And you're coming out of jail on a bracelet, and
             then out of jail on travel (unintelligible)
             recognizance.  Be careful with these people will
             ya, there's something going on here, and he said,
             yeah he said yeah J JZ or JD, his lawyer . . .

CW-6:        Yeah.

GIGLIO:      . . . said um, that the prosecutor, the California
             prosecutor said "they're cutting you a deal, they
             don't want any disclosure."  Ya know once you,
             once you . . .

CW-6:        (unintelligible) want a disclosure
             (unintelligible)

GIGLIO:      Once you, if you, if you get, if you accept their
             deal and you take a deal, take a bargain . . .

CW-6:        Yeah.

GIGLIO:      The Feds do not have to bring their case forward.
             So if the case doesn't open up, you don't know
             who's, involved . . .

CW-6:        Ahhh.

11

GIGLIO:         The second you, if everybody, if everybody plea
                bargains . . .

CW-6:           Yeah.

GIGLIO:         . . . they don't have to tell you anything.  They
                don't have to say anything.

CW-6:           So as . . .

GIGLIO:         So the case doesn't open up and they don't really
                know what's going on even though the
                investigation, they don't know who the narc is,
                who, who's the agency and they had undercover
                agents on these people, from somewhere in
                California . . .

CW-6:           Yeah.

GIGLIO:         I'm telling you, you know, the only reason he got
                backers was that product was so good.

CW-6:           I know, he was . . .

GIGLIO:         This was, this was like beautiful product.  He'd
                always talk about these people, the kings, of this
                whole business.

CW-6:           Right.

GIGLIO:         And he spent all these years trying to get back,
                since the trouble happened.  He had this beautiful
                product (unintelligible)

CW-6:           Was it?

GIGLIO:         That was during the Democratic National
                Convention, four years ago.

CW-6:           Out in L.A. right?

GIGLIO:         L.A. that's right.  That's right, and then you
                know it just past this month and um . . .

CW-6:           And he said the product was real good?

GIGLIO:      Yeah it was beautiful and I think this is what he had coming.

CW-6:        Now did you, did you work that part of it?

GIGLIO:      I used to work it for few years until, you know, he couldn't get anymore because of problems.

CW-6:        Right.

GIGLIO:      But um, yeah, it used to, used to come in these foil packages and beautiful packages, gorgeous product.  It was like Californian home grown, manicured.  It was beautiful.  There's nothing as nice as the, that stuff.  But those people were under heavy investigation.  I mean, over the years he told me that, "this guys missing, this guy got killed."  I mean these people took people out and apparently someone's in trouble and stuff like that.

CW-6:        Really.

GIGLIO:      Oh yeah, oh yeah he told me a couple times, he's like, the fucking guy is gone, he's gone.  Wife and kids, gone.

CW-6:        Oh my God.

GIGLIO:      Yeah.  They were, they were heavy, heavy hitters. I don't know if they were from Mexico, from L.A., or San Diego, or whatever, I don't, I don't know anything, I mean, I was just a peon in helping him do his thing.

CW-6:        Right.

GIGLIO:      . . . but, he was tied into some heavy duty people and I know that (unintelligible) he's got, I said, "You got (unintelligible), you got another guy, and stay there, don't, just stay here and let those guys (unintelligible) do the work."  He kept going back there.

CW-6:        Yeah.

GIGLIO:         He, he kept going back there.  He had a . . .

WAITRESS:       (unintelligible) like to order an appetizer?

CW-6:           No but I'll take one more glass of wine and do you
                have bottles of water by chance, small ones?

WAITRESS:       I have Perrier with bubbles and Saratoga, the
                large bottle, without bubbles.

CW-6:           I'll take the Perrier please.

WAITRESS:       Okay.

CW-6:           Thank you.  You want anything else, you all right?

GIGLIO:         I'm all set thanks.

CW-6:           Um, so your motivation behind you helping him out
                was that you got to pick out . . .

GIGLIO:         Yeah.  I would get, (unintelligible) he'd give me
                eighteen pieces or twenty pieces.  I'd get to look
                at every one, close, with my black light . . .

CW-6:           . . . and pick out . . .

GIGLIO:         . . . in my garage, no better place, and if there
                were four or five pretty ones, they were mine.
                And he would take the rest.

CW-6:           Do you, do you, you don't have a place to work
                anymore though?  You got . . .

GIGLIO:         I sold my house.

CW-6:           You did?  Cause you got a little panicky huh?

GIGLIO:         Well you know after that happened with him I
                decided it's time.  But, it also had, had a lot to
                do with Lauren.  It was, you know, Lauren and I
                have had five years of a rocky relationship cause
                of my ex-wife and, uh, and she had a beautiful
                place on, on Commonwealth  Avenue.  So you have
                two of us, we'd go back to our mutual corners and

14

we never really could be committed to this relationship.  So, he got in trouble, and Lauren and I were talking and I said, "Listen Lauren I'll put the house up for sale.  I'll sell my house.  You give up your apartment."  She has a beautiful, she has a fireplace and all on Comm Ave.

\*      \*      \*      \*      \*

CW-6:       Especially the Fall is nice.  Logistics again, ah, I really think, I think something's gonna happen in the next couple of weeks (unintelligible), um, let's say, cause I am gonna end up with more.  I think I could use a thousand.

GIGLIO:     Yeah sure.

CW-6:       Ah, (unintelligible) end up with um, a little bit extra probably.  I don't know if you can use (unintelligible) but I'm end up with a bunch more, um, (unintelligible) if it's good it goes on it's own.

GIGLIO:     Yeah it's good hearing it.  You're not gonna have problems.  What I'm gonna do is, um, um ah, if it's good, I know I'm gonna be able (unintelligible) show my other guy who has been working, but drifted away from me because of me not being able to supply him.

CW-6:       Right.

GIGLIO:     He was the guy that I, I could buy, he'd take two hundred from me.

CW-6:       Okay.

GIGLIO:     He was good.  He has no problems taking some of them.  He's been working so and he has, ya know, he calls me now and then and see how I'm doing or stops in the store to see how I'm doing.  I, I put the feelers out and he says he's been working, it's the same old Summer, it's been nothing great

15

|  |  |
|---|---|
|  | around but he's been working (unintelligible) he's smart, I would be able to call him (unintelligible) |
| CW-6: | Alright.  Um, but in terms of cash, I need to, I need to get a little something, you should, if I kept something you should be able to come up with some cash. |
| GIGLIO: | Okay. |
| CW-6: | That's what I need.  Logistics wise I'll, I'll work out the logistics.  If you don't mind taking a ride.  Up here.  I'll work out the logistics. |
| GIGLIO: | (unintelligible) I don't mind taking a ride (unintelligible) ya know I got a wife and kids and I want to come to a cool situation.  I felt good with you and the other guy and then I was like ya know of course, I, I, I . . . |
| CW-6: | Of course . . . we won't go backwards. |
| GIGLIO: | I've already, I've already ah scoped out your place and I personally go there (unintelligible) I used to give, like, Dougie a report.  I'd say, "you know, place is really cool to me, don't have too many vehicles, uh, too much (unintelligible) ya know, pick-up trucks" and then, you know, says sometimes we used to say, "I have a feeling there's too many vehicles around that house I'm a little worried."  (unintelligible) I'm never, I haven't been in trouble I'm a good person to talk to, right, I have a good sense, common sense, I have ingenuity . . . |
| CW-6: | Yeah. |
| GIGLIO: | . . . I didn't go to college but I have a good sense, and I, I know the ropes. |
| CW-6: | Right. |

GIGLIO:     You know what I mean, I can smell trouble when I
            smell susp . . . ya know, when things, people
            aren't right.

CW-6:       Good.

GIGLIO:     I mean, uh . . .

CW-6:       No there was always (unintelligible)

GIGLIO:     There were years ago when Dougie was a fucking
            total cocaine addict.

CW-6:       I didn't know him back then.

GIGLIO:     I, I saw him one night and I said I can't do any,
            I can't be around this guy.  I'm somebody else.

CW-6:       How long have you known him for?

GIGLIO:     I know him about fifteen years, maybe more.

CW-6:       So you knew him . . .

GIGLIO:     So there was a time when I went to his house with
            another guy who I stole as one of my partners,
            very close friend, he's my age and he's an older
            guy.  He took me to Dougie's some years ago to ah,
            to buy some pot (unintelligible) go into the
            apartment (unintelligible)

CW-6:       He was messed up?

GIGLIO:     (unintelligible)

CW-6:       I've heard a lot of stories about him, cause I met
            him after that . . .

GIGLIO:     He's been straight a long time.

CW-6:       He's been straight a long time.

GIGLIO:     Yeah.

17

CW-6:          But I heard the people that introduced me to him
               told me he used to be a nut case

GIGLIO:        Yeah, he was nut case.

CW-6:          Well, Doug used to tell me he was a nut case.

GIGLIO:        Yeah, no, he was like, I would not be around him.
               I will not be around people who aren't level
               headed, you know, I'm not an alcoholic, I'm not a
               druggie, I'm not a gambler, I'm not a, ya know,
               I'm a conservative person, but I know this
               business, since I'm a teenager, I know this
               business.  I'm from Brooklyn, New York, I know
               this business, you know.  I know, I look people in
               their eyes, and I know what's good or bad going on
               here.

CW-6:          Oh, without question.

GIGLIO:        Yeah.  So . . .

CW-6:          You have to, you have to have it.

GIGLIO:        Yeah, you gotta.  But I'm good with, you know,
               doing that, with you, you know, ah . . .

CW-6:          That place up there was good.  The reason I liked
               it was it was so far away, yeah.

GIGLIO:        Yeah, and I used to do things that he didn't even
               know I used to do, but I would come one way and
               leave another, never be the same vehicle going
               back and forth, you know what I mean?

CW-6:          And that one time you came up with the, uh,  the
               bamboo (unintelligible)

GIGLIO:        That was funny.

CW-6:          (unintelligible) bamboo trees.

GIGLIO:        Oh yeah.

CW-6:          Bamboo trees ah . . .

18

GIGLIO:          Yeah anything I can do to, set, that's called
                 subterfuge, you know it looks like one thing's
                 going on . . .

CW-6:            Yeah . . .

GIGLIO:          . . . and something else is going on.

CW-6:            Right.

GIGLIO:          It's the same thing with my store.  If you, if I
                 come and see you and I have the van, nobody is
                 suspicious if somebody puts his name on the side
                 of the fucking truck.  That's a legitimate
                 operation.

CW-6:            That's right.

GIGLIO:          That's, that's ah, that's also, people who are
                 looking to find out things are investigators.
                 Investigators, when they don't see a name, they
                 say: "Now what's going on here."

CW-6:            Right.

GIGLIO:          You know.  That's the first thing in their head --
                 "What's going on here?"

CW-6:            Right.

GIGLIO:          Cause you put your name all over the truck, call
                 me, I'm in the furniture business.  They know
                 what's going on here, so now it has to be
                 somebody's ratted you out but I mean, I'm a
                 legitimate business.

CW-6:            No that's a good business.

GIGLIO:          I mean, I'm a strict legitimate business and I,
                 you know.

CW-6:            No, that's why whenever we do (unintelligible)
                 escort (unintelligible) house, ah um, or it could
                 be the vehicle thing, where I give you a vehicle.

|          | Whatever it be it'll be, it'll look like legitimate business. |
|----------|-------------------------------------------------------------|
| GIGLIO:  | Yeah. |
| CW-6:    | But just give me a chance to work it out.  I haven't, (unintelligible) I haven't, but whatever I do it will be a . . . |
| GIGLIO:  | I'm happy your calling and ah (unintelligible) and ah . . . |
| CW-6:    | We'll work it out. |
| GIGLIO:  | And I know we don't have any heat from him.  I know that, that's all out there. |
| CW-6:    | (unintelligible)? |
| GIGLIO:  | Yeah, yeah, especially now that's it's been this long, I mean he never got bailed out because (unintelligible).  Other people who are little people did get bailed out, were around, but they shipped him right out to California.  He never got bail.  So it's all (unintelligible) one investigation out there.  And no, no, nobody, nothing ever, I was never approached or talked to by anybody, even . . . |
| CW-6:    | And he kept you um (unintelligible) |
| GIGLIO:  | I didn't know any of his friends.  I went to him, his, his, girlfriend Karen, the Chinese girl. |
| CW-6:    | I met her once. |
| GIGLIO:  | Yeah well I met her occasionally but never really, I never went to his house over there, but she bought a house in Newton and, ah, they had a house warming party.  And I went there and he introduced me to some of his friends who I know were his friends that he might have done business with, but he was always like, "I got that beautiful armoire from Frank and he's got an antique business."  My girlfriend came with me, |

20

```
                    total, ya know, I'm not sitting next to him like
                    his buddy in the pot business, you know?

CW-6:               Right.

GIGLIO:             But huh, you know, we kept it that way.  I never
                    even went over, I never go to his house at the
                    Prudential, never.  I never called there.  We have
                    mutual friends "what's his num, what's his
                    number?" (unintelligible) you better call him, I
                    don't know.  You know you can't figure that one
                    out, you know what I mean, I don't know.

CW-6:               He was real, really, I was gonna say bad, but he
                    was really good in that regard.  He, um, he
                    didn't, whatever, remember he told you before
                    about the telephone.

GIGLIO:             Yeah.

CW-6:               Like whenever ah, he would change phones every
                    thirty days and I wouldn't even have a number for
                    him sometimes.

GIGLIO:             Yeah.

CW-6:               I'd have to wait for him to get his new number.

GIGLIO:             Yeah I know that's what pissed me off too,
                    sometimes, but it was good and he'd get rid of
                    phones and ah, and, and never if he had to meet me
                    in town, he lived, he lived right near the
                    Prudential and he's say meet me at Starbuck's,
                    meet me at Aubonpan, or meet me over around the
                    corner at the Cap.

CW-6:               Right.

GIGLIO:             Ya know, he'd have names for the, for the
                    restaurants and they were like popular places.  We
                    bumped into you at the Cap

CW-6:               I know.
```

GIGLIO:        Maybe he called it the Cap . . . or he'd say, "ya
               know down from Sonsie" or (unintelligible).

CW-6:          Right.

GIGLIO:        You know, "met me there, alright."  And then we'd
               go in my car, take a drive and talk business.

CW-6:          I, I remember going to your house once.  I can't
               figure out . . .

GIGLIO:        Yeah, in Somerville, you came over to . . .

CW-6:          And you, that's how you got your name, Winter.
               You lived in Winter Hill right?

GIGLIO:        Oh yeah, right, right, yeah.

CW-6:          And I remember going to your house but I can't
               remember why ah.  Was it pot?

GIGLIO:        Maybe.

CW-6:          Was it money?

GIGLIO:        Yeah you might of picked up money cause he was
               (unintelligible).

CW-6:          Yeah, yeah, yeah, yeah.  That's what it was.

GIGLIO:        When he was in trouble I ran the business for him.

CW-6:          That's right.  Well you and me.

GIGLIO:        Yeah we ran it, we did.  Yeah we did, we wanted,
               that's when you came over.

CW-6:          Yeah that's when I came over.  Okay because I was
               trying to figure out (unintelligible).  When you
               told me you sold it I was like (unintelligible)
               that was such a nice place.

GIGLIO:        Yeah it was (unintelligible).  I did real good
               (unintelligible).

CW-6:           (unintelligible) got some place where we could
                work (unintelligible).  You'll figure out
                something.

GIGLIO:         I figure out something.  Um . . .

CW-6:           Stuff I gotta figure out (unintelligible).

GIGLIO:         Yeah.

CW-6:           Alright.

GIGLIO:         You know, I have a, my store is a really big store
                and I have two loading dock entrances in the back
                and I have the van and my store at six o'clock,
                it's closed everyone goes home . . .

CW-6:           Wow.

GIGLIO:         I have access twenty four seven.

CW-6:           OK.

GIGLIO:         So if I need to go look at something, I . . .

CW-6:           I'm just thinking, if I need to bring you
                something and I wanted to get cash back quick, we
                would, unless I have a place, you would have a
                place to do it?

GIGLIO:         Yeah.

CW-6:           Alright.  Okay.  I'm just trying to think of all
                the options ya know.

GIGLIO:         Yeah.

CW-6:           You might have to go downtown somewhere.

GIGLIO:         Yup.  If I, um, if I could see something and know
                that it's nice quality.

CW-6:           (unintelligible)

GIGLIO:         Yeah, I'll go get the money and come back ...

23

CW-6:            Alright.

GIGLIO:          . . . and then grab, you know, how many and then
                 I, I'd owe you some, but I'd . . .

CW-6:            That's alright.

GIGLIO:          (unintelligible)

CW-6:            As long as I know I could get something.

GIGLIO:          Yeah.

CW-6:            (unintelligible)

GIGLIO:          Ya, no, no I'd do it.

CW-6:            At least the beginning, you know, and then
                 afterwards we could . . .

GIGLIO:          Why don't we start with . . . it's a nice product,
                 I'll, I'll come up with the cash.

CW-6:            Alright.  What I think we'll probably do is, um .
                 . .

GIGLIO:          And then I'll get a chance to show it somewhere
                 else and they collect, that guys big money, he'll,
                 he'll buy in.

CW-6:            (unintelligible)

GIGLIO:          He'll buy in.

CW-6:            I'm going down there and look for myself.  I don't
                 trust anybody else as far as making the
                 investment, ya know?

GIGLIO:          Yeah.

CW-6:            I don't trust anybody else.  (unintelligible) see
                 for my own eyes.  If it looks like something
                 worthwhile I invest in it (unintelligible) thats
                 why its so important.  Um . . .

GIGLIO:        Alright.  Well, give me a chance to get started
               with you ya know ah . . .

CW-6:          Alright.

GIGLIO:        I'm a good worker.  I mean I'm in a stalled
               situation so you got understand that.  We got to
               make it start somehow because I haven't been
               working that much.  I worked in the beginning of
               the Summer, I worked ah, once around Christmas or
               New Years but after he got in trouble, I didn't
               work in like six months.

CW-6:          Yeah, it's been, been a long haul.  Almost, almost
               a year.

GIGLIO:        Yeah it's almost a year.  October's a year.  Late
               October.

CW-6:          Since he got in trouble?

GIGLIO:        Yup.

CW-6:          Time flies doesn't it?

GIGLIO:        Ya know I was on Newbury Street the other day,
               with my kids, and it's like, well, not seeing him
               at Sonsie, I mean he hung there, around there,
               just in the afternoons but on Sunday
               (unintelligible) actually, (unintelligible) and I,
               I was just reminiscing, ya know just sitting down
               there, having a water or a ginger ale at Sonsie
               and all the time I'd meet him at these bars, you
               know, he was a good influence, I mean I don't
               drink a lot so I would go and not drink, but we'd
               go hang out.

CW-6:          (unintelligible) he was never a (unintelligible)
               have a cigar until they stopped smoking . . .

GIGLIO:        That's the only bad influence.

CW-6:          So yeah but (unintelligible).

GIGLIO:        Yeah and it's not so bad to smoke a cigar.

CW-6:        (unintelligible) the cigar smoke.

GIGLIO:      Oh yeah cause it was the only thing he could do.

CW-6:        Yeah he wasn't, and coffee.

GIGLIO:      And coffee, yeah right.

CW-6:        He liked his coffee.

GIGLIO:      We always met at the coffee shop.

CW-6:        (unintelligible) coffee shop downtown, cause he wanted to look at the girls.

GIGLIO:      Yeah.

CW-6:        You know what, we'll take the check (unintelligible).  Um, I'm thinking about, I'm gonna try and make it back up like around the twenty fourth, something like that, um, so I'll report back to you at that point, okay?

GIGLIO:      And you can call me on the cell phone . . .

CW-6:        Yup.

GIGLIO:      . . . call me on the store phone because there's seven roaming numbers there (unintelligible)

CW-6:        Two three four zero, zero . . .

GIGLIO:      Zero one, yeah, six one seven two three zero. Because that's, we have seven lines, so you (unintelligible) that number it goes to one of the numbers, its OK, I'm always there and Tuesday through Saturday, eleven to six, in case you need to find me there.

CW-6:        Okay.

GIGLIO:      And you can talk about furniture and you can say, "Franko, I'm looking for Frank, ah din, dining room set I want to see." (unintelligible) you know . . .

26

CW-6:           Yeah.

GIGLIO:         . . . looking for a really nice, high end dining
                room set, I got one (unintelligible) I got two.

CW-6:           Okay and then we can ah, we'll leave it at that.

GIGLIO:         We'll leave it at that.

CW-6:           (unintelligible) I'll call ya in a couple weeks.
                (unintelligible) and I'll um, we'll probably get
                together again, chit chat, and then,
                (unintelligible) work out the logistics.


                        *     *     *     *     *

CW-6:           Just get me five back, we'll be fine.  So what
                else is going on?  How's the ah, furniture
                business?

GIGLIO:         It's good.  I'm good.  I'm having a great month
                this month.  August was good for me.  And
                September's good for me.

CW-6:           I was . . .

GIGLIO:         There's two sides to my business, ya know, it's
                selling and buying.  I just bought two houses,
                estates, two clean outs, two big houses, one in ah
                West Roxbury . . .

CW-6:           And how do you get those, auction?

GIGLIO:         I've had an ad in the yellow pages for twenty two
                years.  No, I don't go to auctions.

CW-6:           How do you get them?  They call you?

GIGLIO:         People call me up selling things.  That ad in the
                yellow pages is not for people looking to buy
                furniture.

WAITRESS:       Thank you so much.


                                27

CW-6:           Thank you.

WAITRESS:       Have a nice night.

GIGLIO:         It's for, selling (unintelligible)

CW-6:           If there's somebody, if there some guy, or
                whatever has an estate.

GIGLIO:         Right, right.

CW-6:           (unintelligible)

GIGLIO:         Yeah.

CW-6:           They call you.

GIGLIO:         (unintelligible) the Yellow Pages.  And then
                there's a lot, ya know, I'm in this business
                twenty two years, so, ya know, one
                (unintelligible) West Roxbury somebody said, gave
                my name, said "call this guy he'll take good care
                of ya."  And that's something that takes years to
                get that, that, rapport with people.

CW-6:           Now do you buy, newer, old?

GIGLIO:         No I only buy old.  I don't buy nothing new used.
                But, if it was made in the seventies and it was
                artisan made, Vermont cherry dining room set made
                by this little guy in his shop, I'd buy it.
                That's good stuff.

CW-6:           Would you spend a lot of time going out looking?

GIGLIO:         I (unintelligible) go to (unintelligible) I don't
                go to the auctions.  I used to do the auctions and
                that's how (unintelligible) day and night.  I'm in
                the, I'm in the Co-op business.  I'm, I'm at work
                every day.

CW-6:           Right.

GIGLIO:         So I can't work at night to.  I can't go can't go
                (unintelligible) these to auctions and things

28

. . .

CW-6:        There you go.  So you do house calls?

GIGLIO:      Yeah I do house calls.  That's how I get my stuff.
             My wife thinks I'm doing a house call in Peabody
             and one in Lynnfield.  I don't go to re-auctions.

CW-6:        You have to look at, my point is you have to go
             out and look at something before you say whether
             or not your going to buy it or . . .

GIGLIO:      Oh yeah, I got to go to, I, even now, I get a lot
             of calls.  I weed them out.  The one's I want to
             go on.  I got some questions I got to ask and then
             ya know if it's the right thing and I specialize
             in certain stuff, it's, it's  quality stuff,
             (unintelligible) get it.

CW-6:        Your showroom was impressive.

GIGLIO:      And then I have another guy who does the auctions
             and everything.  He's called a (unintelligible).
             One guy kind of knows the business and knows what
             I like.  And he goes to all the auctions.  He's
             divorced, doesn't have anyone to come home to
             . . .  Ya know those guys work day and night.

CW-6:        Alright bud.

GIGLIO:      No one knows about my other life, the dark side of
             me.  Which is what you do.

CW-6:        (unintelligible)

GIGLIO:      Yeah that's what I call it.  Cause no one knows.
             Ya know we live this life, (unintelligible)
             families, we have a side but ya have to like, you
             have to be like a, it's like Tony Soprano, ya know
             you have a, life, kids and family, they love you
             and
             everything . . .

CW-6:        Yeah.

29

GIGLIO:        . . . so in a dark sense . . . it's a secret.

CW-6:          It is.

GIGLIO:        (unintelligible)  That's not good.  Ya know, if
               you have to, if you have to spend your money
               renting office, say "honey I'm going to work."
               You go to that office and you, ya know . . .
               exactly . . .

CW-6:          Alright.

GIGLIO:        (unintelligible) spend (unintelligible) money
               (unintelligible) I like to work (unintelligible)
               It's good but I like to go to work.  I go to my
               store in the morning.  (unintelligible)

CW-6:          (unintelligible)

GIGLIO:        Yes.  (unintelligible) that's perfect, that's the
               time I'm not there and (unintelligible) for
               delivering furniture and doing what I do.

CW-6:          Yeah (unintelligible)

GIGLIO:        (unintelligible)

CW-6:          Alright buddy.

GIGLIO:        Where are you?

CW-6:          Right here.  Where are you?

GIGLIO:        Down (unintelligible)

CW-6:          (unintelligible) Alright have a safe trip back.
               Look at that.  We're right beside each other.